## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **WIGBERTO LUGO-MENDER as the duly appointed Trustee in the liquidation of EURO PACIFIC INTERNATIONAL BANK, INC.** | CASE NO.: |
| *Plaintiff,* | |
| vs. | |
| **QENTA, INC.; PETER D. SCHIFF; BRENT DE JONG; ABC INSURANCE COMPANY; XYZ INSURANCE COMPANY; and DEFENDANTS A and B.** | VIOLATION OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. § 1, *et. seq.;* VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §1962; DECLARATORY JUDGMENT; REQUEST FOR PROVISIONAL REMEDIES PURSUANT TO THE PUERTO RICO RULES OF CIVIL PROCEDURE; DEMAND FOR TRIAL BY JURY |
| *Defendants,* | |
| **EURO PACIFIC FUNDS SCC LTD.; EURO PACIFIC SECURITIES, INC.; EURO PACIFIC CARD SERVICES LTD. AND GLOBAL CORPORATE STAFFING LTD.** | |
| *Parties in Interest.* | |

## VERIFIED COMPLAINT

**COMES NOW, Wigberto Lugo-Mender,** in his capacity as the duly appointed Trustee in the liquidation of **Euro Pacific International Bank, Inc.**, through its undersigned counsel, and very respectfully STATES, ALLEGES and PRAYS:

### INTRODUCTION

This case arises from a calculated scheme by Qenta, Inc., its affiliates, and Peter D. Schiff --the sole shareholder of Euro Pacific International Bank, Inc.-- to misappropriate nearly

$50 million in assets belonging to the bank's customers. Disguised as a good-faith effort to assume and service customer accounts through a *Purchase and Assumption Agreement*, Defendants instead orchestrated a campaign of coordinated deception intended to lull customers into believing their assets were safe, while systematically stripping them of control over those assets.  The facts summarized herein are set forth in detail in the *Declaration of Wigberto Lugo-Mender* (the "Trustee Declaration"), submitted as part of this *Verified Complaint*.  See, **Addendum**.  The Trustee Declaration describes, under oath and based on personal knowledge and extensive investigation, the Defendants' scheme and its impact on EPIB's customers.

As part of the OCIF-ordered liquidation of Euro Pacific International Bank, Inc., customers were given the option to either remain within the liquidation process ("opt-out" customers) or transfer their assets to Qenta, Inc. under the *Purchase and Assumption Agreement* ("opt-in" customers). Those who opted out continued to be fully protected by OCIF's liquidation framework and remain entitled to have their claims resolved in the ordinary course of the Trustee's liquidation process. In stark contrast, the "opt-in" customers, who were misled by Defendants into believing their assets would be safe with Qenta, Inc., have been instead deprived of their property.  It is these "opt-in" customers, holding tens of millions of dollars in deposits, securities, and precious metals, who have been left exposed and defrauded by Defendants' scheme.

From September 2022 through mid-2025, Defendants, in joint agreement and with the intent to defraud, issued a steady stream of communications to "opt-in" customers, reassuring them that the migration of their accounts and investments was underway. These updates,

frequent and coordinated, were presented as evidence of progress but were, in reality, false assurances intended to conceal Defendants' true objective: to gain unfettered access to and control of customer cash, securities, and precious metals. Schiff, leveraging his position as Euro Pacific International Bank, Inc.'s sole shareholder and public face, lent credibility to Qenta's narrative and knowingly furthered the scheme, while ignoring all fiduciary duty to the entities' customers.

By July 2025, Defendants had taken control of approximately $50 million in customer assets --including more than $25 million in precious metals expressly designated as customer property-- and then unilaterally terminated the *Purchase and Assumption Agreement*, proposing to return only a portion of the assets after self-serving deductions. Today, most of those assets have vanished. Customers have been left without access to their property and have been deceived by Defendants into believing that they can bring claims against the liquidating entity for the value of the missing assets, when the same Defendants have deprived the Trustee of essential client information needed to fulfill any liquidation mandate. Defendants continue to evade accountability while instead resorting to deceitful information to conceal fraudulent endeavors *vis a vis* these assets.

The Trustee, appointed by the Puerto Rico Office of the Commissioner of Financial Institutions, brings this action because his statutory and fiduciary duty requires it. He is charged with preserving and recovering customer assets in an orderly liquidation process. His duty is to the entity and its customers, not the Defendants. Defendants' misconduct has not only violated federal law --including the Racketeer Influenced and Corrupt Organizations Act as well as the Commodity Exchange Act-- but also directly undermined the OCIF-ordered

liquidation. Unless this Court intervenes, Defendants' scheme will succeed in permanently depriving customers of their property and obstructing the Trustee's ability to perform his mandate.  As described in the Trustee Declaration, the Defendants' actions have been documented through financial records, customer communications, regulatory filings, and the Trustee's direct oversight of the liquidation process, all of which confirm the urgent need for relief.

Through this action, the Trustee seeks treble damages, declaratory relief, and urgent provisional remedies to prevent further dissipation of assets and to ensure that Defendants are held accountable for their fraudulent enterprise. The urgency of this matter cannot be overstated: the longer Defendants' scheme goes unchecked, the greater the risk that customers' assets will remain beyond recovery.

## THE PARTIES

1.      **Wigberto Lugo Mender, Esq., CPA** (hereinafter "Lugo-Mender") is duly appointed Trustee in the liquidation of **Euro Pacific International Bank, Inc.** (hereinafter "EPIB"), with its principal place of business located in Centro Internacional de Mercadeo, Road 165, Tower I, Suite 501, Guaynabo, Puerto Rico.   EPIB was, in turn, a Puerto Rico International Financial Entity ("IFE") licensed by the Office of Commissioner of Financial Institutions for Puerto Rico ("OCIF" in its Spanish Acronym) to offer financial services to non-residents of Puerto Rico.

2.      **Qenta Inc**., a corporation formed under the laws of the State of Delaware, with principal place of business in 777 Post Oak Blvd. #430, Houston, Texas 77056.

3.      **Brent de Jong**, Chairman, CEO, owner, shareholder, and responsible officer of Qenta Inc., and the now-cancelled entities G-Commerce DMCC, and Responsible Gold Trading DMCC, with offices located in 777 Post Oak Blvd. #430, Houston, Texas 77056, or in a jurisdiction other than Puerto Rico.

4.      **Peter D. Schiff**, sole shareholder and responsible officer of Euro Pacific International Bank, Inc., and resides in 22 Dorado Beach Estates, Dorado, Puerto Rico 00646.

5.      Defendants **ABC Insurance Company** and **XYZ Insurance Company** are the insurance carriers who may have furnished liability insurance coverage to those defendants individually named in the instant complaint, and who may be liable to satisfy any losses related to the claims set forth herein, to pay all or part of a possible judgment entered in the instant action or to identify or reimburse for payments made to satisfy any judgment.  Since discovery has not commenced, Plaintiff is not able to confirm the identities of all insurance carriers for the defendants or whether such parties may need to be brought into this action.

6.      **Defendants A** and **B** are undetermined co-defendants of unknown names who may also be liable to Plaintiff. Once known, Plaintiff will explore amending its Complaint accordingly.

7.      **Euro Pacific Funds SCC Ltd.**, **Euro Pacific Securities, Inc.**, **Euro Pacific Card Services Ltd**. and **Global Corporate Staffing Ltd.** are subsidiaries of EPIB and are joined as "Parties in Interests" to the instant litigation, inasmuch as some of the assets which the Plaintiffs mismanaged, and now the customers seek to recover from the Trustee in the instant action, may have been under the custody of some of these entities, and later disposed of by the named Defendants. At all times relevant to the bank's liquidation process the

shareholder and responsible officer of these EPIB subsidiaries is co-defendant **Peter D. Schiff**, who resides in 22 Dorado Beach Estates, Dorado, Puerto Rico 00646.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331, as this case involves claims arising under federal law, specifically the Racketeer Influenced and Corrupt Organizations Act ("RICO").

9.      Jurisdiction is also proper pursuant to 18 U.S.C. § 1964(c), which provides for civil remedies for violations of RICO.

10.      The venue is proper under 28 U.S.C. §1391(a) and (b) since Plaintiff is a resident of this district, the events giving rise to the claim occurred in this district, and the Defendants have engaged in activities that have caused harm in this district.

## FACTS APPLICABLE TO THE CLAIMS FOR RELIEF

11.      On June 30, 2022, OCIF issued an Administrative Complaint and Order to Cease and Desist ("Querella y Orden de Cese y Desista") against EPIB, whose sole shareholder was Peter D. Schiff.  See, **Addendum**.

12.      This enforcement action was based on EPIB's failure to meet capital requirements under Article 2(g) of *The Internation Financial Center Regulatory Act*, Act 273-2012, P.R. Laws Ann. §3081, *et. seq.*, its noncompliance with the Consent Order dated October 28, 2021, and concerns over the bank's overall solvency and ongoing licensing status.

13.      On August 9, 2022, OCIF and EPIB entered a Consent Order for Liquidation and Dissolution, where EPIB agreed to surrender its IFE license and liquidate operations.

14.    Pursuant to this Consent Order, Lugo-Mender was appointed as Trustee for the liquidation of EPIB.

15.    On September 1, 2022, EPIB submitted its Voluntary Liquidation Plan (hereinafter the "Liquidation Plan"), prepared by Schiff himself, which established the framework for the EPIB liquidation process.

16.    An essential component of the Liquidation Plan was a transaction involving Qenta Inc. and its now-cancelled Dubai subsidiaries, G-Commerce DMCC and Responsible Gold Trading DMCC (collectively referred to as "Qenta").

17.    On September 8, 2022, Qenta was publicly identified by Schiff as the acquiring entity through a signed welcome letter issued by its Chairman and CEO, Brent de Jong, and Managing Director, Mariame McIntosh. Throughout the whole negotiations process leading to this Voluntary Plan of Liquidation, Schiff represented this entity as the best alternative available to manage and resolve this process for the benefit of the bank's customers in an efficient and transparent process.

18.    As part of the liquidation process, customers were required to elect whether to "opt out" and remain within the OCIF-supervised liquidation of EPIB, or to "opt in" by transferring their accounts and assets to Qenta pursuant to the *Purchase and Assumption Agreement* (the "PAA") to be executed by Schiff and Qenta.  The Trustee Declaration provides additional details on the notice process, the number of customers electing to opt out, and the approximately $18.5 million wired to close those accounts. See, **Addendum**.

19.    In this letter, Qenta described itself as a "global financial technology company," headquartered in Texas and operating through regulated subsidiaries in Dubai.

20.    Qenta assured EPIB future "op in" clients of continued access to their deposits, precious metals, brokerage accounts, and mutual funds following the corresponding account migration from EPIB to Qenta.

21.    The distinction between these groups is critical. "Opt-out" customers retained the protections of the OCIF liquidation plan, their claims being processed by the Trustee under the supervision of Puerto Rico's banking regulator. "Opt-in" customers, however, were effectively diverted outside the liquidation process and placed at the mercy of Defendants, who promised continuity of service and asset security under Qenta's control.

22.    On September 30, 2022, the PAA was executed between EPIB (represented by Schiff) and Qenta.

23.    Under the PAA, Qenta agreed to assume certain EPIB's deposit obligations, both cash and precious metals, ensuring that "opt-in clients" would have access to their assets following the transfer.

24.    The execution of the PAA triggered an initial payment of $500,000 by Qenta, with an additional $750,000 due 30 days thereafter.

25.    As part of the PAA, Qenta assumed control of EPIB's liquidated assets and, through its acquisition of the EPIB subsidiaries named herein as "Parties in Interests," it also acquired customer-owned precious metals, mutual funds, and FX positions.

26.    According to EPIB's internal reporting dated June 30, 2022, the bank held custody of customer gold holdings totaling 11,244.29 ounces, valued at USD $19,333,213.40 and customer silver holdings totaling 321,885.76 ounces, valued at USD $6,127,739.27 at then current market price in client-designated precious metals, This inventory was expressly

marked as client-owned assets.  The Trustee Declaration provides a full reconciliation of these holdings as of June 30, 2022, including supporting exhibits.  See, **Addendum**.

27.    In addition to the precious metals inventory, on account of this transaction, Defendants did receive $20,531,463.90 in customers funds and the value of moneys owed to customers of the other subsidiaries named in this complaint.  Global Corporate Staffing Ltd., a company domiciled in St. Vincent and the Grenadines was, in turn, the operating arm of the bank, at all times handling most of the employees, electronic and banking systems as well as all customers personal information and transactions and accounting records.  At all times relevant hereto and starting upon the appointment of the Trustee and to this date, this entity and the information of the customers has been and remains in control of the named Defendants.

28.    Between September 28 and November 9, 2022, Qenta and Schiff jointly issued a series of repeated written communications to EPIB customers transferred to Qenta, assuring them that the migration of accounts and assets was proceeding and that any delays were temporary. These communications were frequent and continuous, designed to project an image of progress and stability, while in reality no such migration was occurring.  Moreover, these communications were made, for years, through the EPIB website https://europacbank.com/ (which was under the exclusive control of Schiff and/or Qenta), creating a false sense of legitimacy to the information being relayed through this platform.  The Trustee Declaration attaches samples of these communications and describes their effect on customer decision-making.  See, **Addendum**.

29.    These communications instructed customers to take specific actions --such as liquidating mutual fund holdings, validating account details, and submitting wire requests--

under the guise of facilitating the transition to Qenta. In truth, these directives served to strip customers of independent control of their assets and consolidate those assets under Qenta's custody.

30.    In reality, this distinction meant that "opt-in" customers were uniquely vulnerable. While "opt-outs" retained the safeguards of the OCIF process, "opt-ins" were misled into relinquishing those protections and entrusting their assets to Defendants, who subsequently misappropriated or concealed those assets. By creating a false narrative of progress and inevitability, Defendants exploited the trust of "opt-in" customers, diverting them, and their assets, away from the OCIF liquidation process.

31.    By December 5, 2022, Qenta publicly acknowledged that no transfers had been completed. This admission came only after months of misleading updates from both Qenta and Schiff, who knowingly participated in crafting and disseminating false assurances to customers. These communications were not mere administrative errors; they formed part of a coordinated scheme between Schiff and Qenta to create a false narrative of progress and inevitability, inducing customers to forgo independent action while their assets were being misappropriated.

32.    As of the first quarter of 2025, and after almost three years of financial transactions, approximately $20.6 million in subsidiary account assets were transferred to Qenta pursuant to the liquidation framework.  During this period, assets from EPIB and its subsidiaries were commingled, giving clients the impression that all were part of a single pool of assets.

33.     The total value of the estate under the Trustee's administration stood at $47.56 million.  Per the terms of the Joint Order of Liquidation, outstanding obligations to be paid by the Trustee are $18,524,780.60, subject to the filing of claims and approval by OCIF.

34.     On July 11, 2025, Qenta sent a formal notice of termination of the PAA, alleging impossibility of performance, frustration of purpose, and breach of covenant of good faith.

35.     In this termination notice, Qenta proposed returning $38.37 million after various deductions, including a "termination costs" deduction of $4.94 million.  This amount purportedly includes commingled amounts of all customers transferred to them as well as the cash value of the remaining precious metals inventory adjusted to the price value existing as of 2022.  This value is substantially less than the appraised quoted value as of this date.

36.     On July 21, 2025, the Trustee's counsel responded, rejecting Qenta's claims and emphasizing that the assets in question are "customer-owned assets" that cannot be liquidated without customer instructions.

37.     In this context, the letter from the Trustee's counsel unequivocally stated: "no liquidation, transfer, or return of such assets or their value shall be undertaken without the written, individualized direction from each relevant customer."

38.     Upon information and belief, both the funds received by Qenta on account of the PAA and the precious metals inventory pertaining to these customers have disappeared and are no longer available to honor the compromise with customers. Regarding the customers' inventory of silver holdings, and due exclusively to Qenta's own fault, this inventory was never transferred to customers and remains in custody of a third-party custodian.   As further explained in the Trustee Declaration, the Trustee has confirmed that the silver inventory

remains under the custody of a third-party custodian in Singapore, while the customer-owned gold inventory, valued at approximately $18.5 to $20.4 million, has been dissipated or otherwise misappropriated by Defendants.

39.     Schiff, as sole shareholder and officer of EPIB, knowingly facilitated Qenta's assumption of control over these customer assets and continued to lend his personal credibility to Qenta's narrative, thereby furthering the conspiracy to defraud customers.

40.     Although Schiff has more recently claimed to have "lost contact" with Qenta, such claims only underscore his role in the scheme: having actively partnered with Qenta in misleading customers throughout 2022, and up to this date, while he now seeks to distance himself after the disappearance of assets. His conduct demonstrates both knowledge of, and willful participation in, a pattern of fraudulent misrepresentations that caused direct harm to EPIB's customers.

41.     Upon information and belief, either Schiff and/or Qenta, through their control of the EIPB subsidiaries transferred through the PAA, presently maintain exclusive possession and control over the personal identifying information and contact details of EPIB's clients." By withholding this information, Defendants have effectively deprived the Trustee, EPIB customers, and, perhaps more importantly, regulatory agencies of several jurisdictions in charge of monitoring suspicious money laundering activities, of crucial information regarding assets, transactions and claims as part of the OCIF liquidation process. This conduct has obstructed, and continues to obstruct, the orderly liquidation process mandated by OCIF, in effect holding hostage a critical component of that process and preventing customers and other parties in privy from receiving accurate, timely information from the duly appointed Trustee.

The Trustee Declaration details how Defendants' retention of customer records and personal data has obstructed both the liquidation and regulatory oversight functions.  See, **Addendum**.

42.     The assets that have disappeared include approximately $50 million in customer assets, including $25.46 million in client-designated precious metals, $5.87 million in mutual fund positions, and additional funds and securities totaling approximately $18.67 million.

43.     Defendants' unlawful actions further harm those EIPB's "opt-in" customers, who are now attempting to seek redress under the OCIF liquidation plan. The Trustee is forced to attempt to resolve these claims without access to the necessary client information or the assets required to process them, thereby undermining both the customers' rights and the integrity of the ongoing liquidation process.

44.     The Trustee brings this action in his capacity as the duly appointed liquidating trustee of EPIB, pursuant to the Liquidation and Dissolution Order entered by OCIF.

45.     Under the referenced Liquidation Order, the Trustee is vested with authority and responsibility to identify, marshal, and preserve the assets of EPIB, whether belonging to the bank itself or held in custody for the benefit of EPIB's depositors and customers.

46.     The assets wrongfully assumed, controlled, and dissipated by Qenta and the other defendants include customer-designated assets --cash deposits, securities, and precious metals-- that were held by EPIB in a custodial capacity. Although those assets are beneficially owned by the customers, the Trustee has a fiduciary obligation to safeguard such assets during liquidation and to take all necessary measures to preserve and recover them for ultimate distribution to the rightful owners.

47.    The Trustee therefore has both statutory authority under the OCIF Liquidation Order and fiduciary standing to pursue recovery of such assets on behalf of the estate and the customers whose assets were entrusted to EPIB.

48.    The claims asserted herein, including claims under the Commodity Exchange Act, RICO and for declaratory judgment, are directly tied to the Trustee's mandate to preserve, protect, and recover assets for the benefit of EPIB's customers and creditors.

49.    The Trustee therefore has standing to prosecute this action to redress injuries to business and property caused by defendants' wrongful acts, and to obtain declaratory and provisional relief necessary to preserve assets pending final resolution.

**CLAIMS FOR RELIEF**

**COUNT I - VIOLATION OF 7 U.S.C. §1, *et. seq.***
**(AGAINST ALL DEFENDANTS)**

50.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 49 as if fully set forth herein.

51.    The Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1, *et. seq*., prohibits fraud, manipulation, and deceptive devices in connection with transactions in commodities, including precious metals such as gold and silver.

52.    At all times relevant hereto, Defendants, acting individually and in concert, engaged in the fraudulent solicitation, misappropriation, and conversion of commodities and commodity-related assets belonging to EPIB's "opt-in" customers.

53.    Specifically, under the guise of the PAA, Defendants assumed control of customer-designated precious metals, including gold and silver, falsely representing to

customers that their accounts and property would remain secure, accessible, and properly custodied.

54.    These representations were materially false and misleading. Defendants knew, or acted with reckless disregard for the truth, that they did not intend to safeguard the customer-owned commodities, but rather to commingle, dissipate, or otherwise misappropriate such assets for their own benefit.

55.    In furtherance of this scheme, Defendants used interstate and international wires, electronic platforms, and written communications to disseminate false assurances to customers regarding the security, transfer, and future availability of their commodity holdings.

56.    The Trustee has been able to preserve the customers' silver holdings because those assets remain under the custody of a third-party custodian in Singapore, and now outside Defendants' direct control. However, upon information and belief, the customer-owned gold has been lost as a result of Defendants' scheme, with an estimated value of approximately $20,404,046.98.

57.    As a direct and proximate result of Defendants' violations of the CEA, EPIB's customers, and derivatively the Trustee acting in his fiduciary capacity, have suffered actual damages in excess of $20,404,046.98.

58.    Plaintiff, acting on behalf of the affected EPIB's customers, is entitled under the CEA to recover actual damages proximately caused by Defendants' fraudulent acts.

59.    In addition, because Defendants' conduct was willful, intentional, and undertaken with reckless disregard for customer rights, Plaintiff seeks punitive damages as authorized under the CEA, up to twice the amount of actual damages sustained.

60.     Plaintiff also seeks any equitable relief this Court deems appropriate to prevent further violations of the CEA, including but not limited to an accounting, restitution, and injunctive relief to preserve and recover customer-owned commodities.

### COUNT II - VIOLATION OF 18 U.S.C. §1962
### (AGAINST DEFENDANTS QENTA INC. AND BRENT DE JONG)

61.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 60 as if fully set forth herein.

62.     Defendants conducted or participated in the conduct of an enterprise through a pattern of racketeering activity.

63.     Defendant Qenta and Brent de Jong formed an association-in-fact enterprise that had a common purpose, relationships among those associated with the enterprise, and longevity sufficient to permit the associates to pursue the enterprise's purpose.

64.     The enterprise was engaged in, or its activities affected, interstate or foreign commerce, as it involved the transfer and control of assets between entities in Puerto Rico, Texas, and Dubai, as well as other international jurisdictions.

65.     Defendants actively participated in the operation and management of the enterprise by executing the PAA, taking control of EPIB's assets, issuing communications to customers about migration timelines, and ultimately causing the disappearance of customer assets.

66.     Defendants engaged in a pattern of racketeering activity.

67.     From September 2022 to July 2025, Defendants engaged in multiple related acts of racketeering activity that were continuous over this closed period of nearly three years.

68.     Defendants committed multiple acts of wire fraud in violation of.

69.     Defendants used interstate wire communications to issue false and misleading statements to EPIB customers about migration timelines and access to their assets. Specifically, between September 28 and November 9, 2022, defendants issued a series of regular written updates to EPIB customers, informing them of continued operational delays, migration timelines, and shifting opt-out deadlines, while knowing that these commitments would not be fulfilled.

70.     Defendants committed multiple acts of financial institution fraud.

71.     Defendants obtained customer assets under false pretenses by representing that they would assume EPIB's deposit obligations and ensure clients would have access to their assets following the transfer, while knowing that these representations were false or with reckless disregard for their truth.

72.     Plaintiff suffered injury to business or property by reason of defendants' RICO violations.

73.     The Trustee and EPIB customers suffered injury to their business and property in the form of approximately $50 million in lost customer assets, including $25.46 million in client-designated precious metals, $5.87 million in mutual fund positions, and additional funds and securities.

74.     These injuries were directly and proximately caused by Defendants' pattern of racketeering activity, as the disappearance of customer assets was a direct result of Defendants' fraudulent scheme to acquire control of these assets through false representations.

**COUNT III - VIOLATION OF 18 U.S.C. § 1962**
**(AGAINST ALL DEFENDANTS)**

75.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 74 as if fully set forth herein.

76.     Defendants knowingly agreed to facilitate a scheme that included the operation or management of a RICO enterprise through a pattern of racketeering activity.

77.     Defendants Qenta, Brent de Jong, and Peter D. Schiff entered into an agreement as evidenced by the PAA executed on September 30, 2022, and their subsequent coordinated actions.

78.     Each Defendant knew of and agreed to the overall objective of acquiring control of EPIB customer assets through false representations and then misappropriating those assets.

79.     This knowledge and agreement is evidenced by Defendants' coordinated actions, including the execution of the PAA, the series of communications to customers, the transfer of assets to Qenta's control, and the ultimate disappearance of those assets.

80.     Each defendant agreed that members of the conspiracy would commit multiple predicate acts of wire fraud and financial institution fraud to accomplish their objectives.

81.     Specifically, defendants agreed to use interstate wire communications to issue false and misleading statements to EPIB customers and to obtain customer assets under false pretenses.

82.     Plaintiff suffered injury to business or property by reason of Defendants' RICO conspiracy.

83.     The Trustee and EPIB customers suffered injury to their business and property in the form of approximately $50 million in lost customer assets, which was directly and proximately caused by defendants' conspiracy.

## COUNT IV - DECLARATORY JUDGMENT 28 U.S.C. § 2201
## (AGAINST ALL DEFENDANTS)

84.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 70 as if fully set forth herein.

85.     An actual case or controversy exists between the parties having adverse legal interests.

86.     An actual controversy exists between the Trustee and the defendants regarding the ownership, control, and disposition of approximately $50 million in customer assets. This controversy principally concerns the "opt-in" customers, whose assets were diverted to Qenta and away from the OCIF liquidation process, in contrast to the "opt-out" customers, who remain under the protection of the ongoing liquidation framework.

87.     Defendants claim the right to liquidate assets, deduct "termination costs," and retain control of EPIB subsidiaries, while the Trustee maintains that the assets are customer-owned and cannot be liquidated without customer instructions.

88.     This is evidenced by Qenta's July 11, 2025, termination notice proposing to return only a portion of the assets and the Trustee's July 21, 2025, response asserting that the assets are customer-owned.

89.     The controversy is of sufficient immediacy and reality to warrant issuance of a declaratory judgment.

90.     The fact that the assets have allegedly disappeared makes the need for judicial declaration even more urgent, as the parties' rights and obligations with respect to these assets must be determined to facilitate recovery efforts.

91.    The Court possesses an independent basis for jurisdiction over this declaratory judgment action.

92.    The Court has jurisdiction based on the federal RICO claims under 28 U.S.C. § 1331 and.

93.    A judicial declaration is necessary to determine the rights and obligations of the parties with respect to the customer assets, including whether defendants have the right to liquidate assets, deduct "termination costs," or retain control of EPIB subsidiaries.

94.    Plaintiff also seeks a judicial declaration that it, as Trustee: (i) is entitled to full and exclusive authority to administer and distribute assets of EIPB in accordance with the OCIF liquidation process; and, (ii) is authorized to recover, distribute, and/or cause to be returned to EIPB's "opt-in" customers all funds, securities, and other property currently in the possession, custody, or control of Qenta (or its affiliates), including but not limited to precious metals such as silver.

## COUNT V
## REQUEST FOR PROVISIONAL REMEDIES
### (AGAINST DEFENDANTS QENTA INC., RESPONSIBLE GOLD TRADING DMCC, G-COMMERCE DMCC, AND BRENT DE JONG)

95.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 94 as if fully set forth herein.

96.    Rule 64 of the Federal Rules of Civil Procedure provides that the provisional remedy of attachment and garnishment is available in federal court proceedings, and that state law governs the same.

97.     Rules 56 of the Puerto Rico Rules of Civil Procedure provide a plaintiff, such as the Trustee in this case, with a mechanism to secure satisfaction of judgment through attachment or garnishment.  See, 32 P.R. Laws Ann., Ap. V, R. 56.

98.     Pursuant to Rule 64 of the Federal Rules of Civil Procedure and Rule 56 of the Puerto Rico Rules of Civil Procedure, 32 P.R. Laws Ann., Ap. V, R. 56, Plaintiff hereby moves this Honorable Court for an order against Qenta and its Dubai-based affiliates attaching or garnishing all EIPB customer monies and assets, estimated in approximately $50 million, and enjoining and restraining Qenta and its affiliates from alienating or transferring any such monies, assets or interests belonging to EPIB customers.

99.     Plaintiff also requests a temporary restraining order pursuant to Rule 65 of the Federal Rules of Civil Procedure, restraining Defendants, their officers, agents, employees, and all persons acting in concert with them, from selling, transferring, encumbering, dissipating, or otherwise disposing of any assets belonging to EPIB or its customers, including but not limited to precious metals, cash, securities, and other financial instruments, pending the resolution of this action or further order of the Court.

100.     The provisional remedies sought by Plaintiff are necessary to secure satisfaction of the anticipated judgment in the present action, given Qenta's threatened misuse and/or disposition of these assets, in clear detriment of EPIB's "opt in" customers.

## PRAYER FOR RELIEF

Plaintiff incorporates by reference the Trustee Declaration and supporting exhibits, included as the Addendum to the instant *Verified Complaint*, which substantiate the factual allegations and demonstrate the necessity of the relief requested herein.

**WHEREFORE,** Plaintiff hereby prays that the Court enters judgment in its favor and against Defendants as follows:

1.    An award of damages to Plaintiff, including compensatory and punitive damages, as allowed under the Commodity Exchange Act, arising from Defendants' wrongful acts or omissions.

2.    Treble damages against all defendants in the amount of $150 million (three times the approximately $50 million in lost customer assets) pursuant to 18 U.S.C. §1964.

3.    A declaration that the assets in question are customer-owned assets that cannot be liquidated, transferred, or returned without the written, individualized direction from each relevant customer pursuant to 28 U.S.C. §2201.

4.    A declaration that defendants have no right to deduct "termination costs" or other amounts from the customer assets pursuant to 28 U.S.C. §2201.

5.    A declaration that defendants have no right to retain control of EPIB subsidiaries without fulfilling their obligations under the *Purchase and Assumption Agreement* pursuant to 28 U.S.C. §2201.

6.    A declaration that Trustee: (i) is entitled to full and exclusive authority to administer and distribute assets of EIPB in accordance with the OCIF liquidation process; and, (ii) is authorized to recover, distribute, and/or cause to be returned to EIPB's "opt-in" customers all funds, securities, and other property currently in the possession, custody, or control of Qenta (or its affiliates), including but not limited to precious metals such as silver.

7.    An order requiring defendants to provide a full accounting of all customer assets received, transferred, or disposed of, and to preserve any remaining assets pursuant to 28 U.S.C. § 2202.

8.    An order pursuant to Rule 64 of the Federal Rules of Civil Procedure and Rule 56 of the Puerto Rico Rules of Civil Procedure, 32 P.R. Laws Ann., Ap. V, R. 56, attaching or garnishing all EIPB customer monies and assets, estimated in approximately $50 million, and enjoining and restraining Qenta and its affiliates from alienating or transferring any such monies, assets or interests belonging to EPIB customers.

9.    A temporary restraining order pursuant to Rule 65 of the Federal Rules of Civil Procedure, restraining Defendants, their officers, agents, employees, and all persons acting in concert with them, from selling, transferring, encumbering, dissipating, or otherwise disposing of any assets belonging to EPIB or its customers, including but not limited to precious metals, cash, securities, and other financial instruments, pending the resolution of this action or further order of the Court.

10.    Pre-judgment interest on all damages awarded from the date of injury until the date of judgment pursuant to 28 U.S.C. § 1961.

11.    Post-judgment interest on all damages awarded from the date of judgment until payment pursuant to 28 U.S.C. § 1961.

12.    Reasonable attorneys' fees and costs incurred in bringing this action pursuant to 18 U.S.C. § 1964.

13.    Trial by jury; and,

14.    Whatever other relief the Court deems just and proper.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico this 16th day of September 2025

**EDGE Legal, LLC**
252 Ponce de León Ave.
Citibank Tower, Suite 1200
San Juan, Puerto Rico 00918
Tel. (787) 522-2000
Fax (787)522-2010


*S/Eyck O. Lugo*
EYCK O. LUGO, ESQ.
USDN 216708
E-mail: *elugo@edgelegal.com*