Case 3:25-cv-01501-PAD-GLS    Document 14-1    Filed 09/29/25    Page 1 of 135

At the IAS Term Part LSJ of the New York State Supreme Court in Westchester County at the Courthouse at 111 Dr. Martin Luther King, Jr. Blvd. White Plains on August 1, 2025

Present: Hon. Linda S. Jamieson, J.S.C.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

-----------------------------------------------------------------X

PETER SCHIFF,                                                        Index No.: 67774/2025

           Petitioner,

     - against -

QENTA INC., RESPONSIBLE GOLD TRADING DMCC,
and G-Commerce DMCC

           Respondents.

-----------------------------------------------------------------X

## ORDER TO SHOW CAUSE WITH
## <u>TEMPORARY RESTRAINING ORDER</u>

Upon the Verified Petition of Peter Schiff, dated July 29, 2025, the Affirmation of Peter Schiff, dated July 28, 2025, the Memorandum of Law, and the annexed exhibits, and all prior proceedings:

IT IS ORDERED that Respondents Qenta Inc., Responsible Gold Trading DMCC, and G-Commerce DMCC show cause before this Court, at the Supreme Court, County of Westchester – Commercial Division, 111 Dr. Martin Luther King Jr. Blvd., White Plains, New York 10601, on August 6, 2025, at 10:00 a.m., or as soon thereafter as counsel may be heard, why an order should not be entered:

1. Pursuant to CPLR §§ 7502(c), 6301, and 6313, granting a Preliminary Injunction directing Respondents, their officers, agents, employees, and persons acting in concert, to:

    a. Immediately return all Assets of Euro Pacific International Bank ("EPB") as defined in PAA Section 1.1, including approximately $50 million in precious metals, $19 million in cash, mutual funds, Subsidiary Shares (*e.g.*, Euro Pacific Securities, Inc., Euro Pacific Funds SCC Ltd.), and Assumed Contracts to EPB or its Receiver;

    b. Alternatively, refrain from selling, transferring, encumbering, dissipating, or disposing of such Assets pending arbitration under ICC Rules per PAA Section 8.7;

    c. Provide an immediate accounting of all EPB assets, liabilities, and customer communications, pursuant to CPLR § 3101;

Case 3:25-cv-01501-PAD-GLS    Document 14-1    Filed 09/29/25    Page 2 of 135

d.  Return all Records related to the Assets, pursuant to PAA Section 2.2(e);

2. Granting such other relief as the Court deems just and proper.

~~SUFFICIENT CAUSE APPEARING, it based on Respondents' breach of the PAA, by failing to obtain regulatory approvals, retaining assets without legal or equitable title, and risking dissipation through operational failures and affiliate insolvencies, rendering an arbitration award ineffectual; and it is further~~

SUFFICIENT CAUSE APPEARING, it is ORDERED that, pending the hearing or until further order of this Court, Respondents, their officers, agents, employees and persons acting in concert, are temporarily restrained from selling, transferring, encumbering dissipating, or disposing of any EPB Assets, including approximately $50 million in precious metals, $19 million in cash, mutual funds, Subsidiary Shares, and Assumed Contracts;

ORDERED that, Respondents are prohibited from destroying, concealing, or altering any documents or records related to said Assets.

**TBD**

~~ORDERED that, in the exercise of the Court's discretion pursuant to CPLR § 6313(c), Petitioner is not required to give an undertaking pending the hearing on this order to show cause; or in the alternative, in the event an undertaking is required, Petitioner shall post an undertaking in an amount to be fixed by the Court, but not to exceed $10,000, as a condition to the effectiveness of this Temporary Restraining Order, within five (5) days of entry of this Order.~~

ORDERED that service of this Order, the Verified Petition, Affirmation, Memorandum of Law, and all exhibits shall be made upon Respondents or their counsel by overnight mail and email to legalnotices@qenta.com and to Dan Walfish of Katsky Korins LLP at dwalfish@katskykorins.com, on or before August 2, 2025, which shall be deemed sufficient service.

Dated:  White Plains, New York

August 1, 2025

SO ORDERED

_____

HON. LINDA S. JAMIESON, J.S.C.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

----------------------------------------------------------------X

PETER SCHIFF,                                    Index No.:


              Petitioner,

        - against -

QENTA INC., RESPONSIBLE GOLD TRADING
DMCC, and G-COMMERCE DMCC

              Respondent.

----------------------------------------------------------------X

VERIFIED PETITION FOR TEMPORARY RESTRAINING ORDER AND
<u>PRELIMINARY INJUNCTION IN AID OF ARBITRATION</u>


Petitioner Peter Schiff, by his undersigned attorney, respectfully petitions this Court as
follows:

1.  This is a special proceeding pursuant to CPLR Article 75 and CPLR § 7502(c) for
    a Temporary Restraining Order ("TRO") and Preliminary Injunction in aid of
    arbitration. The relief is necessary to preserve the status quo and prevent an
    arbitration award from being rendered ineffectual due to Respondents' unlawful
    retention and potential dissipation of assets.

2.  **Jurisdiction and Venue:** This Court has jurisdiction pursuant to CPLR § 7502(a)
    because the arbitration agreement is governed by New York law under Section 8.7
    of the Purchase and Assumption Agreement ("PAA" or the "Agreement")
    annexed hereto as Exhibit 1. The PAA designates New York courts as the proper
    forum for interim and injunctive relief, making this venue appropriate and
    consistent with the parties' agreement. Venue is also proper in Westchester
    County pursuant to CPLR § 503(a) because Petitioner maintains business
    operations there (see Schiff Aff. ¶14; Ex. 14).

3.  **Parties**: Petitioner Peter Schiff is the sole shareholder of Euro Pacific
    International Bank ("EPB") and brings this proceeding on behalf of EPB and its

customers, whose assets are the subject of this proceeding. Respondents Qenta Inc., Responsible Gold Trading DMCC, and G-Commerce DMCC (collectively, "Qenta") are entities party to the PAA and currently in control of EPB assets improperly withheld from Petitioner and EPB's customers.

4. **Background**: On September 30, 2022, Petitioner, Euro Pacific International Bank ("EPB"), and Respondent Qenta Inc. entered into the Purchase and Assumption Agreement ("PAA"), annexed hereto as Exhibit 1, which includes a binding arbitration clause requiring resolution of disputes through arbitration. Under Section 2.2 of the PAA, Qenta was required to obtain all necessary regulatory approvals as a condition precedent to acquiring legal title to certain assets. These assets, transferred pursuant to the PAA in 2022, are valued at approximately $80 million, including $50 million in precious metals, which have appreciated by over $25 million since transfer, $19 million in cash, mutual funds, and active subsidiaries. Since the transfer in 2022, the value of the precious metals and related assets has appreciated by over $25 million. On July 11, 2025, Respondents issued unilateral Termination Notice (Exhibit B), citing failure to obtain regulatory approval and terminating the PAA. In response, on July 18, 2025, Petitioner, as sole shareholder, sent a demand letter (Exhibit C) consenting to mutual termination and demanding the unconditional return of all assets. Respondents have failed to return the assets and have not substantively responded to Petitioner's demand, posing a substantial risk of dissipation, transfer, or encumbrance of these unique and appreciating assets.

5. **Likelihood of Success**: Petitioner is likely to succeed in arbitration because Respondents' retention and refusal to return the assets breach multiple material provisions of the PAA, including the express condition precedent requiring regulatory approval before transfer (PAA § 2.2), the obligation to return assets upon termination (PAA §§ 7.1, 7.2), and the fiduciary duties owed to EPB and its customers. Further, Qenta's retention and control of such assets without legal title constitutes unjust enrichment under New York law. *See Oppenheim, Appel, Dixon & Co. v. Co. of N.Y.*, 86 N.Y.2d 685 (1995); *Simonds v. Simonds*, 45 N.Y.2d 233 (1978); *Sharp v. Kosmalski*, 40 N.Y.2d 119 (1976).

6. **Irreparable Harm:** Absent injunctive relief, Respondents will likely dissipate or improperly encumber the assets, rendering any arbitral award ineffectual. These assets—including precious metals, cash, and mutual funds—are unique and have

appreciated significantly. Monetary damages cannot adequately compensate for their loss. Moreover, the continued wrongful retention and mismanagement of these assets cause substantial reputational harm to Petitioner, whose personal and professional reputation—and affiliated businesses—depend on safeguarding these funds and maintaining customer trust. The ongoing operational failures and financial instability of Respondents, including failure to disclose asset location, website outages, and affiliate insolvencies, coupled with their concealment of asset location and management, further heighten the risk of irreparable harm. *See Eastview Mall, LLC v. Grace Holmes, Inc.*, 182 A.D.3d 1057 (4th Dep't 2020).

7. **Balance of Equities:** The balance of equities favors Petitioner. Qenta has no lawful claim to retain the assets or appreciation given failure of the condition precedent and mutual termination. Returning the assets to Petitioner causes no undue hardship to Respondents, whose ability to pursue claims in arbitration preserves their rights and lessens any claimed hardship. In contrast, Petitioner and customers will suffer harm not just financially, but in trust and confidence if assets are lost or mismanaged. Courts routinely grant interim relief to protect unique assets and receiverships. *See Gramercy Co.* v. *Benenson*, 223 A.D.3d 665 (2d Dep't 2024); *Will of Kauffman*, 213 A.D.3d 950 (2d Dep't 2023).

8. **Relief Sought:**[1] Petitioner requests a Temporary Restraining Order and Preliminary Injunction enjoining Respondents from selling, transferring, encumbering, or disposing of any EPB assets pending arbitration, and prohibiting Respondents from destroying, concealing, or altering any documents or records related to the assets.

Petitioner further requests an immediate accounting of all assets, liabilities, and customer communications, return of all records, and such other relief as this Court deems just and proper.

WHEREFORE, Petitioner respectfully requests that this Court grant the relief sought in the annexed Order to Show Cause and such other and further relief as may be just and proper.

---

[1] Such relief is permitted by right under the PAA: "[I]n the event of any breach of this Agreement by it, the non-breaching party will have the right to seek injunctive relief in a court of competent jurisdiction against continuing or further breach by the breaching party, without the necessity of proof of actual damages, in addition to any other right which either party may have under this Agreement, or otherwise in law or in equity." (PAA, §8.7.)

Dated: July 29, 2025

White Plains, New York

Peter M. Chema, Esq.
Attorney for Petitioner
55 Park View Road, South
Pound Ridge NY 10576
Tel. (914) 393-8492
pchema.law@gmail.com

---

**AFFIRMATION OF TRUTH OF STATEMENT**
*[Pursuant to CPLR § 2106, amended 1/1/2024]*

I, PETER SCHIFF, plaintiff in this action, hereby affirm under penalties of perjury under the laws of the State of New York, this 29th day of July 2025, that the foregoing Verified Petition is true to my knowledge, information, and belief. I understand that this document may be filed in a court proceeding.

Peter Schiff

---

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER – COMMERCIAL DIVISION

--------------------------------------------------------------------X

PETER SCHIFF,                                                    Index No.:

             Petitioner,

      - against -

QENTA INC., RESPONSIBLE GOLD TRADING DMCC,
and G-Commerce DMCC
             Respondents.

--------------------------------------------------------------------X

**PROPOSED ORDER TO SHOW CAUSE WITH
TEMPORARY RESTRAINING ORDER**

Upon the Verified Petition of Peter Schiff, dated July 29, 2025, the Affirmation of Peter
Schiff, dated July 28, 2025, the Memorandum of Law, and the annexed exhibits, and all
prior proceedings:

IT IS ORDERED that Respondents Qenta Inc., Responsible Gold Trading DMCC, and
G-Commerce DMCC show cause before this Court, at the Supreme Court, County of
Westchester – Commercial Division, 111 Dr. Martin Luther King Jr. Blvd., White Plains,
New York 10601, on August 6, 2025, at 9:30 a.m., or as soon thereafter as counsel may be
heard, why an order should not be entered:

1. Pursuant to CPLR §§ 7502(c), 6301, and 6313, granting a Preliminary Injunction
directing Respondents, their officers, agents, employees, and persons acting in concert, to:

    a.  Immediately return all Assets of Euro Pacific International Bank ("EPB") as
    defined in PAA Section 1.1, including approximately $50 million in precious metals,
    $19 million in cash, mutual funds, Subsidiary Shares (*e.g.*, Euro Pacific Securities,
    Inc., Euro Pacific Funds SCC Ltd.), and Assumed Contracts to EPB or its Receiver;

    b.  Alternatively, refrain from selling, transferring, encumbering, dissipating, or
    disposing of such Assets pending arbitration under ICC Rules per PAA Section 8.7;

    c.  Provide an immediate accounting of all EPB assets, liabilities, and customer
    communications, pursuant to CPLR § 3101;

    d.  Return all Records related to the Assets, pursuant to PAA Section 2.2(e);

2. Granting such other relief as the Court deems just and proper.

SUFFICIENT CAUSE APPEARING, based on Respondents' breach of the PAA, by failing to obtain regulatory approvals, retaining assets without legal or equitable title, and risking dissipation through operational failures and affiliate insolvencies, rendering an arbitration award ineffectual; and it is futher

ORDERED that, pending the hearing, Respondents, their officers, agents, employees, and persons acting in concert, are temporarily restrained from selling, transferring, encumbering, dissipating, or disposing of any EPB Assets, including approximately $50 million in precious metals, $19 million in cash, mutual funds, Subsidiary Shares, and Assumed Contracts;

ORDERED that, Respondents are prohibited from destroying, concealing, or altering any documents or records related to said Assets.

ORDERED that, in the exercise of the Court's discretion pursuant to CPLR § 6313(c), Petitioner is not required to give an undertaking pending the hearing on this order to show cause; or in the alternative, in the event an undertaking is required, Petitioner shall post an undertaking in an amount to be fixed by the Court, but not to exceed $10,000, as a condition to the effectiveness of this Temporary Restraining Order, within five (5) days of entry of this Order.

ORDERED that service of this Order, the Verified Petition, Affirmation, Memorandum of Law, and all exhibits shall be made upon Respondents or their counsel by email to legalnotices@qenta.com and to Dan Walfish of Katsky Korins LLP at dwalfish@katskykorins.com, pursuant to CPLR § 6313(b), on or before August 1, 2025, which shall be deemed sufficient service.

Dated:  White Plains, New York

       _____, 2025

                                     SO ORDERED

                                    _____

                                    J.S.C.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

---------------------------------------------------------X

 PETER SCHIFF,

                                                 Index No.:

           Petitioner (Plaintiff)

      - against -

QENTA INC., RESPONSIBLE GOLD TRADING
DMCC, and G-Commerce DMCC

           Respondents (Defendants).

---------------------------------------------------------X

### AFFIRMATION OF PLAINTIFF PETER SCHIFF IN SUPPORT
### OF MOTION FOR TEMPORARY RESTRAINING ORDER

## I. Introduction

1. I, Peter Schiff, sole shareholder of Euro Pacific International Bank ("EPB" or the "bank"), submit this affirmation in support of my motion for a Temporary Restraining Order ("TRO") to order Defendants Qenta Inc., Responsible Gold Trading DMCC, and G-COMMERCE DMCC, (collectively, "Qenta") to return assets transferred by EPB, valued at approximately $80 million, including precious metals, cash, mutual funds, and subsidiaries, including Euro Pacific Securities, Inc.—or, alternatively, to prevent Qenta from transferring, dissipating, or disposing of these assets pending resolution of the dispute. I provide the following facts to demonstrate the urgent need to preserve these assets.

## II. Background: The Bank, Receivership, and Access to Customer Assets

2. EPB has been licensed as an International Financial Entity by the Puerto Rico Office of the Commissioner of Financial Institutions ("OCIF") since 2017. The bank originally began operations in 2011 in St. Vincents and the Grenadines, and at all times since formation it operated as a fully-reserved bank providing international banking, precious metals, brokerage, and mutual fund services globally.

3. On June 30, 2022, the Puerto Rico Office of the Commissioner of Financial Institutions ("OCIF") issued a cease-and-desist order suspending EPB's operations due to capital and compliance deficiencies. In response, EPB immediately ceased all banking transactions. Subsequently, pursuant to a Consent Order dated August 9, 2022, signed by both the OCIF Commissioner and myself, as director and sole shareholder of EPB, OCIF placed EPB into receivership and appointed Wigberto Lugo Mender, Esq. as Receiver to oversee the bank's liquidation. A true and correct copy of the Consent Order is annexed hereto as Exhibit 1.

4. The Consent Order shows that at the time, EPB held approximately $68.1 million in cash and equivalents against about $66.7 million in deposit liabilities, along with precious metals and mutual funds fully matched by customer liabilities. EPB had no outstanding loans, debts, or unpaid bills. *See* Ex. 1, page 5, ¶ 4. While the establishment of the receivership is undisputed in this proceeding, for full disclosure, I initiated a federal lawsuit in November 2024 challenging OCIF's actions based on FOIA evidence, demonstrating that EPB posed no financial risk warranting such intervention.

5. Since the receivership, customers have been barred from accessing their deposits—including those denominated in gold and silver—for over three years.[1] This prolonged deprivation of their property rights, combined with the unresolved disputes over asset control detailed herein, underscores the urgent need for judicial intervention through this TRO to preserve the value of these assets pending arbitration.

## III. The Purchase and Assumption Agreement (PAA)

6. Following receivership, on September 30, 2022, EPB entered into a Purchase and Assumption Agreement (the "PA Agreement" or "PAA") with Qenta Inc. and its subsidiaries, to transfer certain assets and liabilities of its opt-in customers in an effort to facilitate liquidation and customer asset management. A true and correct copy of the PA Agreement is attached as Exhibit 2.

7. EPB's customers were divided into "opt-in" customers, who by default agreed to transfer assets and liabilities to Qenta under the PA Agreement, and "opt-out" customers, whose assets remained under EPB and the Receiver's supervision. The

---

[1] I made numerous offers to liquidate EPB directly and efficiently, at no cost to the bank or any other party, to enable all customers to access and withdraw their deposits—including those denominated in precious metals such as gold and silver—promptly upon my proposed liquidation.

Approximate $19 million in cash that transferred to Qenta likely includes funds belonging to opt-out clients, which Qenta has yet to reconcile with the Receiver.

8. The assets Qenta agreed to purchase included, without limitation, precious metals, cash, mutual funds, and active subsidiaries, including Euro Pacific Funds SCC Ltd. and Euro Pacific Securities, Inc.—and undertake liabilities including those to Opt-in customers.

9. Notably, the precious metals in question are now valued at approximately $50 million, reflecting an approximate $25 million increase since 2022, due to rising gold and silver prices.

## IV. Termination, Response, and Demands

10. On July 11, 2025, Qenta issued a notice to terminate the PA Agreement, citing failure to obtain regulatory approval for customer migration and other issues. A true copy of Termination Notice is attached as Exhibit 3.

11. On July 18, 2025, I sent a letter directly to Qenta denying any breach attributable to EPB or myself, consenting to mutual termination of the Purchase and Assumption Agreement ("PAA") as permitted to me in my capacity as sole shareholder, and demanding the unconditional return of all assets to EPB (excluding the $500,000 purchase price) by July 25, 2025. Based on Qenta's own admissions, it failed to obtain legal title due to regulatory deficiencies and its failure to onboard customers, and thus could not fulfill the terms of the PAA. Despite providing Qenta with a full week to comply, it neither responded nor returned the assets. The agreement expressly reserves my right to mutual termination as sole shareholder, independent of EPB. A true and correct copy of my demand letter is attached as Exhibit 4.

12. Despite Qenta informing Opt-in customers on EPB's website that it would 'return all liquidated assets to the Receiver as they were originally received,' it has neither returned the assets nor agreed to their unconditional return. This statement is annexed hereto as Exhibit 9.

13. Instead of honoring this apparent commitment, Qenta's actual offer to the Receiver was only to liquidate the assets and return proceeds based on September 2022 values—*thereby excluding over $25 million in appreciation on the precious metals and mutual funds*—while simultaneously demanding over $5 million in purported costs without substantiation or a legal determination. *See* Ex. 3. Based on my personal knowledge and numerous accounts from customers who

3

have contacted me, Qenta has refused to clarify the terms of its offer—an offer uniformly and emphatically rejected by all relevant parties, including the Receiver (both personally and through counsel), EPB customers, and myself, as it fails to serve our collective interests.

14. Qenta has further declined to acknowledge or agree to return approximately $25 million in appreciated funds. Despite consistent and good-faith outreach by stakeholders, Qenta has continued to ignore calls and emails.

15. There remains no complete accounting of how much of the cash held by Qenta belongs to Opt-in customers and how much belongs to Opt-out customers. This lack of clarity underscores the imperative that all cash be consolidated back at the bank so the Receiver can satisfy all claims equitably. With the Agreement terminated, there are no longer distinct Opt-in or Opt-out customers—there are simply customers—and the Receiver owes an equal fiduciary duty to all of them. However, Qenta continues to obstruct this process and stands in the way of customers receiving their funds. Given the jurisdictional complexities involved, I am uniquely positioned to resolve this matter effectively.

16. As detailed below, the Receiver is actively cooperating with me to address these complex issues and has publicly confirmed that the assets remain under his supervision and ownership of EPB's customers. This cooperation reflects our shared commitment to preserving customer assets and ensuring their proper administration.

## V. Receiver's Position and Cooperation

17. The Receiver has not yet formally demanded a complete return of the assets from Qenta. Documentation of this inaction is attached as Exhibit 5. Initially, the Receiver did not seek the return of any cash or other assets, operating under the ostensibly mistaken belief that these assets, along with associated customer liabilities, had been fully transferred to Qenta.

18. On July 21, 2025, the Receiver issued a notice to Opt-in customers confirming that the assets remain customer-owned and under his supervision. He explicitly rejected Qenta's proposal to liquidate the assets—describing his rejection as 'emphatic'— stating that any transfer requires customer consent and regulatory approval, and advised customers to pursue individual claims against Qenta. On the same date, counsel to the Receiver sent a letter to Qenta's legal representatives, emphatically objecting to Qenta's proposal to liquidate or otherwise dispose of

customer-owned assets without individualized direction from each account holder and without applicable regulatory approvals. The letter clearly states that the assets must be held and managed in their received form pending express customer instructions. The Receiver further emphasized that any attempt by Qenta to liquidate or cancel the acquisition of EPB's subsidiaries without proper legal process is unwarranted and likely illegal. While the letter does not explicitly address Qenta's valuation methodology, the Receiver's unequivocal stance strongly supports preserving the assets intact and underscores the urgent need for judicial intervention to prevent dissipation, unauthorized disposition, and unlawful conduct. These communications, included in Exhibit 5, decisively demonstrate the Receiver's rejection of Qenta's proposals and reinforce Plaintiff's entitlement to immediate injunctive relief in pursuit of protecting assets.

19. Given the dispersed and international nature of the customer base, spanning numerous countries, none of which includes the U.S., it is unlikely that hundreds of clients will pursue individual or collective legal actions against Qenta. Accordingly, this Court's intervention ordering the return of assets to EPB is imperative to enable the Receiver to administer those assets collectively for the benefit of all customers and creditors, ensuring their preservation and proper distribution.

## VI. Custodial Role of Qenta and Ownership Condition

20. Under the PAA, Qenta obtained custody and control of certain assets but ownership and corresponding liabilities remained with EPB under the Receiver's supervision. Ownership and assumption were expressly conditioned on a closing event requiring "all regulatory approvals having been obtained and remaining in full force and effect," a condition that was never satisfied. In his initial response, the Receiver apparently overlooked this key failure and the bank's retention of full ownership of the assets currently in Qenta's custody, and the corresponding liabilities to Opt-in customers.

21. Qenta repeatedly acknowledged to both Opt-in customers and the Receiver that it was awaiting regulatory approval before onboarding clients and admitted that legal ownership of the assets was never transferred. Indeed, Qenta's termination notice recognizes its obligation to return the assets—albeit conditioned on retaining a substantial sum as alleged damages. On multiple occasions, Qenta reassured customers that their assets remained safely held in EPB's accounts under the Receiver's administration, pending regulatory approval for the migration. For example, in a communication sent approximately two years after receipt of the

5

assets, Qenta stated: "Rest assured that all EPB assets continue to be safely held in EPB's accounts. This is currently managed by the Receiver, until the liquidation and migration processes are allowed to commence." This email exchange is attached as Exhibit 6. These admissions confirm that Qenta holds only custodial control—not ownership—underscoring the necessity of this Court's intervention to protect EPB's assets, as ordering the return of the assets to EPB is essential to empower the Receiver to administer those assets collectively for the benefit of all customers and creditors, ensuring their preservation and proper distribution.

## VII. Operational Concerns and Risks to Assets

22. Qenta removed its management page from its website, as evidenced by archived snapshots obtained via the Internet Archive's Wayback Machine. The last available snapshot displaying management information dates to September 19, 2024, after which no current management details have been archived on Qenta's site. This absence has been particularly notable throughout 2025, as reported by EPB customers in public forums. A true and correct copy of these archived pages—including the last snapshot showing management and the current webpage as of today's date with information removed and names taken down—is annexed as Exhibit 7.

23. Qenta failed to pay maintenance fees for EPB's website, resulting in an outage that caused significant concern among customers, as documented in public forums such as OffshoreCorpTalk. Although I offered to pay the fees personally, I lacked the necessary authorization to do so. Ultimately, Qenta paid the outstanding fees, and website access was restored three days later. A snapshot of the site being taken offline from July 9, 2025, is attached as part of Exhibit 8.

24. Upon restoring access, Qenta posted its first update in eight months to the bank's website, notifying Opt-in customers of its cancellation of the PAA and its intent to "return all liquidated assets to the Receiver as they were originally received." (Exhibit 9). This statement is misleading for two reasons: First, none of the bank's assets had been liquidated. Qenta referred to them as "liquidated" because Qenta told the Receiver that it intended to liquidate the assets, but wasn't forthright about that intention to customers. Second, the phrase "as they were originally received" implies that if gold and silver were received, the same quantities of gold and silver would be returned. Yet Qenta's actual offer to the Receiver was not to return the assets "as received," but to liquidate the assets and to return the value of those assets when they were received in Sept. 2022—roughly half their current market value—thus retaining an unearned windfall of approximately $25 million at Opt-in customers' expense. Qenta obviously knew that such an admission would not go over well with customers, who

obviously knew how much gold prices had risen. But Qenta counted on the Receiver not knowing that $25 million in gold and silver in 2022 is worth $50 million today.

25. Based on my communications with Silver Bullion in Singapore, Qenta has not paid storage fees for EPB's silver since February 2024. Silver Bullion currently holds approximately $10 million in EPB customer silver, which Qenta never retitled or properly allocated. After the PAA's termination, Silver Bullion froze the EPB account it holds, controlled by Qenta, and has offered to return the silver to the Receiver in accordance with custodian standards. I am actively coordinating with Silver Bullion and the Receiver to recover these assets. However, Silver Bullion confirmed that Qenta transferred out the gold assets—significantly more valuable than the silver. EPB requires a court order to recover the gold's value and ensure its proper return. A former Qenta employee informed me that Qenta converted EPB's gold into "paper gold" stored in Switzerland without legal title. This unauthorized conversion and withholding, combined with Qenta's failure to secure title, breaches the PAA and jeopardizes EPB customers' rights and financial interests. Immediate judicial intervention is necessary to prevent further dissipation or encumbrance and ensure proper recovery and administration for the rightful owners.

26. **Affiliate Insolvencies**: G-Commerce DMCC, Qenta's Dubai-based entity handling customer onboarding, allowed its license to expire in October 2023 and is winding down (Exhibit 10). Additionally, G Mint Sàrl, Qenta's Swiss gold custody affiliate, entered bankruptcy in 2024 and was removed from the Swiss commercial registry, according to public records from Lixt.ch (Exhibit 11).

27. **Litigation Involving Qenta Principal**: Brent De Jong, a Qenta principal who signed the PA Agreement and termination notice, is named in a 2021 New York lawsuit alleging fiduciary breaches, mismanagement, and improper appropriation of offshore assets. (*Offshore Exploration & Production LLC v. De Jong Capital LP*, Index No. 653659/2021, Exhibit 12).

28. These operational failures, insolvencies, and adverse litigation history raise serious concerns about Qenta's ability and intent to properly manage EPB's assets, increasing the risk of dissipation or concealment.

29. Customer alarm on forums, including OffshoreCorpTalk, reflects frustration over frozen accounts and Qenta's lack of communication, increasing my reputational harm as sole shareholder and impacting my Westchester-based business, Schiff Gold, office is located in White Plains NY.  *See* Exhibit 13 (public forum posts) and Exhibit 14 (Schiff Gold contact page).

## VIII. Personal Liability and Reputational Harm

30. As the bank's sole shareholder, I have indemnified the Receiver against customer claims under the Liquidation and Dissolution Plan executed on September 6, 2022 (Exhibit 15). However, if the Receiver, constrained by the choice-of-law provisions in the Agreement, or unaware of his fiduciary duty to Opt-in customers, as he mistakenly believes the assets held by Qenta and the associated customers' liabilities remain outside of the bank's liquidation process, and he fails to act to recover those assets, and customers suffer losses as a result, I may face personal liability if legal action is brought against the Receiver.[2]

31. Beyond being a shareholder, I am also the public face of EPB. As a widely recognized financial commentator and author of multiple books on economics and investing, my reputation hinges on the trust that customers have placed in the bank and its associated businesses, which have fallen under the "Euro Pacific" brand. Significant losses by EPB customers would not only harm that trust but extend to negatively impact my other ventures, including Euro Pacific Asset Management and Schiff Gold, the latter being headquartered in White Plains, Westchester County, New York—underscoring the local impact of these issues on the jurisdiction of this Court. These businesses bear my brand name and personal reputation. Given that my livelihood depends on credibility and trust in the financial and precious metals industries, protecting the bank's customers and their assets is paramount and personal.

## IX. Jurisdictional and Procedural History

32. The Agreement, which I signed both as sole shareholder and chairman of EPB, specifies New York State law and allows interim injunctive relief in New York courts, with arbitration in New York City for final disputes under ICC (Ex. 2).

33. As previously stated, I maintain significant business connections in Westchester County, New York, justifying venue in this Court. My company Schiff Gold is located in Westchester County, at 222 Bloomingdale Road, White Plains, New York 10605. (Ex. 14). If customers of EPB lose the gold they entrusted me to store, that could cause customers of Schiff Gold, who have also entrusted me to store their gold, to

---

[2] EPB's Bylaws limit my personal liability as sole shareholder to the amount of my paid-in capital, which has been substantially depleted, and also expressly exclude liability for losses arising from gross negligence or willful misconduct. While all litigation inherently carries risk and potential defense costs, securing a court order directing the return of these assets to EPB would significantly mitigate my exposure by enabling the Receiver to regain control and safeguard the assets on behalf of the customers.

lose confidence in me as well. That risks adversely impacting my Westchester County-based business and beyond.

34. I previously sought a Temporary Restraining Order in the District Court of Puerto Rico, where EPB is located and where I currently reside with my family. However, that court denied the motion on July 18, 2025, specifically citing lack of jurisdiction over Qenta Inc., as it is not a defendant in that proceeding. The Court's Order states that it therefore lacks authority to entertain the request to enjoin Qenta from dissipating assets allegedly belonging to the receivership estate. A true and correct copy of the Puerto Rico court's Order denying the TRO is annexed hereto as Exhibit 16. This ruling confirms that New York is the only appropriate forum with jurisdiction over Qenta in this matter, given the parties' PAA. Accordingly, it is imperative that this Court grant the requested TRO to preserve EPB's assets and protect the interests of its customers.

35. I intend to file a Notice of Arbitration contemporaneously with or shortly after this motion, as required under the PAA, pursuant to the arbitration clause set forth in the Agreement among the parties. The arbitration is intended to resolve the underlying contractual disputes between Plaintiff and Defendants, including the issues concerning the assets at issue in this motion. This motion for a Temporary Restraining Order is sought to preserve the status quo and return the assets to the administration of the Receiver to prevent irreparable harm to the assets pending resolution through arbitration.

## XI. Relief Requested

36. I respectfully seek a TRO ordering Qenta to return control of the bank's assets to EPB or, alternatively, to prevent Qenta from transferring, dissipating, or disposing of these assets, to order an accounting, and to preserve the status quo pending final adjudication. Returning the assets is preferable to freezing them, as Qenta's precarious financial position and ongoing lack of transparency increase the risk that the assets may be encumbered the longer they remain under Qenta's control.

37. Given that the arbitration process could take twelve months or more, placing the assets in the Receiver's custody during this period is essential to protect the depositors—who have been waiting since receivership began to recover their assets.[3] As a financial professional, I understand the Receiver owes a fiduciary duty

---

[3] Arbitration is the appropriate forum for Qenta to seek recovery of any losses it claims to have suffered due to the bank's breach, and for EPB to assert any counterclaims related to losses it suffered due to Qenta's breach.

to EPB's customers. Qenta owes no such duty and has already shown disregard for their interests, likely leveraging its control to extract concessions from rightful owners, who, after more than three years, may be pressured to accept significantly less than owed just to receive any payment.

38. While I recognize that this dispute arises out of events centered in Puerto Rico and involves complex regulatory and contractual issues, the circumstances and the parties' Agreement compel me to bring this motion in New York. This filing is not made lightly, but out of solemn duty to protect the interests of EPB's customers and creditors, preserve the assets, and uphold the integrity of the receivership process. The jurisdictional provisions of the Agreement, along with the clear connection to New York through the parties and arbitration venue, make this Court the proper and necessary forum to grant the relief sought.

39. Given the risk of dissipation and ongoing dispute, I respectfully request that the Court grant the TRO to protect EPB's assets, which remain lawfully owned by the bank and are part of the totality of assets administered by the Receiver for the benefit of EPB's Opt-in customers and other creditors. To deny this TRO risks unjustly enriching Qenta by nearly $80 million at the expense of the bank's customers and other creditors. There is no legal basis for Qenta to pay $1,250,000 to purchase the right to custody $80 million in customer assets, assume offsetting liabilities of $80 million tied to those assets, make just the $500,000 down payment, then terminate the PA Agreement, disavow the liabilities, keep the assets, and walk away with an $80 million windfall. Without this TRO, that is precisely what might happen. Without this TRO, assets that rightfully belong to EPB's estate, currently administered by the Receiver, could likely be retained by Qenta for its own enrichment. Granting this TRO not only prevents unjust enrichment and a travesty of justice for the customers involved, but also serves the public interest by upholding the sanctity of the receivership process.

40. I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 28, 2025
White Plains, New York                              Respectfully Submitted,


                                                    Peter Schiff
                                                    Respondent

**AFFIRMATION OF TRUTH OF STATEMENT**

[Pursuant to CPLR §2106, amended 1/1/2024]


I, PETER SCHIFF, plaintiff in this case, hereby affirm on this 28th day of July 2025, under penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in a proceeding in a court of law.

_____

Peter Schiff

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER – COMMERCIAL DIVISION

-------------------------------------------------------------------X

PETER SCHIFF,                                          Index No.:

           Petitioner,

      - against -

QENTA INC., RESPONSIBLE GOLD TRADING DMCC,
and G-Commerce DMCC

           Respondents.

-------------------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF
## <u>TEMPORARY RESTRAINING ORDER</u>

### TABLE OF CONTENTS

Preliminary Statement ........................................................................................... 1

Statement of Facts ................................................................................................ 2

Legal Standard ..................................................................................................... 4

Argument ............................................................................................................. 5

I. Petitioner Is Likely to Succeed on the Merits ................................................. 5

II. Petitioner and EPB Customers Face Irreparable Harm .................................. 5

III. The Balance of Equities Favors Petitioner .................................................... 6

IV. New York Courts Have Jurisdiction and Venue Is Proper ............................ 7

V. Notice, Service, and Undertaking ................................................................... 7

Conclusion ........................................................................................................... 8

### PRELIMINARY STATEMENT

Petitioner Peter Schiff, sole shareholder of Euro Pacific International Bank ("EPB"), respectfully moves this Court, pursuant to CPLR Article 75 and § 7502(c), for a Temporary Restraining Order (TRO) and Preliminary Injunction to preserve approximately $80 million in assets—including $50 million in precious metals (appreciated by $25 million since 2022), $19 million in cash, mutual funds, and subsidiaries—rightfully owned by EPB and its customers. Respondents Qenta Inc., Responsible Gold Trading DMCC, and G-Commerce DMCC (collectively, "Qenta") unlawfully retain these assets in breach of the Purchase and Assumption Agreement ("PAA") dated September 30, 2022, following mutual termination

due to Respondents' failure to obtain regulatory approvals, a condition precedent (Aff. ¶¶ 6, 10–11; Exs. 2–4). Qenta's operational failures (e.g., unpaid storage fees, website outages), affiliate insolvencies, lack of accounting, and concealment of asset locations pose an imminent risk of dissipation, rendering an arbitration award ineffectual (Aff. ¶¶ 14, 22–27; Exs. 7–13). Petitioner faces personal liability as indemnifier of the Receiver and severe reputational harm impacting his Westchester-based Schiff Gold business, where customer trust is paramount (Aff. ¶¶ 29–31; Exs. 14–15). A Puerto Rico federal court denied a TRO on July 18, 2025, for lack of jurisdiction over Qenta, confirming New York's authority under the PAA's forum selection clause (Aff. 34; Ex. 16). Petitioner is filing a Notice of Arbitration contemporaneously to resolve contractual disputes but seeks this TRO to preserve the status quo pending arbitration (Aff. 35).

## STATEMENT OF FACTS

### Receivership and Asset Status

EPB, licensed by Puerto Rico's Office of the Commissioner of Financial Institutions (OCIF) since 2017 (operating since 2011 as a fully-reserved bank providing international banking, precious metals, brokerage, and mutual fund services), was placed into receivership on August 9, 2022, following a June 30, 2022, cease-and-desist order for capital and compliance deficiencies (Aff. ¶¶ 2–3; Ex. 1). At receivership, EPB held $68.1 million in cash and equivalents against $66.7 million in liabilities, fully matched by precious metals and mutual funds, with no outstanding debts (Aff. 4; Ex. 1 at 5, 4). Customers have been barred from accessing deposits, including gold and silver, for over three years, causing significant distress and necessitating urgent relief (Aff. 5). Petitioner challenged OCIF's actions in a November 2024 federal lawsuit, alleging no financial risk warranted receivership, but this does not affect the current proceeding (Aff. 4). Petitioner offered to liquidate EPB efficiently to restore customer access, but this was not pursued (Aff. 5, n.0).

### Purchase and Assumption Agreement

On September 30, 2022, Petitioner, EPB, and Qenta entered the PAA to transfer assets and liabilities of "opt-in" customers to facilitate liquidation (Aff. 6; Ex. 2). Assets include $80 million: $50 million in precious metals (appreciated by $25 million due to rising prices), $19 million in cash, mutual funds, and subsidiaries (e.g., Euro Pacific Securities, Inc., Euro Pacific Funds SCC Ltd.) (Aff. ¶¶ 8–9; Ex. 2 at 1, "Assets" definition). The PAA required Qenta to obtain all regulatory approvals (e.g., from OCIF, subsidiary regulators) as a condition precedent to legal title transfer (Aff. 6; Ex. 2, § 2.2). "Opt-out" customer assets

remained with the Receiver, but $19 million in cash transferred to Qenta likely includes opt-out funds, unaccounted for by Qenta (Aff. 7).

**Termination and Demand for Return**

On July 11, 2025, Qenta issued a Termination Notice citing failure to obtain regulatory approvals (Aff. 10; Ex. 3). Petitioner, as sole shareholder, consented to mutual termination under PAA § 6.1(a) and demanded unconditional return of all assets (excluding the $500,000 paid) by July 25, 2025, denying any breach by EPB (Aff. 11; Ex. 4). Qenta refused, offering to return assets at 2022 valuations (excluding $25 million in appreciation) and demanding $5 million in unsubstantiated costs, an offer rejected by the Receiver, customers, and Petitioner (Aff. ¶¶ 12–13; Exs. 3–5). Qenta's website update misleadingly claimed it would return "liquidated assets as originally received," but its actual proposal was to liquidate at 2022 values, retaining the appreciation—a $25 million windfall (Aff. ¶¶ 12, 24; Ex. 9). Qenta has failed to provide an accounting or disclose asset locations, ignoring communications from Petitioner, the Receiver, and customers (Aff. ¶¶ 14, 25).

**Risk of Dissipation and Mismanagement**

Assets remain under Receiver supervision but in Qenta's custody, posing an imminent dissipation risk (Aff. 20). Qenta failed to pay storage fees for $10 million in EPB silver at Silver Bullion (Singapore) since February 2024, leading to a frozen account; Silver Bullion offered to return it pending court order (Aff. 25). Qenta converted gold to "paper gold" in Switzerland without title, per a former employee, breaching PAA obligations (Aff. 25; Ex. 2, § 2.2). Qenta's removal of its management page from its website (post-September 19, 2024), three-day website outage (July 9, 2025), and lack of communication further heighten concerns (Aff. ¶¶ 22–23; Exs. 7–8). Qenta's affiliates face insolvency: G-Commerce DMCC's license expired in October 2023, and it's winding down; G Mint Sàrl entered bankruptcy in 2024 (Aff. ¶¶ 26–27; Exs. 10–11). Litigation against Qenta principal Brent de Jong for fiduciary breaches and mismanagement in a 2021 New York case (*Offshore Exploration & Production LLC v. De Jong Capital LP*, Index No. 653659/2021) underscores Qenta's unreliability (Aff. 27; Ex. 12).

**Operational Failures and Reputational Harm**

Public complaints on forums like OffshoreCorpTalk reflect customer frustration over frozen accounts, Qenta's lack of communication, and attempts to retain appreciation, damaging Petitioner's reputation and his Westchester-based Schiff Gold business at 222 Bloomingdale Road, White Plains, NY (Aff. ¶¶ 29, 31; Exs. 13–14). Petitioner, a recognized financial commentator and author, relies on customer trust for his "Euro Pacific" brand, including Euro Pacific Asset Management and Schiff Gold (Aff. 31).

**Receiver's Position and Cooperation**

The Receiver confirmed assets remain customer-owned under his supervision, rejecting Qenta's liquidation proposal as unlawful without customer consent or regulatory approval (Aff.  18; Ex. 5). He has not demanded return due to a mistaken belief assets were fully transferred but is cooperating with Petitioner to address issues (Aff. ¶¶ 17–19). Post-termination, the Receiver owes a fiduciary duty to all customers, as opt-in/opt-out distinctions ended (Aff.  15). Individual customer lawsuits are unlikely due to their international dispersion across non-U.S. jurisdictions (Aff.  19).

**Legal and Jurisdictional Context**

The PAA's arbitration clause (Section 8.7) mandates ICC arbitration in New York but allows injunctive relief in New York courts: "[I]n the event of any breach of this Agreement by it, the non-breaching party will have the right to seek injunctive relief in a court of competent jurisdiction against continuing or further breach... without the necessity of proof of actual damages..." (Aff.  32; Ex. 2 at 12). A Puerto Rico federal court denied a TRO on July 18, 2025, for lack of jurisdiction over Qenta, confirming New York's authority (Aff.  34; Ex. 16). Petitioner is filing a Notice of Arbitration contemporaneously to resolve contractual disputes (Aff.  35). As EPB's indemnifier under the Liquidation Plan (September 6, 2022), Petitioner risks personal liability if assets are lost (Aff.  30; Ex. 15).

LEGAL STANDARD

To obtain a TRO in aid of arbitration under CPLR § 7502(c), Petitioner must show that an arbitration award may be rendered ineffectual without interim relief, typically by demonstrating: (1) likelihood of success on the merits; (2) irreparable harm absent relief; and (3) a balance of equities favoring Petitioner. *Nobu Next Door, LLC v. Fine Arts Hous., Inc.*, 4 N.Y.3d 839, 840 (2005); *Gramercy Co. v. Benenson*, 223 A.D.3d 665, 667 (2d Dep't 2024); *Credit Agricole Indosuez v. Rossiyskiy Kredit Bank*, 94 N.Y.2d 541, 548 (2000); CPLR §§ 6301, 6313, 7502(c). Notice complies with Uniform Rule 202.7(a), and Petitioner is prepared to post an undertaking per CPLR § 6313(c). This is not a prejudgment attachment, so fraudulent intent need not be shown. *VisionChina Media Inc. v. Shareholder Representative Servs., LLC*, 109 A.D.3d 49, 60 (1st Dep't 2013).

ARGUMENT

## I. PETITIONER IS LIKELY TO SUCCEED ON THE MERITS

### A. Regulatory Approval Was a Condition Precedent

New York law holds that failure of a condition precedent voids contract enforcement. *Oppenheim, Appel, Dixon & Co. v. Co. of N.Y.*, 86 N.Y.2d 685, 690 (1995); *Sabo v. Delman*, 3 N.Y.2d 155, 160 (1957). PAA Section 2.2 required "all Regulatory Approvals" for title transfer, which Qenta admits it failed to obtain (Aff.   10; Ex. 3). Qenta's unauthorized conversion of gold to "paper gold" in Switzerland and non-payment of silver storage fees since February 2024 breach covenants for proper management and further assurances (PAA §§ 2.2, 5.2; Aff.   25). Qenta's misleading website claim to return "liquidated assets as originally received" while offering 2022 valuations violates good faith obligations (Aff. ¶¶ 12, 24; Ex. 9).

### B. Title Did Not Transfer to Qenta

Qenta holds only custody, not legal title, which remains with EPB under Receiver supervision, as Qenta's communications confirm: "Rest assured that all EPB assets continue to be safely held in EPB's accounts... managed by the Receiver" (Aff.   21; Ex. 6). *Sun Life Assurance Co. of Canada v. Imperial Commercial Inc.*, 62 A.D.3d 146, 152 (1st Dep't 2009). Qenta's retention without title, combined with affiliate insolvencies (G-Commerce DMCC license expired October 2023; G Mint Sàrl bankruptcy 2024) and litigation against principal Brent de Jong for fiduciary breaches (*Offshore Exploration & Production LLC v. De Jong Capital LP*, Index No. 653659/2021), supports claims of mismanagement and unauthorized actions (Aff. ¶¶ 26–27; Exs. 10–12).

### C. Qenta Is Unjustly Enriched

Qenta paid only $500,000 of the $1,250,000 purchase price and assumed no liabilities, yet retains $80 million in assets, including $25 million in appreciation—an inequitable windfall (Aff. ¶¶ 12, 24; Ex. 3). Its failure to account for or disclose asset locations aggravates this enrichment (Aff.   25). *Simonds v. Simonds*, 45 N.Y.2d 233, 241 (1978); *Sharp v. Kosmalski*, 40 N.Y.2d 119, 123 (1976).

### D. Mutual Termination Requires Return of Assets

Mutual termination under PAA § 6.1(a) restores parties to pre-contract positions, requiring return of assets (Aff.   11; Ex. 4). Qenta's refusal, coupled with website outages, unpaid fees, and concealment of asset details, violates PAA obligations (Aff. ¶¶ 23–25; Exs. 8–9).

## II. PETITIONER AND EPB CUSTOMERS FACE IRREPARABLE HARM

Absent injunctive relief, Qenta's actions threaten to dissipate or encumber $80 million in unique, appreciating assets, rendering an arbitration award ineffectual (Aff. ¶¶ 25, 39; CPLR § 7502(c)). Monetary damages cannot compensate for the loss of precious metals ($50 million, up $25 million), cash, and subsidiaries, nor for the reputational harm to Petitioner's businesses, including Schiff Gold in Westchester (Aff. ¶¶ 8–9, 24, 29, 31; Ex. 14). *Eastview Mall, LLC v. Grace Holmes, Inc.*, 182 A.D.3d 1057, 1059 (4th Dep't 2020); *Credit Agricole Indosuez v. Rossiyskiy Kredit Bank*, 94 N.Y.2d 541, 548 (2000). Customers have been barred from accessing deposits for over three years, with public complaints on OffshoreCorpTalk reflecting frustration over frozen accounts and Qenta's lack of communication (Aff. ¶¶ 5, 29; Ex. 13). Qenta's operational failures include:

- ❖ Non-payment of silver storage fees since February 2024, risking $10 million in assets at Silver Bullion, which offered to return them pending court order (Aff.   25).

- ❖ Unauthorized conversion of gold to "paper gold" in Switzerland without title (Aff.   25).

- ❖ Website outages (July 9, 2025) and removal of management details post-September 19, 2024 (Aff. ¶¶ 22–23; Exs. 7–8).

- ❖ Affiliate insolvencies (G-Commerce DMCC license expired; G Mint Sàrl bankruptcy) and litigation against Brent de Jong (Aff. ¶¶ 26–27; Exs. 10–12). Qenta's failure to provide an accounting or disclose asset locations heightens the risk, as does its misleading claim to return assets at 2022 values, seeking a $25 million windfall (Aff. ¶¶ 12, 24–25; Ex. 9). Petitioner faces personal liability as indemnifier of the Receiver under the Liquidation Plan (September 6, 2022) and reputational harm to his "Euro Pacific" brand, critical to Schiff Gold and Euro Pacific Asset Management (Aff. ¶¶ 30–31; Ex. 15). *Reiter v. 1199 SEIU*, 144 A.D.3d 482, 483 (1st Dep't 2016). An accounting is warranted to verify asset status, per *In re Estate of Schnare*, 191 A.D.2d 859, 861 (3d Dep't 1993). Return of records is necessary to prevent concealment and facilitate arbitration (PAA § 2.2(e); CPLR § 6301).

## III. THE BALANCE OF EQUITIES FAVORS PETITIONER

Qenta suffers no hardship returning assets it never legally owned, especially as it retains full rights to assert claims in arbitration, weakening any claimed injury (Aff.   37). Petitioner and EPB customers face severe financial and reputational harm without relief, with customers barred from access for three years and at risk from Qenta's mismanagement, unpaid fees, and insolvencies (Aff. ¶¶ 5, 25–27; Exs. 7–13). The Receiver's cooperation and Silver Bullion's offer to return assets demonstrate feasibility of preservation (Aff. ¶¶ 18–19,

25; Ex. 5). Post-termination, the Receiver owes a fiduciary duty to all customers, unlike Qenta, which seeks to extract concessions (Aff. ¶¶ 15, 37). The international dispersion of customers makes individual lawsuits unlikely, necessitating court intervention (Aff.  19). Courts grant interim relief to protect unique assets and receiverships. *Will of Kauffman*, 213 A.D.3d 950, 952 (2d Dep't 2023); *Aetna Ins. Co. v. Capasso*, 75 N.Y.2d 860, 862 (1990); *Gramercy Co. v. Benenson*, 223 A.D.3d 665, 668 (2d Dep't 2024). The public interest in protecting customer assets and receivership integrity supports the TRO. *NYC Health & Hosps. Corp. v. Wellcare of N.Y., Inc.*, 193 A.D.3d 33, 39 (1st Dep't 2021).


## IV. NEW YORK COURTS HAVE JURISDICTION AND VENUE IS PROPER

The PAA's forum clause (Section 8.7) grants New York courts jurisdiction for injunctive relief: "[T]he non-breaching party will have the right to seek injunctive relief in a court of competent jurisdiction against continuing or further breach... without the necessity of proof of actual damages" (Aff.  32; Ex. 2 at 12). The Puerto Rico federal court denied a TRO on July 18, 2025, for lack of jurisdiction over Qenta, confirming New York's authority (Aff. 34; Ex. 16). Venue is proper in Westchester County under CPLR § 503(a), as Petitioner maintains substantial business operations through Schiff Gold at 222 Bloomingdale Road, White Plains, NY, and Respondents are subject to New York law per the PAA's arbitration clause (Aff.  33; Exs. 2, 14). *Matter of AGS Fin. LLC v. 777 Retail Owner LLC*, 208 A.D.3d 1082, 1083 (1st Dep't 2022).


## V. NOTICE, SERVICE, AND UNDERTAKING

Petitioner requests the Court direct service of this Order to Show Cause and supporting papers upon Respondents or their counsel by email to legalnotices@qenta.com and dwalfish@katskykorins.com (per CPLR § 6313(b) for expediency, as PAA Section 8.6 allows notices by email. (Aff. ¶¶ 33–35; Ex. 4). This complies with Uniform Rule 202.7(a). Petitioner requests a waiver of the undertaking under CPLR § 6313(c), as Respondents face no substantial risk of loss given their lack of legal title to the Assets and ability to assert claims in arbitration (Aff. ¶¶ 20, 37; Ex. 6). Alternatively, Petitioner accepts an undertaking, adjustable by the Court, within five days of entry. *David D. Siegel, New York Practice* § 316 (6th ed.).

CONCLUSION

Petitioner respectfully requests the Court grant a TRO:

1. Directing Respondents to return all EPB assets (estimated at approximately $50 million in precious metals, $19 million in cash, mutual funds, subsidiaries) to EPB or its Receiver;

2. Alternatively, enjoining Respondents from transferring, dissipating, encumbering, or disposing of these assets pending arbitration;

3. Ordering an immediate accounting of all assets, liabilities, and customer communications (CPLR § 3101; *In re Estate of Schnare*, 191 A.D.2d 859 (3d Dep't 1993));

4. Compelling return of all Records per PAA § 2.2(e) (CPLR § 6301);

5. Granting further relief as just and proper.


Dated:  July 29, 2025
        White Plains, New York


Respectfully submitted,

Peter M. Chema, Esq.

Attorney for Petitioner

55 Park View Road, South

Pound Ridge, NY 10576

Tel: (914) 393-8492

pchema.law@gmail.com

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

----------------------------------------------------------X

PETER SCHIFF,

Index No.:

Petitioner (Plaintiff),

- against -

QENTA INC., RESPONSIBLE GOLD TRADING
DMCC, and G-Commerce DMCC

Respondent (Defendants).

----------------------------------------------------------X

**LIST OF EXHIBITS TO THE AFFIRMATION OF PETER SCHIFF IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER**

| Exhibit No. | Description |
|---|---|
| **Exhibit 1** | Consent Order dated August 9, 2022, placing EPB into receivership, signed by OCIF and Peter Schiff. |
| **Exhibit 2** | Purchase and Assumption Agreement (PA Agreement or PAA) between EPB and Qenta, dated September 30, 2022. |
| **Exhibit 3** | Qenta's Termination Notice dated July 11, 2025. |
| **Exhibit 4** | Peter Schiff's Demand Letter to Qenta dated July 18, 2025. |
| **Exhibit 5** | (i) Notice from the Receiver to Opt-in customers dated July 21, 2025; (ii) Letter from Receiver's counsel to Qenta rejecting Qenta's liquidation proposal. |

**Exhibit 6**     Email communications between Qenta representatives and Opt-in customers confirming lack of regulatory approval and continued EPB custody of gold assets.

**Exhibit 7**     Screenshots from the Internet Archive (Wayback Machine): (i) Snapshot from September 19, 2024, showing Qenta management page; (ii) Current version with management information removed.

**Exhibit 8**     Screenshot of EPB's website outage on July 9, 2025, due to Qenta's failure to pay maintenance fees.

**Exhibit 9**     Qenta's website update after restoration of access, stating intent to "return all liquidated assets to the Receiver."

**Exhibit 10**    Documentation showing G-Commerce DMCC allowed its license to expire in October 2023 and is winding down.

**Exhibit 11**    Public records from Lixt.ch confirming G Mint Sàrl bankruptcy and removal from the Swiss commercial registry in 2024.

**Exhibit 12**    Supreme Court of New York complaint in *Offshore Exploration & Production LLC v. De Jong Capital LP* (Index No. 653659/2021), alleging fiduciary breaches by Brent De Jong.

**Exhibit 13**    Forum posts from OffshoreCorpTalk reflecting customer's concerns over asset freezes, Qenta's attempt to sell metals and retain the appreciation, and lack of communication by Qenta.

**Exhibit 14**    Contact page for Schiff Gold showing Peter Schiff's business location at 222 Bloomingdale Road, White Plains, NY.

**Exhibit 15**    Liquidation and Dissolution Plan executed on September 6, 2022, by Peter Schiff indemnifying the Receiver.

**Exhibit 16**    Order from the U.S. District Court for the District of Puerto Rico dated July 18, 2025, denying TRO for lack of jurisdiction over Qenta.

# Exhibit 1

**GOBIERNO DE PUERTO RICO**
**OFICINA DEL COMISIONADO DE INSTITUCIONES FINANCIERAS**
**SAN JUAN, PUERTO RICO**

| | |
|---|---|
| **OFICINA DEL COMISIONADO DE INSTITUCIONES FINANCIERAS** | **CASO NÚM.:** C22-D-006 |
| Querellante,<br>**v.** | **SOBRE:** |
| **EURO PACIFIC INT'L. BANK, INC.** | Violaciones a la Ley Núm. 273-2012, según enmendada, conocida como "Ley Reguladora del Centro Financiero Internacional" |
| Querellado. | |

## CONSENT ORDER FOR LIQUIDATION AND DISSOLUTION OF INTERNATIONAL FINANCIAL ENTITY

**WHEREAS**, this Consent Order for Liquidation and Dissolution of International Financial Entity ("Liquidation Order") is made and is effective this ⁹ day of August 2022 ("Effective Date") by and among Euro Pacific Int'l Bank, Inc., (hereinafter referred to interchangeably as "Euro Pacific" or "IFE"), an International Financial Entity organized and operating pursuant to Act No. 273-2012, as amended, known as the "International Financial Center Regulatory Act"[1] ("Act No. 273-2012"), its officers, directors, executives, managers, employees, agents, attorneys, divisions, related and subsidiary entities, affiliates, successors and assigns and the Office of the Commissioner of Financial Institutions ("OCFI"), collectively hereinafter referred to as the "Parties".

**WHEREAS**, Euro Pacific, by and through its duly elected and acting Board of Directors ("Board"), has executed a Stipulation to the Issuance of a Liquidation Order dated August 8, 2022 that is accepted by the OCFI. With this Stipulation, Euro Pacific has consented to execute this Liquidation Order.

**WHEREAS**, the execution of the Liquidation Order, including adequate protection and/or payment of all deposits held in the institution, disposes of the controversies before Administrative Hearing Examiner, Luis Torres Méndez, Esq., in the matter captioned: Oficina del Comisionado de Instituciones Financieras v. Euro Pacific Int'l. Bank, Inc., case number: C22-D-006, dated June 30, 2022, (hereinafter, the "Complaint"). Accordingly, the Parties have agreed to file a joint motion informing the Administrative Hearing Examiner of this Liquidation Order so that he can issue a Resolution disposing of the case, while  also retaining jurisdiction to address any potential issues that may arise, if any, with respect to Euro Pacific's compliance with its obligations and terms and conditions related to the liquidation proceeding set forth herein.

**WHEREAS,** OCIF and Euro Pacific recognize and acknowledge that this Liquidation Order shall be interpreted to guarantee compliance with the policy objectives underlying Act No. 273-2012, including but not limited to the adequate protection of all client deposits held in the international financial institution.

---

[1] 7 L.P.R.A. §§ 232 *et seq.*

**WHEREAS,** Euro Pacific acknowledges that it has been advised and is fully aware of its rights, including the right to challenge the OCFI's enforcement action through an adversarial administrative process, and has instead voluntarily elected to close this matter, in its entirety, with the execution of the present Liquidation Order.

**NOW, THEREFORE,** the Parties hereby adopt and sets forth this Plan of Liquidation and Dissolution of the IFE.

## I. JURISDICTION

Act No. 4 of October 11, 1985, as amended, known as the "Office of the Commissioner of Financial Institutions Act" ("Act No. 4") entrusts the OCFI with the main responsibility of controlling and supervising the financial institutions that operate or do business in Puerto Rico. The Commissioner of Financial Institutions (the "Commissioner") has been authorized by Act No. 4 to examine and to carry out all types of investigations, studies and research on matters related to the banking, financial, or securities industry for which he/she may request the necessary, relevant, and essential information for achieving such purposes.

Pursuant to Act No. 4, the OCFI has the responsibility for monitoring and supervising the financial institutions that operate or do business in Puerto Rico. In conjunction with Act No. 4, the Commissioner administers Act No. 273-2012 and Regulation No. 5653, known as "Regulation of the International Banking Center Regulatory Act" ("Regulation No. 5653")

Act No. 273-2012 allows the Commissioner to monitor and regulate the operations of any person or institution that offers or provides services as an International Financial Entity (IFE) in Puerto Rico.

## II. RELEVANT FACTUAL BACKGROUND

1.    On June 30, 2022, and due to a non-compliance with the minimum regulatory capitalization requirements set forth under Act No. 273-2012 and to avoid an irreparable harm to the operational adequacy and financial security of the institution, OCFI filed a Complaint and Order to Cease and Desist and Provisional Order for Designation of Trustee ("Complaint") against Euro Pacific ordering (i) the suspension of the IFE's banking activities for non-compliance with the minimum capitalization requirements under applicable law; and (ii) designating a Trustee-Receiver to take over the administration of Euro Pacific and effectively manage the liquidation process of the international financial entity. **Exhibit A and attachments thereto.**

2.    OCFI and Euro Pacific hereby incorporate by reference the contents of the Complaint and all attachments thereto to this Liquidation Order, subject to Section V, Paragraph 16 herein.

3.    As of today, and as set forth in the Complaint, Euro Pacific is under the provisional administration of the Trustee-Receiver, Wigberto Lugo-Mender, esq., who has duly complied with all his obligations arising under the Designation Order issued by OCFI, including the implementation of certain measures to reasonably guarantee the payment of all ordinary expenses, including payroll, operational expenses, lease agreement payments; advisor fees; and fines and penalties due to governmental authorities, related to the IFE's business operations and affording adequate protection to all client deposits held in the international financial institution.



4.    OCFI and Euro Pacific have engaged in extensive discussions and negotiations regarding Euro Pacific's noncompliance with the minimum capitalization requirements set forth in Act No. 273-2012, which poses a significant risk to the financial institution's operational adequacy. To that effect, the parties

have agreed to provide the transfer or liquidation of Euro Pacific in a period not to exceed ninety (90) days as further detailed below.

     5.     Therefore, the Parties have jointly agreed that, considering the totality of the circumstances related to the financial institution and the captioned enforcement action, including the implementation of certain measures to reasonably guaranteeing the adequate protection of client deposits and safeguarding the credibility of Puerto Rico's international financial industry, it is in their best interest to execute this Liquidation Order with respect to Case No. C22-D-006; by means, among others, of the actions, terms, conditions and measures expressly and/or implicitly provided for it in this document.

### III. DEFINITIONS

As used herein, the following words and terms shall have the following meanings:

**"Business Day"** means any day of the year other than a Saturday, Sunday or a day on which banks in the Commonwealth of Puerto Rico are authorized or required by law, regulation or executive order to close.

**"Cash Reserve Account"** means a cash reserve established by the Trustee on behalf of the IFE with sufficient funds in cash or readily available funds to pay ALL the Deposits.

**"Creditor(s)"** means a person with whom the IFE has an outstanding contractual payment obligation, including but not limited to depositors, lenders, lessors, service providers and employees.

**"Department of State"** means the Department of State of the Commonwealth of Puerto Rico.

**"Deposit(s)"** means liabilities of Euro Pacific in the form of demand deposits or time deposits but does not include trust or custody accounts held with the IFE.

**"Depositor(s)"** means a person that holds a Deposit(s) in Euro Pacific.

**"Effective Date"** shall be ⁹ day of August 2022.

**"Expense(s) of the Corporation"** means the following expenses of the IFE: (i) payroll, (ii) operational expenses, including but not limited to leases, utilities, licensing of software; (iii) fees of advisors including but not limited to accountants, attorneys, auditors, management and compliance consultants; and (iv) fines, penalties and administrative penalties due to governmental authorities.

**"Inactive Accounts"** means Deposit accounts that have been inactive for the last twelve (12) months.

**"Non-Related Parties"** means a person that is not a Related Party.



**"Related Party"** means the persons listed in **Exhibit B**.

## IV. LIQUIDATION ORDER

Therefore, in view of all the above, pursuant to the powers and authority granted to OCFI, in executing this Liquidation Order, Euro Pacific and the OCFI agree to the following and Euro Pacific is therefore ORDERED to take all affirmative actions as follows:

1. Euro Pacific acknowledges that OCFI has legal authority and jurisdiction with regards to the Complaint, the remedies imposed/requested therein, the designation of the Trustee, and entry of the Liquidation Order, and thus, expressly waives all claims and defenses to the contrary.

2. Based on the nature and circumstances of the legal and/or regulatory violations averred in the Complaint, including the entity's failure to comply with the minimum capitalization requirements applicable to an IFE, and the significant risk that this noncompliance poses to the deposits held in the international financial entity, by virtue of this Liquidation Order, Euro Pacific expressly and irrevocably agrees to:

   a. Surrender it's IFE License under Act No. 273-2012, through a Sworn Statement duly authorized by Euro Pacific's Board, which clearly establishes that the entity will cease its banking operations in Puerto Rico.
   b. Surrender the IFE's Tax Decree, should there be one in place, for all legal purposes, through a Sworn Statement duly authorized by Euro Pacific's Board.
   c. Cease and desist from engaging in conduct, including acts and/or omissions, constituting or which could constitute a violation of Act No. 273-2012 and its Regulation, including without limitation, recurrence of the conduct described in the Complaint.
   d. Provide OCFI with a Voluntary Liquidation Plan ("Voluntary Liquidation Plan") within fifteen (15) days of the execution of this Liquidation Order, which acceptance shall be subject to OCFI and the Trustee's approval and strictly aligned with the policy objectives arising under Act No. 273-2012 and requirements of this Liquidation Order, including the adequate protection of all client deposits. All costs, directly or indirectly, related to the Voluntary Liquidation will be defrayed by Euro Pacific.
   e. Produce to OCFI the Audited Financial Statements for the year 2021 and sufficient and adequate third party certification regarding the accuracy of EPB's financial information for fiscal year 2022.

3. <u>Voluntary Liquidation Plan</u>: The Voluntary Liquidation Plan shall be subject, at a minimum, to the following terms and conditions, including any additional measures required, at the sole discretion of OCFI and the Trustee, that are reasonably designed and needed to comply with the policy objectives underlying Act No. 273-2012, including affording adequate protection to all Deposits held in Euro Pacific. The closing of operations, transfers and withdrawals of funds shall be as follows:

   (i) The Voluntary Liquidation Plan shall become effective on the date of the approval of the Plan by the affirmative written consent of Euro Pacific, the Trustee, and OCFI.
   (ii) The Liquidation Period shall not exceed ninety (90) days from the Effective Date.
   (iii) Euro Pacific may only maintain its business operations for the sole purpose of completing the operating tasks geared to the effective and adequate



implementation of this Liquidation Order, marshaling, winding up its business and affairs, and preserving the value of its assets.

(iv)     At the date of the Effective Date, Euro Pacific shall provide the Trustee with a list of all accounts, including Inactive Accounts.

(v)      Within five (5) Business Days of the Effective Date, Euro Pacific shall mail a notice to its Creditors, at their address shown on Euro Pacific's records, that Euro Pacific is undergoing a Voluntary Liquidation and thus, the deposits held at Euro Pacific will be transfer or pay accordingly, as set forth below.

(vi)     The Voluntary Liquidation Plan shall provide that all deposits accounts held in Euro Pacific shall be transferred to an assuming institution that will make all monies available to clients immediately after the transfer.

(vii)    Euro Pacific, as a corporate entity, shall be terminated as soon as the Voluntary Liquidation Plan is terminated, by submitting all required documents to the Department of State.

(viii)   The assuming institution to which Euro Pacific client accounts are transferred may resume banking operations in any foreign jurisdiction other than Puerto Rico, subject to strict compliance with all statutory and/or regulatory requirements governing their business operations in the corresponding jurisdiction.

(ix)     At the execution of the last payment obligation, Euro Pacific business locations and international banking operations in Puerto Rico will be closed permanently and irrevocably.

4.  Preference and Payment of Claims: According to the information contained in Euro Pacific's business records, as reviewed by the Trustee, as of June 30, 2022, and the representations made by the IFE, the Net Cash Available, including proprietary precious metals to be monetized, is $68,109,302 USD. As of the same date, client deposits totaled the amount of $66,747,758. Therefore, as of June 30, 2022, Euro Pacific had an excess cash position to cover all deposits, assuming it is able to monetize its proprietary precious metals. Despite this cash position, Euro Pacific recognizes that is does not meet Act 273-2012's minimum regulatory capitalization requirements.

In view of Euro Pacific's failure to comply with the minimum capitalization requirements applicable to IFE's, OCFI has determined that the financial entity lacks sufficient assets to execute a complete distribution on general unsecured creditor claims (and any lower priority claims) and therefore, all such claims, asserted, or unasserted, are expected to recover less than the total amount of debts existing as of June 30, 2022, unless additional cash is injected into Euro Pacific or other unencumbered assets are monetized to adequately cover said cash shortfalls. As such, as a condition precedent to put in place and implement the Voluntary Liquidation Plan, Euro Pacific (through the Trustee) must create a Cash Reserve Account with sufficient funds in cash or readily available funds to pay ALL deposits and the Trustee's administrative expenses. The Parties agree that the Trustee shall certify whether the Cash Reserve Account satisfies the requirements set forth herein.



In compliance with the policy objectives underlying Act No. 273-2012, including affording adequate protection to all IFE held deposits and thus, safeguarding the credibility and granting legal certainty to Puerto Rico's international financial industry, the Voluntary Liquidation Plan shall, at a minimum, guarantee preference and provide adequate protection to all client deposits

held in Euro Pacific. To this effect, and based OCFI's delegated powers under Act No. 4, and Act No. 273-2012, for purposes of guaranteeing an adequate and effective liquidation of the IFE, it is hereby ordered that Euro Pacific's Voluntary Liquidation Plan shall comply with the priority parameters developed by the Federal Deposit Insurance Corporation ("FDIC") in its applicable laws and/or regulations, particularly those provided in the "*Resolution and Receivership*" rules codified in 12 CFR Part 360.3.

In compliance with the above, the Voluntary Liquidation Plan shall be formulated to satisfy all unsecured claims in the following order of priority:

(1) Administrative Expenses of the Trustee-Receiver related to the Liquidation Order.
(2) Any deposit of Euro Pacific clients, excluding any deposited, debt or obligation, payable as described in paragraph five (5) below.
(3) Any other "senior" or general debt of the institution.
(4) Any other obligation that has been subordinated to the payment of the deposits of clients or general creditors.
(5) Any deposit, debt or obligation to shareholders, affiliates, subsidiaries, or members of the IFE.

For purposes of the Voluntary Liquidation Plan requirements set forth herein, the Parties incorporate by reference to this Liquidation Order, a document identifying Euro Pacific's Related Parties and setting forth a general overview of the transactions conducted with such parties. **Exhibit B**.

During the Voluntary Liquidation Period, Euro Pacific shall pay, discharge, or otherwise provide for payment or discharge of, all liabilities and obligations of the IFE, following the subsequent order:

A. First, Euro Pacific shall send a written notice ("Notice") to each Depositor and Creditor to the address on record. The notice shall be mailed within five (5) Business Days of the Effective Date. The Notice shall include the Trustee's official email address to receive claims and inquiries. The Notice shall state the procedure for withdrawing and/or transferring funds. Likewise, the Notice shall inform the procedures after the allotted time for withdrawing and/or transferring funds has lapsed.

B. Second, the funds shall be paid, discharged, or otherwise provide for payment or discharge as follows:

1. Within thirty (30) Business Days of the Notice, Euro Pacific shall pay its Depositors that are Non-Related Parties, that have a right to withdraw their Deposits in cash (wire transfer or check), either because they are demand deposits or time deposits that become due. Within said period, Euro Pacific shall also transfer any Non-Related Parties Deposits, to the extent that Depositors prefer to transfer their Deposits to an assuming institution.

2. Within two (2) Business Days of the Depositor transfer instruction, Euro Pacific shall transfer Deposits of Non-Related Parties to the assuming institution. In the event the Non-Related Parties does not answer the Notice within the allotted timeframe to do so, Euro Pacific shall transfer the Accounts and Deposits to an assuming institution, which shall provide notice to all new Accounts regarding the transfer.



3. After completing the payment or transfer of Deposits, as contemplated above, and after completing payment of any claims following the order of priority set forth above, but within the Liquidation Period, Euro Pacific shall transfer deposits of Related Parties to the assuming

institution or other depository institution authorized to receive such deposits, *provided however* that such transfer of deposits of Related Parties shall only occur in the event that (i) Euro Pacific has established and fully funded the IFE's Cash Reserve Account, which shall have sufficient funds in cash or readily available funds to pay all deposits held in the international financial institution and (ii) there are no outstanding account receivables due to Euro Pacific from said Related Parties.

4. During the Voluntary Liquidation Period, Euro Pacific shall pay any liabilities before they are due to its Creditors, other than Depositors, provided however, that such payments shall only occur if the IFE has established and fully funded the Cash Reserve Account to pay all Deposits.

5. If Euro Pacific is unable to pay, discharge or otherwise provide for any of its liabilities during the Voluntary Liquidation Period, the IFE may, however, retain cash or cash equivalents in an amount that the Trustee estimates necessary and reasonable to discharge any unpaid liabilities, expenses of the corporation, and obligations on the entity's books as of the Effective Date, payable for the period prior to the Liquidation, and pay such contingent liabilities against the remaining assets of Euro Pacific, consistent with the order of priority set forth above.

6. No distribution of assets of Euro Pacific shall be made to the Shareholder, Peter Schiff, until all Deposits are either paid in cash or transferred to the assuming institution or another depository institution with the consent of the Depositor, as provided herein; provided however, that such distribution of assets to the Shareholder, Peter Schiff, shall be allowed, following the order of priority set forth above, if Euro Pacific has established and fully funded the Cash Reserve Account to pay all Deposits held in the institution.

7. Euro Pacific shall cause the Shareholder, Peter Schiff, to endorse for cancellation and deliver to the entity the shares of the IFE owned by its represented certificates, which shall be redeemed and canceled by the corporation in accordance with the requirements arising under applicable laws and/or regulation.

5. Disposal and Sale of Assets: As of the Effective Date, the Trustee, on behalf of Euro Pacific, shall have the authority to either dispose or sell and liquidate its assets and engage in such other transactions as maybe appropriate to its dissolution and liquidation, including, without limitation, obtaining all necessary approvals and authorizations from the OCFI. The disposal and sale of Euro Pacific's assets shall be subject to the following terms and conditions:

   a. All proceeds of the sale of assets shall be used to (i) pay the administrative expenses of the Trustee; (ii) fund the Cash Reserve Account to pay all Deposits; (iii) pay any fines imposed by OCFI; and (iv) pay expenses of Euro Pacific.

   b. All assets of clients or customers of Euro Pacific held in trust accounts or in custody accounts, if any, shall be transferred as per instructions of said clients or customers. Securities held in such accounts shall be transferred to securities accounts designated by such clients, or in the event the client so orders that the securities be sold, such securities will be sold, and the proceeds shall be delivered to the client or customer.

6. Liquidation by the Trustee: The Trustee shall be in charge of completing the liquidation to Euro Pacific to the best of his ability, consistent with the parameters set forth in the Designation Order, in the event that Euro Pacific is unable to establish and fully fund the Cash Reserve Account and in the event that Euro Pacific is unable to complete the Voluntary Liquidation Plan during the Liquidation Period.



7. <u>Taxes</u>: On or after the Effective Date, Euro Pacific shall file a request for an administrative determination or ruling with the Department of Treasury for the Government of Puerto Rico confirming that the Voluntary Liquidation is not subject to Puerto Rico taxation pursuant to the Act and the Internal Revenue Code to provide such determination to the OCFI and the Department of State.

8. <u>Fines and Penalties</u>: In full settlement of the Complaint, Euro Pacific will issue a check payable to the Secretary of the Treasury on the date of the execution of this LIQUIDATION ORDER in the sum of **THREE HUNDRED THOUSAND DOLLARS ($300,000.00).** Such Settlement Amount constitutes an administrative fine which includes all monetary remedies of any kind relating to the Complaint, including but not limited to, fines, penalties, and interest.

9. <u>Time is of the Essence</u>. The Parties agree and acknowledge that time is of the essence regarding the Settlement Payment; therefore, Euro Pacific agrees to issue full payment in favor of OCFI; and OCFI agrees to voluntarily dismiss the Complaint filed against Euro Pacific within thirty (30) days after receiving notification from Euro Pacific certifying its full compliance with all the terms of this Liquidation Order.

10. The OCFI and Euro Pacific, as well as their attorneys and agents agree to execute all documents that are legally required for the execution of this Liquidation Order and the policy objectives of Act No. 273-2012.

## V. NOTICES

1. Nothing herein shall preclude the Government of Puerto Rico, its departments, agencies, boards, commissions, authorities, political subdivisions, and corporations, or any other federal or state agency, from asserting any claims, causes of action, or applications for compensatory, nominal, and/or punitive damages, administrative, civil, criminal, or injunctive relief against Euro Pacific.

2. This Liquidation Order includes the settlement of the totality of all claims by the OCFI against Euro Pacific, arising under the provisions of Act No. 273-2012 and Regulation No. 5653, as well as any other applicable laws and regulations in connection with the facts described in the Complaint.

3. Except as explicitly provided in this Liquidation Order, nothing herein is intended to nor shall be construed to have created, compromised, settled, or adjudicated any claims, causes of action, or rights of any person whomsoever, other than as between the OCFI and Euro Pacific, in accordance with this Liquidation Order.

4. The Parties are entering into this Liquidation Order freely, knowingly, and voluntarily, under the advice of counsel of their choices and with a full understanding of its terms. This Liquidation Order is final and irrevocable for all legal purposes.



5. The Parties warrant that they are not subject to any statute or contractual obligation, which may make unlawful the execution and performance of this Liquidation Order.

6. Euro Pacific warrants that the person appearing on its behalf in this Liquidation Order is duly authorized by Euro Pacific to execute the same.

7. This Liquidation Order reflects the total agreement between the Parties and any statement, promise or representation given by any of the Parties, which is not included herein, shall be null and void.

8. This Liquidation Order shall be interpreted for all purposes consistent with the laws of the Government of Puerto Rico. If any clause of this Liquidation Order should ever be determined to be unenforceable, it is agreed that this will not affect the enforceability of any other clause or the remainder of this Liquidation Order.

9. Euro Pacific hereby acknowledges that the failure to comply with all or any of the terms and conditions set forth in this Liquidation Order which are applicable to Euro Pacific may result in the exercising of any right or prerogative possessed by the OCFI, as provided by Act No. 4 or any other applicable law.

10. This Liquidation Order will become part of Euro Pacific's permanent record and may be considered in any future actions brought by the OCFI or any other regulator against Euro Pacific.

11. OCFI and Euro Pacific (together, "the parties"), their officers, directors, agents and/or representatives, mutually agree that they shall not make any disparaging remarks, or any remarks that could reasonably be construed as disparaging of one another and/or regarding their officers, directors, employees, stockholders, representatives, or agents, including Peter Schiff. The parties shall, except to the extent otherwise required by applicable laws, rules, or regulations or as appropriate in the exercise of their fiduciary duties (as determined by each party with advice of counsel), exercise reasonable efforts to cause the following individuals to refrain from making any disparaging statements, orally or in writing, regarding the parties from and after the termination of the Liquidation period: OCIF's executive officers, Euro Pacific's executive officers, and Peter Schiff.

12. Euro Pacific, through the execution of this Liquidation Order, voluntarily waives any rights Euro Pacific may have to seek judicial review or otherwise challenge or contest the terms and conditions of this Liquidation Order and the Complaint.

13. Euro Pacific and the OCFI agree that this Liquidation Order is entered into for purposes of resolving only the matters as described herein.

14. This Liquidation Order is binding upon Euro Pacific, its officers, directors, and Euro Pacific's affiliates, successors, and assignees as well as to the successors and assignees of relevant affiliates with respect to all conduct subject to the provisions established above and all future obligations, responsibilities, undertakings, commitments, limitations, restrictions, events, and conditions.

15. Nothing in this Liquidation Order precludes the OCFI from: (a) taking adverse action based on other conduct; (b) taking this Order and the conduct described above into account in determining the proper resolution or action based on other conduct; (c) taking any and all available steps to enforce this Order; (d) taking any action against other entities or individuals,



regardless of any affiliation or relationship between the IFE and the entities or individuals; or (e) be construed to limit the OCFI's jurisdiction in any other proceeding after its issuance.

16. Neither this Liquidation Order nor anything contained within it shall be admissible in any proceeding as evidence of liability or wrongdoing on the part of either party. However, this Liquidation Order may be introduced into evidence in any proceeding instituted to enforce its terms. Moreover, Euro Pacific agrees to this Liquidation Order without admitting or denying the findings herein, except as to OCFI's jurisdiction over Euro Pacific and the subject matter of these proceedings and the findings concerning Euro Pacific's noncompliance with the minimum capitalization requirements set forth in Act No. 273-2012.

17. Each of the parties has participated in the negotiation of this Liquidation Order.

18. Euro Pacific, its directors and officers, do hereby release and forever discharge the OCFI, its attorneys, insurers, assignees, transferors, transferees, principals, partners, officers, directors, employees, agents servants, subsidiaries, parent corporations, affiliates, successors, stockholders, agents and representatives, including the Trustee (the "Releasee(s)"), from any and all claims, demands, damages, debts, liabilities, obligations, contracts, agreements, causes of action, suits, of whatever nature, character or description, that Euro Pacific may have or may hereafter have or claim to have against each other Releasee(s) arising out of or related to the facts or allegations made in any of the papers or pleadings filed in the Complaint and any conduct, including actions and omissions, to enforce the Complaint.

19. Euro Pacific waives any right to recover from the OCFI, costs, expenses, and attorney's fees in connection with the Complaint.

20. This Liquidation Order is the complete agreement between the OCFI and Euro Pacific concerning their disagreement. The Parties certify that they have made no other written or oral agreement relating to their disagreement. This Liquidation Order supersedes any prior agreements, understandings, or negotiations, whether written or oral, between the OCFI and Euro Pacific.

21. If any portions of this Liquidation Order are held invalid and unenforceable, all remaining portions shall nevertheless remain valid and enforceable, to the extent they can be given effect without the invalid portions.

22. Euro Pacific is hereby given notice that, pursuant to the provisions of Article 20(c) of Act No. 4, the OCFI may impose an administrative fine not greater than Five Thousand ($5,000.00) Dollars for each day of non-compliance with the orders issued under the provisions of that Act, up to a maximum of Fifty Thousand ($50,000.00) Dollars. In the event of total or partial non-compliance with this Order, the OCFI, in support of the statutory jurisdiction granted by Act No. 4, may request the Court of First Instance, San Juan Superior Section, to enforce the same, under penalty of contempt, and to impose fines and sanctions in addition to the ones the OCFI may deem to be proper, with any other determination which is proper as a matter of law.

23. The terms of this Liquidation Order will become effective immediately upon its execution.

**IT IS SO ORDERED BY THE COMMISSIONER**.

This Liquidation Order is executed in San Juan, Puerto Rico, on August 9, 2022.

Natalia I. Zequeira Díaz, Esq.
COMMISSIONER OF FINANCIAL
INSTITUTIONS

**GOBIERNO DE PUERTO RICO**
**OFICINA DEL COMISIONADO DE INSTITUCIONES FINANCIERAS**
**SAN JUAN, PUERTO RICO**

| | |
|---|---|
| **OFICINA DEL COMISIONADO DE INSTITUCIONES FINANCIERAS** | **CASO NÚM.:** C22-D-006 |
| Querellante, <br> v. | **SOBRE:** <br><br> Violaciones a la Ley Núm. 273-2012, según enmendada, conocida como "Ley Reguladora del |
| **EURO PACIFIC INT'L. BANK, INC.** | |
| Querellado. | |

**CONSENT FOR ORDER FOR LIQUIDATION AND**
**DISSOLUTION OF INTERNATIONAL FINANCIAL ENTITY**

Euro Pacific Int'l Bank, Inc., ("Euro Pacific") hereby acknowledges that it has been served with a copy of the Liquidation Order issued on this day and, after evaluating the same with the assistance of legal counsel, has waived its right to a hearing and appeal in this matter. Euro Pacific recognizes the jurisdiction of the Office of the Commissioner of Financial Institutions ("OCFI") for purposes of filing the captioned enforcement and admits the Facts contained in the Liquidation Order.

Euro Pacific has discussed the same with its respective attorneys and voluntarily consents to the entry of the Liquidation Order issued by the OCFI as settlement of the violations contained in the Complaint, avoiding protracted and expensive proceedings.

Euro Pacific states that no promise of any kind or nature was made to induce it to execute this Liquidation Order and expresses its Consent to comply with the terms therein which will be effective immediately upon its execution on August 9 , 2022.
                                                              a director and sole
Mr.    Peter Schiff    , represents and warrants that he or she is    shareholder
of Euro Pacific and that, as such, has been authorized through the corresponding Resolution to Consent to the Liquidation Order for and on behalf of Euro Pacific.

On August 8 , 2022.


_____

Euro Pacific Int'l Bank, Inc.

# Exhibit 2

Execution Version

## PURCHASE AND ASSUMPTION AGREEMENT

**THIS PURCHASE AND ASSUMPTION AGREEMENT** (this "Agreement"), dated September 30, 2022 (the "Effective Date"), is entered into by and between **EURO PACIFIC INTL. BANK, INC.,** an International Financial Entity licensed under the laws of the Commonwealth of Puerto Rico, as seller ("Seller"), **PETER D. SCHIFF,** Seller's sole shareholder (the "Sole Shareholder"), **QENTA INC.,** a Delaware company ("Qenta"), **G-COMMERCE DMCC** and **RESPONSIBLE GOLD TRADING DMCC,** two free zone companies incorporated under the laws of the United Arab Emirates and licensed by the Dubai Multi Commodities Centre (respectively "G-Commerce" and "RGTD"; together with Qenta, the "Purchasers" and, together with Qenta, Seller and the Sole Shareholder, the "Parties").

**WHEREAS,** Seller is in the process of surrendering its International Financial Entity license and liquidating its assets, and for such purposes has presented and obtained approval from its receiver and the Office of the Commissioner of Financial Institutions of Puerto Rico ("OCFI") to a liquidation and dissolution plan on September 6, 2022; and

**WHEREAS,** in light of Seller's anticipated liquidation, Purchasers desire to acquire the Assets (as defined below) and undertake the Liabilities (as defined below).

**NOW, THEREFORE,** in consideration of their mutual promises and obligations and intending to be legally bound hereby, the Parties agree as follows:

## ARTICLE 1
## CERTAIN DEFINITIONS

**1.1.**    Certain Definitions. As used in this Agreement, the terms below shall have the meanings set forth.

"Affiliate" of a person means any person directly or indirectly controlling, controlled by or under direct or indirect common control with such first person.

"Assets" means (i) all of Seller's current cash (whether denominated in USD or in any foreign currency and whatever the account where they may be deposited), cash equivalents, receivables, cash and receivables from depository institutions, including cash items in the process of collection, plus any accrued interest thereon computed to and including Closing, and precious metals deposits (including but not limited to all metals held through Silver Bullion Pte. Ltd.), a list of which as of the Effective Date is attached hereto as Exhibit 1; (ii) the Subsidiary Shares; (iii) the Assumed Contracts (including all of Seller's rights and obligations thereunder); (iv) the Records; (v) securities (other than the Subsidiary Shares), plus any accrued interest thereon computed to and including Closing, held by or in the Seller or the Subsidiaries; and (vi) the IT Equipment (also listed in Exhibit 1) and the Seller's website (domain europacbank.com, hereinafter the "Domain"); *provided, however,* that the Assets do not include: (a) the assets or the portion of the assets described in item (i) above that exceed the Liabilities at Closing (as such terms are defined below); (b) any deferred Tax assets, refunds for Taxes relating to the period prior to the Effective Date and prepaid Taxes; or (c) all or any portion of Assets backing Liabilities which, in the discretion of the OCFI, either may be required to satisfy it for any liquidated or contingent liability of any Eligible Customer arising from an unauthorized or unlawful transaction.

"Assumed Contracts" means the contracts listed on Exhibit 1 that, having originally been entered into by Seller, Purchaser will assume with all their rights and obligations as of the Effective Date and in the terms hereof and thereof.

Execution Version

"Bank Closing Date" has the meaning ascribed thereto in Section 5.3.

"Business Day" means a day on which banking institutions are required to be open for business in the State of New York which is not a Saturday, Sunday or another legal holiday.

"Closing" shall mean the moment in which all Assets and Liabilities have been transferred to the Purchasers pursuant to the terms hereof; *provided* that there may be one or more partial transfers hereunder until final Closing is achieved, as contemplated in Section 2.3.

"Confidential Information" has the meaning set forth in Section 5.1.

"Eligible Customers" means all of Seller's customers (i) whose names are not included in the Office of Foreign Assets Control (OFAC) Specially Designated Nationals and Blocked Persons List or in any other list published or utilized by the Financial Crimes Enforcement Network (FinCEN); (ii) who are not residents of Puerto Rico; (iii) who have not expressly "opted-out" from the transfer of the corresponding Liabilities to Purchasers hereunder in accordance with the processes established for such purposes by Seller and/or Purchasers; and (iv) whose accounts with Seller are not, as of the Effective Date, categorized as closed, blocked or "under liquidation" (unless with the express consent of either Purchaser) and which are compliant with Purchasers' KYC and general compliance policies.

"Encumbrances" means all mortgages, claims, charges, liens, encumbrances, easements, limitations, restrictions, commitments, security interests, pledges or other similar charges or liabilities, whether accrued, absolute, contingent or otherwise, except for statutory liens for ad valorem tax payments securing payments not yet due.

"IT Equipment" means the computer hardware, software and related equipment identified in Exhibit 1 and until the corresponding Closing owned by Seller which is needed by Seller's staff for managing or servicing the Assets in the ordinary course.

"Liabilities" means all of Seller's liabilities and obligations towards Eligible Customers as of the corresponding Closing.

"Losses" means losses, liabilities, damages (including forgiveness or cancellation of obligations), expenses, costs, legal fees and disbursements, collectively.

"Material Adverse Effect" means a material adverse effect, individually or in the aggregate, on the condition, financial or otherwise, or results of operations of Seller, or on its ability or that of either Purchaser to consummate timely the transactions contemplated hereby. Notwithstanding the foregoing, a Material Adverse Effect shall not be deemed to exist as a result of general economic conditions.

"Purchase Price" has the meaning set forth in Section 2.1(b).

"Records" means all information and documents in Seller's possession (including records maintained electronically and through third party applications) which pertain to and are utilized by Seller to administer, reflect, monitor, evidence or record information respecting the business or conduct of Eligible Customers, as well as any information on the Assets and/or the Liabilities.

"Regulatory Approvals" means all approvals, permits, authorizations, waivers or consents of governmental or regulatory agencies or authorities necessary or appropriate to permit consummation of the transactions contemplated herein, including without limitation those from the Seller's receiver, the Office

of the Commissioner of Financial Institutions of Puerto Rico ("OCFI") and each of the Subsidiaries' regulators, to the extent applicable and as such approvals must be given under applicable law.

"Subsidiaries" means Seller's subsidiaries Euro Pacific Funds SCC Ltd., Euro Pacific Securities, Inc., Euro Pacific Card Services Ltd. and Global Corporate Staffing Ltd.

"Subsidiary Shares" means all shares of stock issued by the Subsidiaries.

"Tax" refers to all federal, state, local, or foreign income, gross receipts, windfall profits, severance, property, production, sales, use, excise, transfer, license, franchise, employment, withholding or similar taxes or amounts required to be withheld and paid over to any government in respect of any tax or governmental fee or charge, including any interest, penalties, or additions to tax on the foregoing.

"Uncleared Cash" means all cash Assets held with, and not yet cleared for wiring by, Seller's correspondent banks, including but not limited to Novo Banco, S.A. as of the initial Closing date.

**1.2.**    Use and Application of Terms. In using and applying the various terms, provisions and conditions in this Agreement, the following shall apply: (1) the terms "hereby", "hereof", "herein", "hereunder", and any similar words, refer to this Agreement; (2) words in the masculine gender mean and include correlative words of the feminine and neuter genders and words importing the singular numbered meaning include the plural number, and vice versa; (3) words importing persons include corporations, associations, general partnerships, limited partnerships, limited liability partnerships, limited liability limited partnerships, limited liability companies, trusts, business trusts, corporations and other legal organizations, including public and quasi-public bodies, as well as individuals; (4) the use of the terms "including" or "included in", or the use of examples generally, are not intended to be limiting; and (5) this Agreement shall not be applied, interpreted and construed more strictly against a person because that person or that person's attorney drafted this Agreement.

# ARTICLE 2
# THE TRANSACTIONS

**2.1.**    Transfer and Consideration.

(a)    Subject to the terms and conditions set forth in this Agreement, at the Closing, Purchasers shall purchase the Assets and assume the Liabilities object thereof, and Seller shall sell, assign, transfer, convey and deliver to Purchaser, free and clear of all Encumbrances, all of Seller's right, title and interest in and to such Assets and Liabilities.

(b)    The purchase price for the Assets and Liabilities (the "Purchase Price") is US$1,250,000 (One Million Two Hundred Fifty Thousand Dollars), payable as follows:

(i)    US$500,000 (Five Hundred Thousand Dollars), which were paid by Purchasers immediately after the execution of G-Commerce's Letter of Intention for the acquisition of the Assets and Liabilities by the Seller's receiver and OCFI, and which payment Seller and the Sole Shareholder hereby irrevocably acknowledge; and

(ii)    US$750,000 (Seven Hundred Fifty Thousand Dollars), within 15 (fifteen) Business Days after the final Closing hereunder subject to Sections 2.2 and 2.3.

**2.2.**    Initial Closing. Subject to all Regulatory Approvals having been obtained and remaining in full force and effect, an initial Closing shall take place between the execution date hereof and 23:59 CT

on September 30th, 2022, by virtue of Seller perfecting (at its own expense) the assignment, transfer, conveyance and delivery to Purchasers (and to their satisfaction) of the following Assets, and the assumption by Purchasers of all the Liabilities corresponding to such Assets, in each case free and clear of all Encumbrances, pursuant to the following:

(a)    All of Seller's Assets listed in <u>Exhibit 1</u> hereof (except for Uncleared Cash, if any) shall be transferred to Purchasers or a designated Affiliate by virtue of (A) the transfer, via wire of immediately available funds, of all cash to the account(s) designated by G-Commerce for such purposes; and (B) the transfer of all of Seller's right, title and interest in and to any precious metals held with third party depositors;

(b)    All Subsidiary Shares shall be transferred, assigned or endorsed in favor of Qenta or a designated Affiliate, all share ledgers and other corporate records shall be delivered and shall duly reflect such transfer, and Seller or Sole Shareholder shall have resigned to any managerial positions in such entities and appointed representatives of Purchasers to replace them in such positions, as well as sole controlling parties over each Subsidiary's bank accounts indicated by Purchasers as necessary for the ongoing operation of such entities;

(c)    The Assumed Contracts and all of Seller's rights and obligations thereunder shall be duly transferred or assigned to Purchasers or a designated Affiliate with the acknowledgement or consent of the relevant counterparty, if applicable, or in compliance with their respective terms, unless either Purchaser consents in writing to the transfer of all or part of such Assumed Contracts on a subsequent Closing as per Section 2.3;

(d)    All Liabilities shall be assumed by Purchasers or a designated Affiliate, except for those related to Uncleared Cash, if any, or unless either Purchaser consents to the transfer of any such Liabilities on a subsequent Closing as per Section 2.3; and

(e)    Custody over the Records shall be transferred by Sellers to Purchasers or a designated Affiliate in compliance with all applicable laws, through physical delivery to, and at the address indicated by, Purchasers or designated Affiliates, or through the granting to them of sufficient credentials for permanent access to such information (including through Assumed Contracts or otherwise), except for Records related to Liabilities for Uncleared Cash, if any, or unless either Purchaser consents to the transfer of any such Records on a subsequent Closing as per Section 2.3. Once Records have been transferred, the corresponding transferee Purchaser or Affiliate shall assume the sole responsibility of retention thereof, except for Records that the Sole Shareholder is required by OCFI to retain pursuant to Seller's Liquidation and Dissolution Plan.

(f)    Ownership of the Domain shall be transferred by Seller and Sole Shareholder to Purchasers or a designated Affiliate; *provided* that ownership of the Domain shall be subsequently transferred by the relevant Purchaser or Affiliate to the Sole Shareholder on or before December 31st, 2022.

**2.3.**    <u>Additional Closing</u>. An additional Closing shall take place on the earliest to occur between (a) the date of clearing of all Uncleared Cash, if any, by Seller's correspondent bank, or (b) the second Business Day following a request by either Purchaser to the Sole Shareholder. On such additional Closing, Seller and the Sole Shareholder shall be liable for the effective transfer to Purchasers or their designated Affiliates of any Uncleared Cash and the corresponding Liabilities, or any other Assets and/or Liabilities which transfer after the initial Closing was consented in writing by either Purchaser pursuant to Section 2.2, if any. Seller and the Sole Shareholder undertake the obligation to update <u>Exhibit 1</u> hereof to include any Assets or Liabilities transferred on an additional Closing.

Execution Version

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller and the Sole Shareholder represent and warrant as follows:

**3.1.** <u>Organization and Authority</u>. Seller is an International Financial Entity (*Entidad Financiera Internacional*) duly organized and validly existing under the laws of the Commonwealth of Puerto Rico, and has the requisite corporate power and authority and has taken all corporate action necessary in order to execute and deliver this Agreement and to consummate the transactions contemplated hereby. This Agreement is a valid and binding agreement of Seller enforceable against Seller in accordance with its terms.

**3.2.** <u>No Conflict; Licenses and Permits</u>. The execution, delivery and performance of this Agreement by Seller does not, and will not, violate any provision of its charter or bylaws or violate or constitute a breach or contravention of, or default under, any law, rule, regulation, order, judgment, decree or filing of any government, governmental authority or court to which Seller is subject or under any agreement or instrument of Seller, or by which Seller is otherwise bound, or to which any of the Assets, Liabilities or Assumed Contracts are subject.  Seller has all material licenses, permits or other authorizations of all foreign, federal, state and local governments and governmental authorities necessary for the lawful conduct of its business as currently conducted.

**3.3.** <u>Approvals and Consents</u>. Except as it relates to the Regulatory Approvals, no notices, reports or other filings are required to be made by Seller with, nor are any consents, registrations, approvals, permits or authorizations required to be obtained by Seller from, any governmental or regulatory authorities in connection with the execution and delivery of this Agreement by Seller and the consummation by Seller of the transactions contemplated hereby.

**3.4.** <u>Title</u>. Seller has good title to the Assets and Assumed Contracts, free and clear of all Encumbrances, and the value of cash and cash equivalents constituting the Assets is equal to or greater than the Liabilities.

**3.5.** <u>Contracts</u>. Each Assumed Contract constitutes a valid, binding and assignable obligation of Seller and there does not exist, with respect to Seller's obligations thereunder, any default, or event or condition which constitutes, or after notice or passage of time or both would constitute, a material default on the part of Seller under any Assumed Contract.

**3.6.** <u>Fiduciary Obligations</u>. Seller has no trust or fiduciary relationship or obligations in respect of any of the Assets or the Liabilities.

**3.7.** <u>Employees</u>. Seller has complied, and is currently in compliance, in all material respects, with applicable law (including, without limitation, the Employee Retirement Income Security Act of 1974, as amended ("ERISA")), rules and regulations relating to the employment of labor or the provision of compensation or benefits thereto, including without limitation those relating to wages, hours, unfair labor practices, employment discrimination and payment of social security and similar taxes with respect to its employees.

**3.8.** <u>Proceedings</u>. There is no action, suit, proceeding or investigation pending or, to Seller's knowledge, threatened against Seller, in, before, or by any court or governmental agency or authority related to the Assets, the Assumed Contracts or the Liabilities or that could reasonably be expected to have a Material Adverse Effect.

**3.9.**    Regulatory Matters. There are no pending, or, to the knowledge of Seller or the Sole Shareholder, threatened, disputes or controversies between Seller and any federal, state or local governmental authority with respect to the Assets or the Liabilities, or that could reasonably be expected to have a Material Adverse Effect. Seller is unaware of any reason why the Regulatory Approvals and, to the extent necessary to consummate the transaction described herein, any other approvals, authorizations or filings, registrations and notices could be revoked or nullified.

**3.10.**    Brokers' Fees. Seller has not employed any broker or finder or incurred any liability for any brokerage fees, commissions or finders' fees in connection with the transactions contemplated by this Agreement.

**3.11.**    Compliance with Laws. To Seller's and the Sole Shareholder's knowledge, Seller's and the Subsidiaries' business has been conducted in compliance with all federal, state and local laws, regulations and ordinances applicable thereto.

**3.12.**    Taxes.

(a)    With respect to the Liabilities, Seller is in material compliance with the law (including the Foreign Account Tax Compliance Act and the Bank Secrecy Act) and IRS regulations relative to obtaining from the beneficiaries thereof executed IRS Forms W-8 and W-9.

(b)    There are no liens for Taxes allocated to or imposed on Seller on any of the Assets and to the knowledge of Sellers or the Sole Shareholder there is no basis for the assertion of any such liens, other than normal and recurring ad valorem tax liens and sales and use taxes on assets being sold.

(c)    Seller has paid when due Taxes in respect of the Assets.

(d)    No tax is required to be withheld by Purchaser from the Purchase Price as a result of the transfers contemplated by this Agreement pursuant to the Code or any other provision of federal, state or local Tax law.

**3.13.**    Off-Balance Sheet Liabilities. Seller has no liabilities except for (i) those which are adequately reflected or reserved against in its financial statements delivered to Purchasers and OCFI, and (ii) those which have been incurred in the ordinary course of business since the date of such financial statements and which do not, individually or in the aggregate, and together with all other liabilities of Seller and the Subsidiaries, exceed the total value of the assets of the Seller or Subsidiaries immediately before giving effect to Closing.

**3.14.**    Subsidiaries and Subsidiary Shares.

(a)    Each Subsidiary is duly organized and validly existing under the laws of its jurisdiction of incorporation.

(b)    All Subsidiary Shares: (i) have been duly authorized, validly issued, fully paid, and non-assessable, (ii) have been issued in compliance with all applicable federal and state securities laws, (iii) have not been issued in violation of any agreement, arrangement, or commitment to which the relevant Subsidiary is a party or is subject to or in violation of any preemptive or similar rights of any person or entity, (iv) have the rights, preferences, powers, restrictions, and limitations set forth in the corporate documents of each Subsidiary, and (v) are free and clear of Encumbrances and the Sole Shareholder is the only holder thereof until the execution of this Agreement.

Execution Version

(c)     No subscription, warrant, option, convertible or exchangeable security, or other right (contingent or otherwise) to purchase or otherwise acquire equity securities of any Subsidiary is authorized or outstanding, and there is no commitment by a Subsidiary to issue shares, subscriptions, warrants, options, convertible or exchangeable securities, or other such rights or to distribute to holders of any of its equity securities any evidence of indebtedness or asset, to repurchase or redeem any securities of such Subsidiary or to grant, extend, accelerate the vesting of, change the price of, or otherwise amend any warrant, option, convertible or exchangeable security or other such right. There are no declared or accrued unpaid dividends with respect to any shares of capital stock of any Subsidiary.

(d)     The Subsidiaries have no liabilities except for (i) those which are adequately reflected or reserved against in their respective financial statements delivered to Purchasers, and (ii) those which have been incurred in the ordinary course of business since the date of such financial statements and which are not, individually or in the aggregate, material in amount.

(e)     There are no Actions pending or, to Sole Shareholder's knowledge, threatened against or by any Subsidiary affecting any of its properties or assets, nor any event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

(f)     There are no outstanding governmental orders and no unsatisfied judgments, penalties or awards against or affecting any Subsidiary or any of their properties or assets.

(g)     All Subsidiaries have complied, and are now complying, with all laws applicable to them or their business, properties or assets.

(h)     All Permits required for any Subsidiary to conduct its business have been obtained by it and are valid and in full force and effect, and all fees and charges with respect to such Permits as of the date hereof have been paid in full.

(i)     Each Subsidiary has been in compliance in all material respects with the terms of any collective bargaining agreements and other employee-related contracts and all applicable laws pertaining to employment and employment practices, including all laws relating to labor relations, equal employment opportunities, fair employment practices, employment discrimination, harassment, retaliation, reasonable accommodation, disability rights or benefits, immigration, wages, hours, overtime compensation, child labor, hiring, promotion and termination of employees, working conditions, meal and break periods, privacy, health and safety, workers' compensation, leaves of absence, and unemployment insurance. There are no actions against any Subsidiary pending, or to Seller's or Sole Shareholder's knowledge, threatened to be brought or filed, by or with any governmental authority or arbitrator in connection with the employment of any current or former applicant, employee, consultant, volunteer, intern, or independent contractor of any Subsidiary, including, without limitation, any claim relating to unfair labor practices, employment discrimination, harassment, retaliation, equal pay, wage and hours, or any other employment related matter arising under applicable laws.

(j)     Neither Seller nor any Subsidiary or other person associated with or acting on behalf of either, including any director, officer, agent, employee or Affiliate has (i) used any corporate funds for any unlawful contribution, gift, entertainment, or other unlawful expense relating to political activity or to influence official action; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (iii) made any bribe, rebate, payoff, influence payment, kickback, or other unlawful payment; or (iv) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder.

Execution Version

**3.15.** <u>Records</u>. All Records and personally identifiable information have been obtained, maintained and processed in accordance with applicable law.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF PURCHASERS

Purchasers represent and warrant as follows:

**4.1.** <u>Corporate Organization and Authority</u>. Purchasers are duly organized and validly existing under the laws of their respective jurisdiction of incorporation, have the requisite corporate power and authority and have taken all corporate action necessary in order to execute and deliver this Agreement, to consummate the transactions contemplated hereby and to own the Assets and undertake the Liabilities. This Agreement is a valid and binding agreement of Purchaser enforceable against Purchaser in accordance with its terms subject, as to enforcement, to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

**4.2.** <u>No Conflict; Licenses and Permits</u>. The execution, delivery and performance of this Agreement by the Purchasers does not, and will not, violate any provision of its charter or bylaws or, subject to the receipt of the Regulatory Approvals, violate or constitute a breach or contravention of, or default under, any law, rule, regulation, order, judgment, decree or filing of any government, governmental authority or court to which Purchasers are subject or under any agreement or instrument or Purchaser, or by which Purchaser is otherwise bound, which violation, breach, contravention or default could reasonably be expected to have a Material Adverse Effect.

## ARTICLE 5
## COVENANTS OF THE PARTIES

**5.1.** <u>Confidentiality</u>.

(a)     Each party to this Agreement shall hold, and shall cause its respective directors, officers, employees, agents, consultants, advisors, investors or financing sources to hold, in strict confidence (unless disclosure to a regulatory authority is necessary in connection with any Regulatory Approval or unless compelled to disclose by judicial or administrative process or, in the written opinion of its counsel, by other requirements of law or the applicable requirements of any regulatory agency or relevant stock exchange) and, with respect to Purchasers, all non-public personal information of any consumer or customer of Seller, records, books, contracts, instruments, computer data, system requirements and other data and information (collectively, "<u>Confidential Information</u>") furnished to it by the other party or its representatives pursuant to this Agreement, except to the extent that such Confidential Information can be shown to have been (i) previously known by the receiving party on a non-confidential basis, (ii) in the public domain through no fault of the disclosing party, or (iii) later lawfully acquired from other sources by the receiving party and such other source is not subject to a confidentiality restriction with regard to such Confidential Information), and neither party shall release or disclose such Confidential Information to any other person or use it except for the performance of its obligations hereunder.

(b)     This Section shall not prohibit disclosure of Confidential Information required by applicable law order from competent authority to be disclosed by either party, but such additional disclosure shall be limited to that actually required by law, and the party making disclosure shall give the other party as much notice as is practicable of such obligation (except where prohibited by applicable law) so that the other party may seek a protective order or other similar or appropriate relief, and also shall undertake in

good faith to have the Confidential Information disclosed treated confidentially by the party to whom the disclosure is made.

**5.2.**    <u>Further Assurances</u>. From and after the date hereof, upon request from the Purchasers, Seller and/or the Sole Shareholder shall execute and deliver such instruments, documents and other writings as may be reasonably necessary or desirable to confirm and carry out and to effectuate fully the intent and purposes of this Agreement, including without limitation the execution of any document, granting of any consent, giving of any notice or requesting of information, actions or consents from third parties as may be necessary or appropriate to vest in Purchasers (or their designees under the terms hereof) the full legal and equitable title to the Assets and Liabilities, free and clear of all Encumbrances. Seller and Sole Shareholder acknowledge and accept that, upon their transfer, Purchasers and/or their Affiliates will convert cash or cash equivalent components of the Assets into precious metals and specifically into Responsible Gold™ and/or G-Coin®.

**5.3.**    <u>Notices of Default and Seller Liquidation</u>. Seller and Sole Shareholder shall promptly give written notice to the Purchasers upon (a) becoming aware of the impending or threatened occurrence of any event which could reasonably be expected to cause or constitute a breach of any of their respective representations, warranties, covenants or agreements hereunder; and (b) upon Seller having been definitely liquidated and dissolved (the "<u>Bank Closing Date</u>").

**5.4.**    <u>Transaction Settlement and Customer Service</u>. Seller and Sole Shareholder agree that, until such time as the assignment or transfer of all Assets and Liabilities to Purchasers has been perfected in the terms hereof and Seller has been effectively liquidated, they shall:

(a)    comply with their obligations under section 5.2 and reasonably cooperate with Purchasers in their interactions with Seller's receiver, OCFI and/or any other relevant party (including vendors, correspondent banks, etc.) so as to achieve the purpose of this Agreement;

(b)    redirect to Purchasers any Eligible Customers that reach out to them for customer service; and

(c)    exclusively address any requests for assistance from non-Eligible Customers and be liable to them with respect to the corresponding liabilities.

## ARTICLE 6
## TERMINATION

**6.1.**    <u>Termination</u>. This Agreement may be terminated at any time prior to the Closing Date:

(a)    By the mutual written consent of Purchasers and Sole Shareholder;

(b)    By either Purchaser in case of breach of any of Seller's and Sole Shareholder's representations, warranties or covenants herein which is not cured or cannot be cured within 10 (ten) Business Days; *provided, however,* that for the purpose of determining the truthfulness of a particular representation or warranty under this Section, the materiality qualifiers contained in such particular representation or warranty shall be disregarded, and, *provided further*, that termination pursuant to this Section shall not relieve the breaching party of liability for such breach or otherwise; and

(c)    By either Purchaser in case of denial or revocation of any Regulatory Approval.

**6.2.** <u>Effect of Termination</u>. In the event of termination of this Agreement and abandonment of the transactions contemplated hereby, no party hereto (or any of its directors, officers, employees, agents or Affiliates) shall have any liability or further obligation to any other party, <u>except</u> (i) Seller and the Sole Shareholder for the portion of the Purchase Price paid as of the relevant date, which shall be returned in its entirety by Seller to Purchasers within 10 (ten) Business Days via wire transfer of immediately available funds; (ii) as provided in Article 7 hereof, and (iii) that nothing herein will relieve any party from liability for any breach of this Agreement.

**ARTICLE 7**
**INDEMNIFICATION**

**7.1.** <u>Indemnification</u>.

(a)    Seller and Sole Shareholder shall jointly and severally indemnify and hold harmless Purchasers and their Affiliates, shareholders, directors, officers and agents from and against any and all Losses which such person may suffer, incur or sustain arising out of or attributable to (i) any breach of any representation or warranty made by Seller or Sole Shareholder pursuant to this Agreement, (ii) any breach of any covenant or agreement to be performed by Seller or Sole Shareholder pursuant to this Agreement, (iii) any third party claim, penalty asserted, legal action or administrative proceeding based upon any action taken or omitted to be taken by Seller or Sole Shareholder prior to the Closing or resulting from any transaction or event occurring prior to the Closing, relating in any such case to the Assets or the Liabilities, or (iv) any liabilities, obligations or duties of Seller or Sole Shareholder that are not Liabilities but are related to the Assets; *provided* that the Sole Shareholder's liability hereunder, including attorney fees and costs, shall be limited to the lesser of the Purchase Price or the cash amount that Sole Shareholder is able to withdraw from Seller after the final Closing and Seller's liquidation.

(b)    Purchasers shall indemnify and hold harmless Seller and Sole Shareholder from and against any and all Losses which such person may suffer, incur or sustain arising out of or attributable to (i) any breach of any representation or warranty made by Purchasers pursuant to this Agreement, (ii) any breach of any covenant or agreement to be performed by Purchasers pursuant to this Agreement, (iii) any third party claim, penalty asserted, legal action or administrative proceeding based upon any action taken or omitted to be taken by Purchasers or resulting from any transaction or event occurring after the Closing, relating in any such case to the Assets or the Liabilities assumed by Purchasers at Closing up to the amount of the Purchase Price.

(c)    To exercise its indemnification rights under this Section as the result of an assertion against it of any claim or potential liability for which indemnification is provided, the indemnified party shall promptly notify the indemnifying party of the assertion of such claim, discovery of any such potential liability or the commencement of any action or proceeding in respect of which indemnity may be sought hereunder. Notwithstanding the foregoing, notice of any claim for indemnification arising out of a third party lawsuit or other similar legal action shall be made within 10 (ten) calendar days after the indemnified party receives the summons and complaint or similar documents in connection therewith; *provided, however,* that an indemnified party's failure to timely give such notice shall not affect its right to indemnification in connection therewith except to the extent the indemnifying party is materially prejudiced as a result of such failure to timely give such notice. The indemnified party shall advise the indemnifying party of all facts relating to such assertion within the knowledge of the indemnified party, and shall afford the indemnifying party the opportunity, at the indemnifying party's sole cost and expense, to defend against such claims for liability. In any such action or proceeding, the indemnified party shall have the right to retain its own counsel, but shall bear such counsel's fees and expenses unless the indemnifying party and the indemnified party mutually agree to the retention of such counsel.

Execution Version

# ARTICLE 8
## MISCELLANEOUS

**8.1.**    <u>Survival</u>. The Parties' respective representations and warranties contained in this Agreement shall survive for a period of 12 (twelve) months following the Closing, and thereafter neither party may claim any damage for breach thereof. The covenants contained in this Agreement shall survive the Closing and not expire unless otherwise specifically provided in this Agreement.

**8.2.**    <u>Assignment</u>. Neither this Agreement nor any of the rights, interests or obligations of either party hereunder may be assigned by either of the Parties without the prior written consent of the other party.

**8.3.**    <u>Binding Effect</u>. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. Except as expressly provided herein, the Parties intend that nothing in this Agreement, express or implied, is intended to or shall confer upon any other person, including, without limitation, any employee or former employee of Seller or any of the Subsidiaries, any legal or equitable right, benefit or remedy of any nature whatsoever, including without limitation, any rights of employment or benefits for any specified period, under or by reason of this Agreement.

**8.4.**    <u>Post-Closing Support</u>. Upon request from Seller or the Sole Shareholder, the Parties agree to negotiate in good faith and reasonable commercial terms towards executing a contract for Purchasers or their Affiliates to provide services to Seller or the Sole Shareholder, on an actual cost basis, for the management of Assets or Liabilities not transferred to Purchasers hereunder.

**8.5.**    <u>Public Notices</u>. Neither party shall directly or indirectly make, or cause to be made, any press release for general circulation, public announcement or disclosure or issue any notice or communication generally (except to the Parties' employees) with respect to any of the transactions contemplated hereby without the prior consent of the other party, which consent shall not be unreasonably withheld or delayed. Consent shall be deemed granted by the party from which it is sought unless such party objects within 2 (two) Business Days after receipt of the proposed press release or other announcement from the party requesting consent. The Parties shall cooperate reasonably to produce public announcements to be released simultaneously within 3 (two) Business Days after the date of this Agreement; *provided* that nothing herein shall limit the right of Purchasers or any Affiliate to refer to this transaction in any document required to be filed with the Securities and Exchange Commission or with any other competent regulatory body. Nothing in this Agreement shall limit the right of either party to make any disclosure required by law, subject to the provisions of Section 5.1.

**8.6.**    <u>Notices</u>. All notices or other communications required or permitted to be given or made hereunder shall be in writing and delivered personally or sent by pre-paid, first class certified or registered mail, return receipt requested, or by facsimile transmission, to the intended recipient thereof at its address or facsimile number set out below. Any such notice or communication shall be deemed to have been duly given immediately (if given or made in person or by facsimile confirmed by mailing a copy thereof to the recipient in accordance with this Section on the date of such facsimile), or 5 (five) calendar days after mailing (if given or made by mail), and in proving same it shall be sufficient to show that the envelope containing the same was delivered to the delivery service and duly addressed, or that receipt of a facsimile was confirmed by the recipient.

If to Seller or Sole Shareholder:                    If to Purchaser:

22 Dorado Beach Estates                              777 Post Oak Blvd. #430
Dorado, Puerto Rico 00646                            Houston, TX 77056

Attention: Peter D. Schiff                                    Attention: Legal & Compliance Department
Email: bahdebing@yahoo.com                            Email: legalnotices@qenta.com

Either party may change the address to which notices or other communications to such party shall be delivered or mailed by giving notice thereof to the other party hereto in the manner provided herein.

    **8.7.**   <u>Dispute Resolution and Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to the conflict of law principles thereof. All disputes arising out of or in connection with this Agreement shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said Rules. Any award granted shall be final, binding and enforceable against the parties thereto, but no award or procedural order made in the arbitration shall be published. The arbitration shall be held in the English language and in the City of New York, N.Y., and discovery shall only be admissible to the extent permitted under or not prohibited under Art. 20 of the ICC-Rules and agreed upon by the Parties, who shall cooperate with one another at the outset of the proceeding to define the extent of discovery reasonably needed to complete the proceeding. The procedural law of the State of New York shall otherwise be applied to any proceedings held in connection with said arbitration. Judgment upon an award rendered by the Arbitrator shall be binding and may be entered in any court with appropriate jurisdiction, and the Parties consent to jurisdiction therein for the purpose of such enforcement. Notwithstanding anything to the contrary contained in this Agreement or elsewhere, each of the Parties hereby acknowledges and expressly agrees that any breach by it of this Agreement, which does or may result in loss of confidentiality or improper use of Confidential Information, would cause irreparable harm to the other party for which money damages would not be an adequate remedy. Therefore, each of the Parties hereby agree, that in the event of any breach of this Agreement by it, the non-breaching party will have the right to seek injunctive relief in a court of competent jurisdiction against continuing or further breach by the breaching party, without the necessity of proof of actual damages, in addition to any other right which either party may have under this Agreement, or otherwise in law or in equity.

    **8.8.**   <u>Entire Agreement</u>. This Agreement contains the entire understanding of and all agreements between the Parties with respect to the subject matter hereof and supersedes any prior or contemporaneous agreement or understanding, oral or written, pertaining to any such matters which agreements or understandings shall be of no force or effect for any purpose.

    **8.9.**   <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

    **8.10.**   <u>Waiver and Amendment</u>. The waiver of any breach of any provision under this Agreement by any party shall not be deemed to be a waiver of any preceding or subsequent breach under this Agreement. No such waiver shall be effective unless in writing. This Agreement may not be amended or supplemented in any manner except by mutual agreement of the Parties and as set forth in a writing signed by the Parties or their respective successors in interest.

    **8.11.**   <u>Expenses</u>. Except as specifically provided otherwise in this Agreement, each party shall bear and pay all costs and expenses, including without limitation brokerage and legal fees, which it incurs, or which may be incurred on its behalf in connection with the preparation of this Agreement and consummation of the transactions described herein, and the expenses, fees, and costs necessary for any approvals of the appropriate regulatory authorities.

    **8.12.**   <u>Severability</u>. If any provision of this Agreement or the application of any such provision to any person or circumstance shall be held invalid, illegal or unenforceable in any respect by a court of

competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision hereof.

**8.13.** <u>Third Party Beneficiaries</u>. Except as specifically provided herein with respect to indemnification, no provision of this Agreement shall be deemed to create any third party beneficiary right in anyone not a party to this Agreement. Nothing contained in this Agreement shall be construed to affect or limit any right Purchasers or their Affiliates over or with respect to any of the Assets or Liabilities.

*[Rest of page intentionally left blank. Signature page(s) follow(s).]*

Execution Version

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their duly authorized officers as of the date first above written.

**SELLER**
**Euro Pacific Intl. Bank, Inc.**

By: _____
Name: Peter D. Schiff
Title: Chairman

**SOLE SHAREHOLDER**
**Peter D. Schiff**

_____

**PURCHASERS**
**Qenta Inc.**

By: _____
Name: Brent de Jong
Title: Chairman and CEO

**G-Commerce DMCC**

By: _____
Name: Brent de Jong
Title: Director

**Responsible Gold Trading DMCC**

By: _____
Name: Brent de Jong
Title: Director

Execution Version

**<u>Exhibit 1</u>**

**ASSETS**

Closing date: September 30, 2022.

**Cash and Cash Equivalents:**

To be transferred to Purchasers or their designated Affiliate upon their release by Seller's correspondent banks including but not limited to Novo Banco, S.A.

**Precious Metals:**

All gold and silver reserves held in the name of Seller as of the Closing date by Silver Bullion Pte. Ltd.

**Subsidiary Shares:**

All outstanding shares of stock or membership interests issued by each of the Subsidiaries, along with its complete corporate records and the Seller and/or Sole Shareholder's resignation to any managerial position therein and designation of representatives of the Purchasers as the only controlling parties of any bank accounts indicated by Purchasers as necessary for the ongoing operation of the Subsidiaries.

**Assumed Contracts:**

Cloud Service Subscription Agreement number SAAS-CCA-WV-2015-138697, including addendums and supplemental terms, originally entered into by and between Seller and Temenos Headquarters SA on March 30, 2015.

**Records**

All Records related to Assets or Liabilities transferred on the relevant Closing.

**IT Equipment**

*[List follows.]*

Execution Version

| Type | Brand | Model | SN | Specs | |
|------|-------|-------|----|-------|--|
| MICRO DESKTOP | DELL | OPTIPLEX 7060 MICRO | 9F576Q2 | RAM: 8GB / SSD: 256 / PROC: I7 | |
| MICRO DESKTOP | DELL | OPTIPLEX 7060 MICRO | 9FC66Q2 | RAM: 8GB / SSD: 256 / PROC: I7 | |
| DESKTOP | APPLE | IMAC 21.5 A1418 | C02RF4PTGF1J | RAM: 8GB / HDD: 1TB / PROC: I5 | |
| MONITOR | DELL | P2419H | QDC00-86P-2L5B-A00 | | 24.1 |
| MONITOR | DELL | P2419H | TV200-9B7-726B | | 24.1 |
| MONITOR | DELL | P2419H | TV200-987-80KB | | 24.1 |
| MONITOR | DELL | P2419H | TV200-9B7-80MB | | 24.1 |
| MONITOR | SAMSUNG | U28E850R | 065EHCHM803871J | | 27 |
| HEADSET | PLANTRONICS | A8 | 20307901 | | |
| HEADSET | PLANTRONICS | H8 | 2036TF042318 | | |
| HEADSET | PLANTRONICS | H8 | 1919TF028728 | | |
| KEYBOARD | APPLE | MAGIC KEYBOARD | FOT9485012SJKNCAQ | | |
| KEYBOARD | Dell | KB216P | ONGR8G | | |
| KEYBOARD | Dell | KB216P | 0F9D93 | | |
| MOUSE | APPLE | MAGIC MOUSE | CC2945312UDJ2XEAD | | |
| MOUSE | Dell | M116T | CN-ODVORH-LO300-855-0BK9 | | |
| MOUSE | Dell | M116T | CN-ODVORH-LO300-7BE-1ZEW | | |
| BATTERY BACKUP | Cyber Power | 550VA | CQYEN2002468 | 4 BATTERY + SURGE AND 2 SURGE | |
| BATTERY BACKUP | APC | UPS-650 | 4B1930P08308 | 4 BATTERY + SURGE AND 2 SURGE | |
| BATTERY BACKUP | APC | UPS-650 | AB1803P32198 | 4 BATTERY + SURGE AND 2 SURGE | |
| MICRO DESKTOP MOUNT CASE | | | | | |
| MICRO DESKTOP MOUNT CASE | | | | | |
| MONITOR DUAL MOUNT | | | | | |
| MONITOR DUAL MOUNT | | | | | |
| MONITOR DUAL MOUNT | | | | | |

**SELLER**
**Euro Pacific Intl. Bank, Inc.**


By: _Peter Schiff_
Peter Schiff (Sep 30, 2022 14:17 EDT)
Name: Peter D. Schiff
Title: Chairman

**SOLE SHAREHOLDER**
**Peter D. Schiff**


_Peter Schiff_
Peter schiff (Sep 30, 2022 14:17 EDT)

**PURCHASERS**
**Qenta Inc.**


By: _____
Name: Brent de Jong
Title: Chairman and CEO

**G-Commerce DMCC**


By: _____
Name: Brent de Jong
Title: Director

**Responsible Gold Trading DMCC**


By: _____
Name: Brent de Jong
Title: Director

16

# Exhibit 3

July 11, 2025

**Wigberto Lugo Mender, Esq. CPA**
Trustee in the Liquidation of
Euro Pacific Intl. Bank, Inc.
Centro Internacional de Mercadeo
Carr. 165, Torre 1, Suite 501
Guaynabo, PR 00968

**Re:** <u>Notice of Termination of Purchase and Assumption Agreement</u>

Dear Mr. Lugo Mender:

Reference is made to the Purchase and Assumption Agreement (the "<u>Agreement</u>") dated September 30, 2022 between Qenta Inc. and Responsible Gold Trading DMCC (together "<u>Purchasers</u>"), Euro Pacific Intl. Bank, Inc. ("<u>EPB</u>"), and Mr. Schiff as EPB's sole shareholder. Capitalized terms not defined herein have the meanings ascribed thereto in the Agreement.

## 1. Introduction

This letter constitutes formal notice of the Purchasers' termination of the Agreement concerning the acquisition of assets and customer relationships from EPB. After nearly three years of exhaustive efforts to reach a final closing, continued performance has become legally impossible due to:

- Irreconcilable disagreements on asset and customer splits between those who had initially opted to migrate to the Purchasers ("opt-ins") and those who had opted to participate in the liquidation of EPB ("opt-outs") led by you as its OCFI-appointed Receiver pursuant to the Cease-and-Desist Order dated June 30, 2022;

- Third-party interventions (correspondent banks, custodians) preventing final Closing;

- Lack of final regulatory approval to support the migration plan; and

- Frustration of the Agreement's core purpose.

## 2. Grounds for Termination

### 2.1. <u>Impossibility of Performance</u>

Despite good-faith efforts since the execution of the Agreement, the following unforeseen and unresolvable issues prevent final Closing:

- Third-party complications: EPB's correspondent banks refusing or delaying the release of assets for reasons outside of the Purchasers' control.

- Asset-split deadlock: The partial transfer by the Receiver or third parties of insufficient assets vis-à-vis the opt-in customer now being considered final by the Receiver; the inability of the parties to finalize the distribution of assets and customers, and your threatened legal actions, which have frustrated communication, fallen short of EPB's obligations under the Agreement, and created an indefinite impasse in the migration, rendering contractual obligations unfulfillable.

- Regulatory Approvals. The lack of final approval by the OCFI of your final liquidation plan including all necessary aspects of the migration to Purchasers to provide certainty to them and to the customers pursuant to section 6.1(c) of the Agreement.

## 2.2.    Frustration of Purpose

The fundamental objective of the Agreement —seamless transfer of unencumbered assets and customers to ensure continuity of services and facilitating the liquidation of EPB— has been irreversibly undermined by a fundamental misalignment between your liquidation mandate, and the Purchasers' expectation to acquire and serve customers.

Without viable options, the Purchasers have been forced to take the role of a de-facto manager of a portion of the assets without having the possibility of migrating any customers. The assets were preserved and readied for distribution upon what was thought to be an imminent receipt of customers at Qenta affiliates and the need to fulfill possible liquidity demands. Almost three years have passed. All the while Qenta has tried to help the Receiver resolve the transfer of customers and has incurred significant expense, time of personnel and reputational harm. First, in preservation of the spirit of the original transaction, the Purchasers paid a portion of the purchase price ($500,000) and assumed control of a number of EPB's liquidated assets — including precious metals, mutual funds, and FX positions. The Purchasers hired several of EPB's former employees and committed internal resources to manage the assets, assist in consolidating customer accounts and even help respond to requests for information sent to EPB by certain tax and other regulators.

At this point the original intent of the transaction has been irreparably frustrated as there is no chance of preserving customers. So, after nearly three years of continued but unsuccessful efforts to achieve final closing of the original deal, and receiving no recognition or reimbursement for the substantial costs incurred, the Purchasers are left with no option but to terminate the Agreement and return the assets for the ultimate benefit of the customers.

2.3.    <u>Breach of Covenant of Good Faith and Fair Dealing</u>

By failing to act reasonably and with fidelity to the agreed-upon common purpose and justified expectations of the Purchasers, the Receiver has, on behalf of EPB, effectively deprived the Purchasers of the benefits of the Agreement.

As the agent for the seller under the Agreement, the Receiver is obligated not only to fulfill its express contractual duties (i.e. delivering assets, providing disclosures) but also to act in good faith throughout the transaction process, particularly during the period between signing and closing. Contrary to this principle, the Receiver, acting for EPB, has failed to, among other things: cooperate reasonably with the Purchasers to facilitate the closing conditions, take reasonable steps to preserve the value of the assets being sold, refrain from taking actions that intentionally or negligently undermine the Purchasers' ability to realize the benefits of the acquisition and, generally, proceed with a genuine intent to close the transaction on the agreed terms.

## 3.  Resolution

To resolve this fairly and amicably we are returning to you all assets received on or around September 30, 2022 at their receipt values as of their receipt date, with a portion to be returned within 10 business days from your countersignature hereof, and the balance 60 days thereafter, net of a reasonable termination amount to compensate for the Purchasers' time, effort, and expenses. This is subject to the execution of customary releases.

With the same goal of facilitating the termination of the transaction and the liquidation of EPB, the Purchasers are prepared to keep the EPB subsidiaries, control of which they acquired pursuant to the Agreement (i.e. Euro Pacific Securities Inc., Euro Pacific Funds SCC Ltd., Euro Pacific Cards Services Ltd. and Global Corporate Staffing Ltd.), but the Purchasers will not be settling the unpaid portion of the purchase price since the condition for its payment (i.e. final Closing) has not occurred.

Attached is a document summarizing the liquidated assets, their value and the net amounts being returned.

## 4.  Conclusion

We have exhausted all avenues to salvage the Agreement. Termination is the only viable path forward, as regulatory approvals have not occurred, performance is legally impossible, the purpose has been frustrated, and the Receiver –acting for EPB– has breached the implied covenant of good faith and fair dealing. We request written acknowledgment of this termination by July 21, 2025 and propose a meeting to coordinate asset returns.

We are convinced that this course of action will facilitate the liquidation of EPB and prioritize customer interests by ending this unsustainable limbo.

The grounds recited above are not meant as a complete statement of Purchasers' legal position or of their rights and remedies, all of which are hereby expressly preserved.


Brent de Jong, on behalf of
Qenta Inc. and Responsible Gold Trading DMCC




*Acknowledged and agreed in the terms hereof:*



Wigberto Lugo Mender, Esq. CPA,
as Trustee in the Liquidation of Euro Pacific Intl. Bank, Inc.




*C.c.      Eyck O. Lugo, Esq. – EDGE Legal*

**Appendix**

**Liquidated Assets**

| Asset | Received/Liquidated Value (USD)[1] |
|---|---|
| Silver Bullion Account[2] | 24,749,109 |
| Saxo - EPS | 71,608 |
| Interactive Brokers - EPS | 17,558,862 |
| Interactive Brokers - EPIB | 520,116 |
| Sensus, GBE Trading - EPS | 870,659 |
| Sensus, GBE Wallet - EPS | 30,699 |
| Mutual Fund positions | 5,872,665 |
| Initial EPIB investment in Mutual Funds[3] | 385,008 |
| **Total:** | **50,058,725** |

**Netted Values**

| Asset | Liquidated Value (USD) |
|---|---|
| Subsidiaries[4] | (367,241) |
| Partial Reimbursement of Purchase Price[5] | (500,000) |
| Mutual Fund positions[3] | (5,872,665) |
| Termination Costs[6] | (4,946,030) |
| **Total:** | **(11,685,936)** |

**Return of Funds:**

**$38,372,789.00**

--------------------------------------------------------------

[1] Values as of September 30, 2022 or as of date noted.

[2] Considers partial sales and wires to bank account under control of the Receiver for the purpose of settling storage fees.

[3] Represents the balance of EPIB's seed investment in the mutual funds, but is not the value of the mutual fund portfolios (shown in the preceding line). Given the acquisition and preservation of the corresponding entity (Euro Pacific Funds SCC Ltd.), the relevant customers and portfolios will remain with Purchasers and will be satisfied, thus appearing in the netted values section.

[4] Reflects negative book value of the subsidiaries that Purchasers propose to keep to facilitate EPB's liquidation, considering that Purchasers will incur additional costs to manage their wind-up.

[5] Represents the initial payment for entering into the Agreement that was never completed.

[6] On account of the extraordinary costs incurred due to the protracted nature of the transaction.

# Exhibit 4

**Brent De Jong**

Qenta Inc.
777 Post Oak Blvd. #430
Houston, TX 77056
Email: Brent.dejong@qenta.com

**CC:** Eyck O. Lugo, Esq.
Edge Legal Strategies, PSC
252 Ponce de León Ave.
12 Ramirez Silva St., Esq. Las Acacias
Manatí, PR 00680
Email:  elugo@edgelegal.com


**Re: Demand for Return of Customer Assets Held by Qenta Inc.**

Dear Mr. De Jong,

I am writing as the sole shareholder of Euro Pacific Intl. Bank, Inc. ("EPB") in response to your letter dated July 11, 2025, notifying the termination of the Purchase and Assumption Agreement ("P&A Agreement") dated September 30, 2022, between Qenta Inc., G-Commerce DMCC, Responsible Gold Trading DMCC, EPB, and myself, and the subsequent response from the Receiver's counsel, Eyck O. Lugo, dated July 21, 2025.

While pursuant to (Section 6.1a) I acknowledged and accepted your termination of the P&A Agreement by email on July 20, 2025 and agree with the Receiver that Qenta cannot on its own accord sell or liquidate the customer-owned assets held in its custody, I respectfully disagree with the Receiver's position that Qenta should retain custody of those assets and independently manage the associated liabilities to EPB's customers. Instead, I demand the immediate return of all customer assets to EPB for safekeeping as part of the ongoing liquidation process, particularly in light of the reported financial difficulties of Qenta and its subsidiary, G-Commerce DMCC.

The P&A Agreement (Section 2.1(a)) contemplated the transfer of EPB's assets, including cash, precious metals, securities, and subsidiary shares, to Qenta and its affiliates, along with the assumption of liabilities to Eligible

Customers, upon final Closing. Your termination notice confirms that final Closing never occurred due to alleged third-party complications, asset-split deadlocks, and lack of final regulatory approval from the Office of the Commissioner of Financial Institutions (OCFI) (Termination Notice, Page 1, Section 1). As a result, Qenta never acquired ownership of the assets, valued at approximately $50 million when initially transferred, but approximately $80 million at the current appreciated market values.

I concur with the Receiver's assertion that Qenta, as a custodian, is prohibited from selling or disposing of these customer-owned assets without individual customer instructions (Receiver's Letter, Page 2) and remitting 100% of the proceeds to customers. However, I respectfully disagree with the Receiver's directive that Qenta retain custody and independently manage these assets and liabilities. This position is untenable for several reasons:

- **Termination of the P&A Agreement**: The termination of the P&A Agreement (Section 6.1(b) and (c)) voids Qenta's obligation to assume customer liabilities and manage accounts (Section 2.1(a)). Retaining custody without a binding agreement places an improper burden on Qenta and risks mismanagement, particularly given reports that G-Commerce DMCC's is in the process of dissolution and Qenta's inability to handle customer accounts.
- **Financial Instability**: The dissolution of G-Commerce DMCC, the designated assuming institution, and Qenta's reported financial difficulties raise significant concerns about your ability to safeguard customer assets. The Liquidation Plan (Page 2, Section II) mandates that the Receiver ensure the proper disposition of customer assets, which I believe cannot be achieved by delegating custody to a financially distressed entity.
- **Lack of infrastructure**: Based on reliable information and belief, Qenta currently lacks the capacity to manage the customer's assets and liabilities due to its lack of infrastructure, resources, and personal. This makes the return of those assets to the bank imperative, so that the receiver can management them as well as the corresponding customer liabilities.
- **Appreciation of Assets:** Your attempt to retain for Qenta all of the appreciated value of customer's assets since Sept. 30th 2022 raises concerns as to your intention to honor your fiduciary duty to

customers and that you might attempt to unjustly enrich Qenta at their expense**.**
- **EPB's Responsibility**: As the Receiver's letter acknowledges, the assets are customer-owned, and EPB retains legal title pending proper distribution (Liquidation Plan, Page 3, Section III(2)(a)). The Receiver's decision not to demand the immediate return of these assets undermines EPB's ability to fulfill its obligations under the Liquidation Plan and Consent Order to discharge customer liabilities (Page 2, Section II).

Given these circumstances, I demand that Qenta immediately return all customer assets in its custody, including but not limited to cash, precious metals, securities, and related records, to EPB or a designated account under the Receiver's control. This return is necessary to ensure that EPB, through the Receiver, can safeguard these assets and manage customer liabilities as part of the liquidation process, as mandated by the Liquidation Plan and OCIF. The reported dissolution of G-Commerce DMCC and Qenta's financial challenges heighten the urgency of this demand to protect customer interests. I respectfully urge the Receiver to reconsider the current approach and support this demand to ensure alignment with the Liquidation Plan.

Furthermore, I want to reiterate my objection to Qenta's termination notice proposing to liquidate the assets and return to the bank only what it would have been received had the positions been liquidated at their receipt values on Sept 30, 2022, rather than their highly appreciated current values, net of a termination amount (Termination Notice, Page 3, Section 3). I urge Qenta to comply with this proposal by promptly coordinating with the Receiver to effectuate the return of all assets, without deductions, to EPB. Any attempt to retain any portion of these assets, or otherwise dispose of them, would violate Qenta's custodial duties and expose Qenta to liability for conversion or breach of fiduciary duty under the P&A Agreement (Section 7.1(b)) and applicable laws.

I respectfully request that Qenta confirm in writing, within five (5) business days of this letter, its commitment to the immediate and unconditional return of all transferred assets to EPB. I am copying the Receiver's counsel, Eyck O. Lugo, to ensure transparency and again urge the Receiver to join in this effort to protect EPB's customers, especially since his letter of July 21st specifically reserves "all legal and equitable rights

regarding the return and disposition of assets held by Qenta." Should Qenta fail to comply, I reserve all my rights to pursue all legal and regulatory remedies to protect customer assets, including coordination with OCIF and other relevant authorities.

Thank you for your prompt attention to this matter. I am available to discuss the logistics of asset return personally to ensure a swift and orderly process.

Sincerely,

Peter D. Schiff
Sole Shareholder, Euro Pacific Intl. Bank, Inc.

**CC:**
Eyck O. Lugo, Esq. (elugo@edgelegal.com)
Carlos Garduno (Carlos.garduno@genta.com)
Javier Micheo, Esq. (j.micheo@dmprp.com)
Ismael Torres, Esq. (ismaeltorres2002@yahoo.com)
Wigberto Lugo-Mender, Esq. (wigberto@lugomender.com)
Daniel Walfish (dwalfish@katskykorins.com)

# Exhibit 5

**Important Notice to Customers of Euro Pacific International Bank, Inc. (EPB)**
**Date: July 21, 2025**

- *Update on Qenta and the Liquidation Process.*

Qenta Inc. has notified on its intent to end its agreement to acquire certain EPB assets and customer accounts. This agreement was originally executed  in 2022 to help transfer specific customer accounts and assets to Qenta, while some other handled by the EPB trustee.

This notice communicates Qenta's intention to liquidate assets, including precious metals and securities, received from EPB's customers in connection with the Purchase and Assumption Agreement entered into with the stockholder.  The Trustee emphatically rejects any such proposal as the assets in question are customer-owned assets. Consequently, the disposition of these assets must be subject to individual negotiation and direction from the respective account holders.

The Trustee sustains that Qenta, having accepted custody or control of these assets with knowledge of this fact, cannot liquidate or otherwise dispose of such assets except strictly in accordance with instructions from the underlying customers and any applicable regulatory directives. Hence, Qenta is required to hold and manage all precious metals and securities in their received form, pending express instructions from the respective customers.

Despite this attempt of termination, the EPB liquidation process will continue under the supervision of the Puerto Rico Office of the Commissioner of Financial Institutions ("OCIF").

- *What Does This Mean for You?*

Qenta has announced it may liquidate (sell) some precious metals and securities that belong to former EPB customers and are currently in Qenta's custody.

The trustee's position is clear: these assets should not be sold or transferred without each customer's written consent.

- *What Should You Do?*

If you had precious metals or securities with EPB and believe they may now be held by Qenta, you should contact Qenta directly regarding your options.

Consider seeking independent legal advice. Because these events may affect your rights, we strongly recommend you consult with a legal professional to ensure your interests are protected as the liquidation continues.

**Wigberto Lugo Mender, Esq., CPA**
Trustee in the Liquidation of Euro Pacific International Bank, Inc.

July 21, 2025

*BY EMAIL* carlos.garduno@qenta.com

Mr. Bret de Jong
c/o Mr. Carlos Garduño
Quenta, Inc.
Responsible Gold Trading, DMCC

**RE: Notice of Termination of Purchase and Assumption Agreement (hereinafter the "Agreement").**

Dear Mr. De Jong:

We acknowledge receipt of your letter dated July 11, 2025, titled "Notice of Termination of Purchase and Assumption Agreement," which outlines Qenta Inc. and Responsible Gold Trading DMCC's formal notification of the termination of the Agreement executed on September 30, 2022, in connection with the acquisition of assets and customer relationships from Euro Pacific International Bank, Inc. (hereinafter "EPB" or "the Bank"),

As counsel to the duly appointed Trustee for the liquidation of EPB, please be advised that my client has at all times exercised its role in strict compliance with the August 9, 2022, OCIF consent order, the subsequently approved liquidation plan, and all regulatory requirements imposed by the Puerto Rico Office of the Commissioner of Financial Institutions ("OCIF" in its Spanish acronym).

The Trustee rejects any suggestion or implication that he has breached his fiduciary duties in administering the liquidation of EPB or in the migration process of account holders to Qenta. The trustee has diligently executed his mandate, including preserving and seeking the optimal disposition of all customer assets in accordance with the OCIF orders and the relevant liquidation plans. The Trsutee has also acted consistently in the best interests of all EPB account holders, without partiality, and always subject to the oversight and direction of OCIF.

Please be advised that the Trustee will continue with EPB liquidation process, undeterred by the termination notice received from Qentas, nor has any change or modification in the liquidation process being pursued by the trustee has been adopted or approved by OCIF.

252 Ponce de León Ave.
12th Floor
San Juan, PR 00918

12 Ramírez Silva St.
Esq. Las Acacias
Mayagüez, PR 00680

 787.522.2000
 787.522.2010
 www.edgelegal.com

*Mr. Bret de Jong*
*Page -2-*

Notwithstanding the foregoing, your letter communicates Qenta's intention to liquidate assets, including precious metals and securities, received from EPB's customers in connection with the Purchase and Assumption Agreement. My client must object emphatically to any such proposal.

The assets in question are customer-owned assets. Consequently, the disposition of these assets must be subject to individual negotiation and direction from the respective account holders. The Trustee sustains that Qenta, having accepted custody or control of these assets with knowledge of this fact, cannot liquidate or otherwise dispose of such assets except strictly in accordance with instructions from the underlying customers and any applicable regulatory directives. Hence, Qenta is required to hold and manage all precious metals and securities in their received form, pending express instructions from the respective customers.

To be clear: our client firmly believes that no liquidation, transfer, or return of such assets or their value shall be undertaken without the written, individualized direction from each relevant customer. The Trustee will promptly advise EPB's customers of this development and direct them to Qentas in connection thereto.

Furthermore, your announced intent to cancel Qenta's acquisition of the different subsidiaries once owned by EPB is not only unwarranted but most likely illegal. As you know, all these entities are separate legal entities, domiciled in jurisdictions outside Puerto Rico and to which none were ever part of the Joint Order of Liquidation executed by OCIF. If Qenta decides to liquidate these entities, it will need to do so in accordance to the laws and regulations detailed in their corporate charters and/or applicable jurisdiction.

The Trustee remains committed to working in good faith with all counterparties, strictly within the boundaries of his mandate and regulatory obligations.

The Trustee expressly reserves all rights, claims, and remedies in connection with the Agreement, the termination, and all underlying or related conduct and transactions, including but not limited to all legal and equitable rights regarding the return and disposition of assets held by Qentas.


Cordially,

*s/Eyck O. Lugo*
**Eyck O. Lugo**


C:    Javier Micheo, Esq.  (j.micheo@dmrpr.com)
       Ismael Torres, Esq. (ismaeltorres2002@yahoo.com)
       Wigberto Lugo-Mender, Esq. (wigberto@lugomender.com)
       Adriana Vega, Esq.

# Exhibit 6

## Fwd: [## 809793 ##] Enquiry

From:  Schiff Radio (info@schiffradio.com)

To:    █████████████████████

Date:  Tuesday, July 22, 2025 at 09:26 AM AST

---------- Forwarded messa_e ----------
From: █████████████████████
Date: Sun Jul 20, 2025, 04:51 PM GMT
Subject: [## 809793 ##] Enquiry
To: ✕✕✕✕✕✕✕✕, info@schiffradio.com

Good day Peter.

As per the Offshore Corp Talk discussion, you requested that we should forward email trails to show that Qenta did not perform from their side.

See my email conversation that I had since the Opt In process started with Qenta until I started receiving non delivery emails.

I want to sincerely thank you for stepping up to the plate, I can see that you are doing your best to help and protect your old customers.

Best re_ards
█████████

---------- Forwarded message ---------
From █████████████████████
Date: Sun, 15 Jun 2025 at 10:52
Subject: Re: [## 809793 ##] Enquiry
To: <info@europacbank.com>

Good day.

I have sent 2 emails on 03 June and again on 12 june to this email address with no reply.
Last night I received a Non delivery message that indicated that the emails could not be delivered to you.
Can you please reply to this email and also give me an update as to what is going on with the Opt In clients that is supposed to migrate to Qenta.

Best regards.
Pieter

On Mon, 28 Apr 2025 at 20:35, Andrew Almajose <info@europacbank.com> wrote:

> Dear ████,
>
> Thank you for your message. We have not received any new updates from the Trustee's office at this time, including a date or time period for the Q1 2025 receiver report.
>
> Qenta had been optimistic that the Trustee would begin his liquidation process in the early months of 2025, unfortunately, a finalized migration date still cannot be provided for Opt-In clients, and there has been no new information at this time from the Trustee's side. I understand that this is not the ideal response you are expecting,

but please know that Qenta remains engaged with the Trustee to produce any updates and next steps for the Opt-In migration.

**Account Update:**
Please know that I see your account name ▰▰▰▰▰▰▰▰▰▰▰▰ and email 
continues to be a **part of Qenta's Opt-in list**.

Rest assured, we will continue to post updates to the EPB website as soon as they become available. We deeply sympathize with the unreasonable time consumed by the liquidation, please feel free to let us know if any further assistance can be provided in the meantime.

Best Regards,
Andrew
Client Services

---- on Mon, 28 Apr 2025 02:07:00 -0700 ▰▰▰▰▰▰▰▰▰▰▰▰ wrote ----

Good day.

I trust all is well.

I had a look at the EPB Bank Liquidation website. The last entrance was for Q4 on 07 February 2024. Can you please advise on when Q1 2025 Receiver report will be available. Also what still needs to be done and what estimated time frame can one expect for the completion of this process?

Best regards

On Thu, 17 Oct 2024 at 00:10, Raffy Baltazar <info@europacbank.com> wrote:

Dear ▰▰▰▰

Thank you for your clarification. **On the Opt In side**, at this time there is no needed action from clients as Qenta is also waiting for the receiver's office to finalize their liquidation process with OCIF -- unfortunately, the process continues to be on-going and there has been no specific date of completion set at this time. Once finalized, Qenta will send invites via email to Opt In clients to download the app and immediately begin the sign up and onboarding process. Once onboarded in the app, clients may cash out at any time through their bank account or other payment channels such as PayPal or Payoneer.

**Optional action as an Opt In client:**
As an Opt-In client, the Qenta team also allows a choice to Opt-Out if you wish to fully liquidate your account immediately and not join the migration to Qenta. For this case, you will be added to our Opt-On/Cash-Out list. If part of this list, our Qenta Customer Support team will reach out to you promptly after the migration has been completed. They will gather the necessary first-party wiring details from you to liquidate your account accordingly.

Please know that Qenta is continually engaging the receiver to share as much information as possible especially with regard to a firm migration date. Rest assured, we are committed to working closely with the Receiver to facilitate the seamless migration of opt-in customers at the earliest opportunity.

Do let us know here if you wish to be added to the Opt In / Cash out list. For the latest migration news and subsequent information, please refer here in EPB's website. We thank you very much for your continued patience.

Best Regards,
Raffy
Client Services

---- on Wed, 16 Oct 2024 17:56:24 +0300 ▰▰▰▰▰▰▰▰▰▰▰▰ rote ----

Good day Andrew.

I received an email today regarding the liquidation of EPB.

There is one paragraph that I do not understand and I want clarity on it:

"After receiving the proofs of claims by parties participating in the liquidation process and prior to any distribution, each claim filed, as well as the supporting documents received in conjunction thereto will be
reviewed. If any additional document or information is required from the Trustee, those customers will be duly notified and allowed a reasonable period of time to further support their claims."

Can you please advise me if I need to make a claim on my assets? Since I am an "Opt in" Client, I thought that this would be an automatic action and that I would only be notified once my account has been activated at Qenta?

Should I need to lay claim on my assets, can you explain exactly how this should be done.

And lastly, I want an assurance that EPB will contact me via **email** when this needs to be done. I have had a very nasty and costly experience with EPB because I did not receive email correspondence to notify me of administrative actions that were needed from my side.

Best regards



On Mon, 9 Sept 2024 at 15:55, Andrew Almajose <info@europacbank.com> wrote:

Dear 

Good day and thank you for your patience from our last message.

**Monthly maintenance fees:**

I am glad to confirm that Qenta will not be charging interest on amounts owed for monthly maintenance fees as the fees were discontinued in August of 2023 when the banking systems were shut down.


**Receiver's financial report and Your gold holdings:**

As Qenta is separate from the receiver's office and will only be managing the migration of Opt-In clients, we are unable to provide accurate responses regarding the financial report. May we instead recommend to contact the receiver's office directly through the following channels below:
  • Receiver's website - https://lugomender.com/
  • Opt-Out liquidation portal - https://epbprliquidation.com/

Please know that the balance of your account continues to be:
Gold = 98.617 oz

Rest assured that all EPB assets continue to be held safely in EPB's accounts. This is currently managed by the receiver until the liquidation and migration processes are allowed to commence.

At this time, I would like to apologize as a migration date has yet to be announced as the receiver's office continues to finalize the bank's liquidation plan with OCIF. Please know that Qenta continues to engage the receiver's office for any information especially a firm migration date for Opt-In clients. I hope the information ab ve has been helpful. ease feel free to message us here for any questions you may have, we appr ciate your cont ued patience.

Best Regards,
Andrew
Client Services

---- on Thu, 05 Sep 2024 03:38:23 -0700 **Andrew Almajose<info@europacbank.com>** wrote ----

Dear 

Good day and we appreciate your message. To provide an accurate response, please allow me time to coordinate your question with the client services team. As always, do expect a response from us here as soon as available.

Best Regards,
Andrew
Client Services

---- on Thu, 05 Sep 2024 03:03:30 -0700 ▓▓▓▓▓▓▓▓▓▓▓▓▓ wrote ----

Good day Andrew or whoever it may concern.

I went onto the Europacific Bank website and saw that the last report was given on 09 August 2024.

I admit that I am not a legal or financial expert, thus I am asking this question.

I only see US Dollar figures on this financial document, and nowhere any mention of Gold ounces? Or did I miss it somewhere?

And I would really appreciate a response on my email this time.

Best regards.

▓▓▓▓▓

On Thu, 22 Aug 2024 at 13:59, Andrew Almajose <info@europacbank.com> wrote:

Dear ▓▓▓▓▓

Thank you for getting in touch. We would like to apologize for the delay in our communication as well as the lack of new information from the receiver's office.

I will go ahead and coordinate with the client services team to confirm the status of your account along with the mentioned charges and penalties. Please expect an update from us here as soon as possible.

Best Regards,
Andrew
Client Services

---- on Sun, 11 Aug 2024 22:38:40 -0700 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ wrote ----

about:blank

4/9

Good morning.

I trust all are well with you.

I had a look this morning and saw that the last update regarding the migration process was on 16 April 2024.

I also didn't receive a reply to my last email regarding the outstanding balance that I had with Europacific Bank when the account was closed.

Can you please just reassure me that you will not charge me a monthly interest fee on the $28 that will later be a burdensome amount, and if possible an update on the  migration process.

Best regards.



On Wed, 3 Jul 2024 at 09:32, ████████████████████ wrote:

> Good day.
>
> I am writing this email with great concern in my heart.
>
> I started my relationship with Europacific Bank in 2014. I believed in Peter Schiff's vision about the future of the world and the economic system. This was the reason why I trusted him and invested a rather big sum of money in his gold holding program.
>
> I understand that the authorities have abused the system to get to Peter and EP bank.
> But I sit in an extremely difficult situation.
> As per my previous emails. I would like to make sure that SOMEBODY or SOME ENTITY have my gold, and acknowledge the amount held.
>
> EP Bank has slapped me with nearly $800 of penalties just because I didn't access my account for a couple of months.
> I am something like $28 in the red with EP Bank, and as far as I have seen, EP bank is extremely vindictive and will charge me a stupid interest rate on that $28 until it is hundreds or thousands of dollars that I will need to pay them back. In the meantime I do not have access to  rectify this negative balance.
>
> THEN....I injured my back at work and have been living off my savings the last couple of months. How much longer will I have to wait before I will have access to these funds?
>
> I trust you understand my frustration and concern with EP Bank and the whole process?
>
> Best regards.
>
>
>
> On Sat, 11 May 2024 at 07:47, ████████████████████ wrote:
>
>> Thank you for your assistance.
>>
>> On Fri, 10 May 2024 at 18:41, Raffy Baltazar <info@europacbank.com> wrote:

Dear ▰

Thank you for your patience. I would like to apologize as, unfortunately, we are no longer able to provide a statement for your precious metals holding as EPB's systems are no longer available. We can, however, confirm the balance of your account to be:
Gold = 98.617 oz

Additionally, we would like to confirm that you're included in our Opt-In client list and are scheduled for migration into Qenta's ecosystem. At this time there is no needed action from your end as Qenta is also waiting for the receiver's office to finalize their liquidation process with OCIF. Once finalized, Qenta can immediately begin onboarding Opt-In clients into the app.

Please know that Qenta is continually encouraging the receiver to share as much information as possible especially with regard to a firm migration date. Rest assured, we are committed to working closely with the Receiver to facilitate the seamless migration of opt-in customers at the earliest opportunity.

For the latest migration news and subsequent information, please refer here in EPB's website. We thank you very much for your continued patience. Please feel free to let us know if any further questions in the meantime.

Best Regards,
Raffy
Client Services

---- on Wed, 08 May 2024 15:58:43 +0300 **Andrew Almajose**<**info@europacbank.com**> wrote ----

Dear ▰

As we are awaiting the statement containing your balance for precious metals, please see the initially provided bank statement attached below. Please expect a follow up message from us here as soon as the other statement is available. Thank you again and we continue to appreciate your patience.

Best Regards,
Andrew
Client Services

---- on Tue, 07 May 2024 07:15:12 -0700 **Andrew Almajose**<**info@europacbank.com**> wrote ----

Dear ▰

We appreciate your follow. I would like to apologize for the continued delay in providing the requested bank statement.

Currently, the validation of your information is completed and our team is continuing to work with Euro Pacific Bank in retrieving your information. Rest assured, the urgency of the

request is regularly mentioned and continuous follow ups are performed internally. We thank you again for your continued patience.

Best Regards,
Andrew
Client Services

---- on Mon, 06 May 2024 20:50:36 -0700  wrote ----

Good day Andrew.

As per my previous email requesting a bank statement, I am still waiting for your response.

Attached are screenshots of my last bank balance and also my gold holding with Europack bank account before your system went offline.

I will be waiting for my official bank statement from you.

Best regards.



On Mon, 29 Apr 2024 at 04:36, Andrew Almajose <info@europacbank.com> wrote:

Dear ▰

Thank you for your response and confirmation. We will now forward this information or validation. Rest assured, we will inform you once the validation process is complete and provide you with your bank statement.

Please feel free to reach out to us for any questions you may have.

All the best,
Andrew
Client Services

---- on Sun, 28 Apr 2024 02:39:50 -0700 ▰ wrote ----

Good day Andrew.

My date of birth is ▰
My address is ▰
▰ outh Africa.

I hope you can understand my concern regarding me being seperated from my assets for such a long time now and one only receives



emails with promises of the process winninding down.

Best regards.



On Sun, 28 Apr 2024 at 11:09, Andrew Almajose <info@europacbank.com> wrote:

Dear 

Thank you reaching out, we can certainly help you with your request. Yes, unfortunately, the banking platform is no longer available as these systems have been shut down in preparation for the liquidation of the bank

To proceed in preparing your statement, we kindly ask you to verify your date of birth and registered address to ensure the security of your account.

Do let us know if you have additional questions. Thank you for your understanding and we'll be on standby for your confirmation.

Best Regards,
Andrew
Client Services

---- on Sat, 27 Apr 2024 20:54:03 -0700

wrote ----

Good day.

I am following up on your last liquidation update.

I have tried numerous times to access the Europacific Bank website and it seems the website has been terminated since I can not get access to it.

I am getting seriously worried that I might have lost my 98, 742 Oz of gold that would translate to roughly $220,000. I would like to get a statement from Europacific Bank as to what my gold balance with the bank is please.

Best regards.



This e-mail message may contain confidential or legally privileged information and is intended only for the use of the intended recipient(s). Any unauthorized disclosure, dissemination, distribution, copying or the taking of any action in reliance on the information herein is prohibited. E-mails are not secure and cannot be guaranteed to be error free as they can be intercepted, amended, or contain viruses. Anyone who communicates with us by e-mail is deemed to have accepted these risks. Euro Pacific Bank is not responsible for errors or omissions in this message and denies any responsibility for any damage arising from the use of e-mail. Any opinion and other statement contained in this message and any attachment are solely those of the author and do not necessarily represent those of the company.

# Exhibit 7



## Category

> Africa

> Remittances

> Senegal

> Uncategorized

## Recent Posts

Remittances with Purpose
30 Apr 2025

Cash: Where in the world it…
30 Apr 2025

Migration, Remittances …
30 Apr 2025

## Archives

> June 2025

> May 2025

> April 2025



INTERNET ARCHIVE

DONATE

Explore more than 946 billion web pages saved over time

https://qenta.com/management/

Calendar · Collections · Changes · Summary · Site Map · URLs

Saved **10 times** between October 1, 2022 and September 19, 2024.

| | | | | | | | | | | | | | | | | | | | | | | | | |
|002|2003|2004|2005|2006|2007|2008|2009|2010|2011|2012|2013|2014|2015|2016|2017|2018|2019|2020|2021|2022|2023|2024|**2025**|

### JAN
|   |   |   |   |   |   |   |
|---|---|---|---|---|---|---|
|   |   | 1 | 2 | 3 | 4 |   |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 |   |

### FEB
|   |   |   |   |   |   |   |
|---|---|---|---|---|---|---|
|   |   |   |   |   |   | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 |   |

### MAR
|   |   |   |   |   |   |   |
|---|---|---|---|---|---|---|
|   |   |   |   |   |   | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 |   |   |   |   |   |

### APR
|   |   |   |   |   |   |   |
|---|---|---|---|---|---|---|
|   |   | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 |   |   |   |

### MAY
|   |   |   |   |   |   |   |
|---|---|---|---|---|---|---|
|   |   |   | 1 | 2 | 3 |   |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

### JUN
|   |   |   |   |   |   |   |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 |   |   |   |   |   |

### JUL
|   |   |   |   |   |   |   |
|---|---|---|---|---|---|---|
|   |   | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 |   |   |

### AUG
|   |   |   |   |   |   |   |
|---|---|---|---|---|---|---|
|   |   |   |   |   | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 |   |   |   |   |   |   |

### SEP
|   |   |   |   |   |   |   |
|---|---|---|---|---|---|---|
|   | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 |   |   |   |   |

### OCT
|   |   |   |   |   |   |   |
|---|---|---|---|---|---|---|
|   |   |   | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 |   |

### NOV
|   |   |   |   |   |   |   |
|---|---|---|---|---|---|---|
|   |   |   |   |   |   | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 |   |   |   |   |   |   |

### DEC
|   |   |   |   |   |   |   |
|---|---|---|---|---|---|---|
|   | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 |   |   |   |





Founder, Chairman & CEO
**Brent De Jong**



Chief Administrative Officer
**Nirali Shah**



Chief Operations & Technology Officer
**Todd Davis**



Chief Financial Officer
**Toby O'Connor**



Chief Accounting Officer
**Denisse Berumen**



General Counsel
**Carlos Garduno**



Head of Business Development & Strategic Partnerships
**Jacob Farber**



India Lead
**Salil Rajadhyaksha**



UK/Europe Lead
**Kerim Chouaibi**



US Lead
**Katherine McClure**

# Exhibit 8



# The site you were looking for couldn't be found.

This domain is successfully pointed at WP Engine, but is not configured for an account on our platform.

- If you just signed up, we're still likely creating your account.
- Did you add this domain to your install?
- Did you point DNS to the correct IP address or CNAME?

If you've completed the steps above, or need more help, please contact us and we can help get your site up and running in no time.

Hosted by  **WP**engine

# Exhibit 9

# Euro Pacific Bank

Status Update: July, 2025

Published: July 12, 2025



Dear Opt-in Customers,

We would like to update you on recent developments concerning the purchase agreement related to Euro Pacific Intl. Bank Inc.

Over the past three years, our team has worked diligently to finalize the agreement and ensure a smooth transition for all opt-in customers. Unfortunately, despite our best efforts, we have not received all the necessary assets or approvals required to complete the reconciliation and migration process. We have also been unable to engage constructively with the Receiver to resolve outstanding issues or secure reimbursement for excess expenses incurred due to the delay in achieving the final closing of the transaction.

Therefore, we have made the difficult decision to terminate the purchase agreement and return all liquidated assets to the Receiver as they were originally received. We have notified this to the Receiver and stand ready to work constructively with him and his team to make this happen.

Thank you for your understanding and continued trust.

Sincerely,
Qenta Team.

Status Update: July, 2025

Published: July 12, 2025



Dear Opt-in Customers,

We would like to update you on recent developments concerning the purchase agreement related to Euro Pacific Intl. Bank Inc.

Over the past three years, our team has worked diligently to finalize the agreement and ensure a smooth transition for all opt-in customers. Unfortunately, despite our best efforts, we have not received all the necessary assets or approvals required to complete the reconciliation and migration process. We have also been unable to engage constructively with the Receiver to resolve outstanding issues or secure reimbursement for excess expenses incurred due to the delay in achieving the final closing of the transaction.

Therefore, we have made the difficult decision to terminate the purchase agreement and return all liquidated assets to the Receiver as they were originally received. We have notified this to the Receiver and stand ready to work constructively with him and his team to make this happen.

Thank you for your understanding and continued trust.

Sincerely,
Qenta Team.



› Account Opening
› Affiliates
› Bank Accounts
› Bank Cards
› Brokerage Accounts
    › Euro Pacific Trader
› Client Warnings
› Managed Investments
    › Manager Commentary
    › Mutual Funds
    › Separately Managed Accounts
› News & Blog
› Precious Metals
› Security and Regulation
› Top Articles
› Wire Transfers

# Exhibit 10



# Public register

## Search our register of DMCC entities

| G COMMERCE DMCC | |
| --- | --- |
| جى كومورس دى.ام.سى | |
| License Number | DMCC-823348 |
| License Issue Date | 14/10/2021 |
| License Expiry Date | 13/10/2023 |
| License Address | |
| License Address(Arabic) | |
| License Manager | Matthew Owen Keen |
| License Manager(Arabic) | ماثيو كين |
| License Activity | Non-Manufactured Precious Metal Trading |
| License Activity(Arabic) | تجارة الذهب والمعادن الثمينة غير المشغولة |
| License Status | Terminated by Authority |
| Registration Status | Commenced Winding-Up |
| Registration Number | DMCC191438 |
| Registration Date | 19/09/2021 |

| GNG COMMERCE DMCC | |
| --- | --- |
| جى إن جى كومورس دى.ام.سى | |
| License Number | DMCC-857896 |
| License Issue Date | 31/08/2022 |
| License Expiry Date | 30/08/2024 |
| License Address | |
| License Address(Arabic) | |
| License Manager | Oleg Beiba |
| License Manager(Arabic) | اوليغ بيب |
| License Activity | Ghee & Vegetable Oil Trading Grains, Cereals & Legumes Trading Non Edible Oil Trading Trading Refined Oil Products Abroad |
| License Activity(Arabic) | تجارة السمن والزيوت النباتية تجارة الغلال والحبوب والبقول تجارة الزيوت النباتية والحيوانية غير الغذائية تجارة مشتقات تكرير النفط خارج الدولة |
| License Status | Terminated |
| Registration Status | Dissolved |
| Registration Number | DMCC194462 |

# Exhibit 11



# Exhibit 12

FindLaw

Find a Lawyer

Legal Forms & Services

Learn About the Law

Legal Professionals

Blogs

FINDLAW  /  CASE LAW  /  NEW YORK  /  NY SUPREME CT.  /  LLC V. LLC

## LLC v. LLC (2023)

### Supreme Court, New York County, New York.

Offshore Exploration and Production, LLC, Plaintiff, v. De Jong Capital, LLC, Defendant.

### Index No. 653659 /2021

### Decided: May 24, 2023

The following e-filed documents, listed by NYSCEF document number (Motion 002) 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 75, 89, 95 were read on this motion toDISMISS.

Plaintiff Offshore Exploration and Development (OEP) alleges that it and defendant De Jong Capital, LLC (DJC) formed a partnership to purchase and operate an oil and gas business in Peru. Plaintiff asserts that defendant unlawfully usurped the partnership's opportunity to acquire the business, in order to use plaintiff's proprietary information to purchase the business on its own. Defendant moves to dismiss the complaint pursuant to CPLR 3211. Defendant contends that a partnership did not exist as the parties never agreed on the final terms of a partnership agreement.

I. Allegations in the Complaint

Unless otherwise indicated, these events took place in 2020. Each party is incorporated in Delaware and has a principal place of business in Houston, Texas. Throughout the parties' dealings, Brent De Jong acted as defendant DJC's principal and Brent Kallop did the same for plaintiff OEP.

In 2009, plaintiff sold nonparty Offshore International Group (OIG) to the national oil

companies of Colombia and South Korea. One of the sales terms was that $150 million of the $1.3 billion purchase price would be held in escrow for the purpose of settling post-closing indemnity obligations potentially owed by plaintiff. Plaintiff was to receive any amounts remaining in the escrow

account after resolution of the indemnity obligations. At the time that this complaint was filed, $36.5 million remained in the escrow account.

In 2014, plaintiff learned that OIG was for sale and began planning to repurchase it, a process that included research and discussions with potential investors, including defendant. In 2016, the parties began discussing the possibility of together buying OIG. Plaintiff considered offering defendant "an equity interest in a joint venture in exchange for . . . entering the sale process on behalf of a partnership between" the parties (NYSCEF 20, complaint, ¶ 20). Defendant had no material knowledge or understanding of OIG's operations or potential. Plaintiff "walked De Jong through the basics" of OIG (id., ¶ 22). The parties agreed that defendant would request admission to the sales process "on behalf of the partnership" (id., ¶ 26). OIG's agent admitted defendant to the sales process in August 2020, and defendant relied heavily on the information provided by plaintiff to navigate the sales process. Potential buyers of OIG were allowed to gain access to confidential information about its operations via a virtual data room. Defendant executed a confidentiality agreement which enabled access to the virtual data. Defendant and plaintiff then drafted their own confidentiality agreement.

The parties agreed that they would form a partnership with a 90/10 equity split. The larger part belonged to plaintiff, because its proprietary knowledge of OIG would be the principal asset of the partnership and it was providing the capital. Defendant would contribute capital, but instead earned its 10% equity stake by spearheading the bidding process" (NYSCEF 20, ¶ 35). Defendant said that it would not do the deal without plaintiff. "This statement was a key milestone in the De Jong-OEP partnership, giving OEP the assurance that De Jong would not circumvent OEP and inducing OEP to share additional valuable confidential information for the benefit of the partnership. Relying on that promise, OEP shared with De Jong extensive analyses of [OIG]'s business activity and invaluable proprietary, nonpublic information" (id., ¶ 37).

In September, defendant began secret efforts to augment its equity by falsely representing to plaintiff that, under the terms of defendant's confidentiality agreement with OIG, plaintiff and defendant had to be 50/50 partners for defendant to share information from the virtual data room with plaintiff. Plaintiff rejected the suggestion of an equal partnership. Plaintiff learned that defendant had misrepresented OIG's confidentiality agreement, which allowed information to be shared with plaintiff without a 50/50 partnership. Plaintiff became "wary of sharing" information with defendant and stopped sharing information and analysis, "for a time" (NYSCEF 20, ¶ 42).

Plaintiff gained admission to the sales process and obtained access to OIG's virtual data room. Defendant "struggled to understand both the opportunity and the mechanics of the business without [plaintiff]'s further assistance, causing the deal to stall" (NYSCEF 20, ¶ 44). Eventually, OIG's agent notified defendant that its participation in the sales process was terminated and requested that defendant delete all files downloaded from the virtual data room. "Instead of deleting the files, DJC

concocted a story in an attempt to utilize OEP's proprietary information to revive efforts to acquire the business" (id., ¶ 45). Defendant told the agent that it would be willing to complete the transaction if the escrow account could be assigned to defendant. As the escrow account was plaintiff's property, it could only be assigned to defendant if the parties were in a partnership.

Plaintiff expressed concern to defendant that the latter had made an unauthorized proposal about the escrow to OIG's agent. Defendant again assured plaintiff that it would not buy OIG without plaintiff and countersigned the parties' confidentiality agreement. The agreement is dated September 15.

In November, the sales process opened for nonbinding proposals to buy OIG and the parties drew up a nonbinding offer. Plaintiff's input included substantial proprietary information about OIG. On November 19, defendant submitted the nonbinding offer to OIG's agent on behalf of the partnership. Plaintiff also drafted a nonbinding offer and submitted the offer on behalf of the partnership. Defendant said to plaintiff that they had a verbal agreement to work as partners, and they worked together on finalizing a partnership agreement.

OIG's agent invited the parties to submit binding offers. In reliance on defendant's assertion that they were partners, plaintiff continued to share its extensive analysis of OIG to draft the binding offer.

On November 30, the deadline for submitting binding offers, shortly after 2 p.m., defendant sent plaintiff an outline of possible offers. Plaintiff expressed reservations and the parties agreed to talk later in the day. At 6:30 p.m., during an online meeting, defendant presented plaintiff an unauthorized bid structure with alternate proposals. One proposal reflected the deal that the parties had worked on together. The other proposal did not reflect the deal that the parties had worked on together and involved the possibility of a third-party investor. Defendant promised to call back shortly after reviewing the final draft of the partnership agreement sent by plaintiff. Defendant did not call back or answer plaintiff's messages.

November 30, at 9:19 p.m., defendant emailed plaintiff that defendant had submitted the unauthorized offer and that, if OIG accepted the offer, the partnership documentation would only need to be "tweaked." Plaintiff was "alarmed" by the change of plans and defendant's failure to respond to text messages the previous day. To protect its own interests, plaintiff submitted a binding offer the same night. This offer reflected the offer that the "partnership had worked on together." Plaintiff submitted this bid fully intending to honor its partnership with defendant if the offer were accepted. Later that night, defendant sent plaintiff the partnership agreement with some "minor edits."

On December 4, plaintiff called defendant and offered additional financial support for the purchase of OIG in the form of collateral security from a plaintiff affiliate in Peru. In mid-December, plaintiff asked defendant about any feedback from OIG, but defendant did not tell of any developments. In late

December, at OIG's agent's request, plaintiff submitted a revised binding offer fully intending to honor the partnership if it were accepted.

Although the partnership agreement was not signed, all material terms had already been negotiated and agreed to. Defendant expressly asserted that the parties had a "verbal deal," and stated in writing (before and after the submission of binding offers) that the parties had a 90/10 split. In January 2021, OIG announced that defendant had purchased it. Defendant revealed that it had found a new partner, who had put in the capital for the purchase. Defendant admitted that it had told plaintiff that it would not do the deal without plaintiff and that it used plaintiff's confidential information to bring the transaction with its new partner to fruition.

II. The Partnership Agreement

The parties never signed the partnership agreement that they drafted. The parties exchanged ten drafts of the "Collaboration and Interim Investors Agreement," the title for all the drafts. The parties' emails variously referred to the agreement as a partnership agreement or a JV agreement. "Partnership" and "joint venture" do not appear in any of the agreements.

It seems that the first version was drafted by De Jong who sent it to plaintiff on November 14. Each party made material amendments to the agreements. Plaintiff's attorney revised the last draft, which plaintiff sent to defendant on December 3 (NYSCEF 49). No more agreements were exchanged.

The agreements provide that the parties are contemplating the acquisition of OIG, and that they wish to agree on terms that will govern their relationship with respect to the sales process and BidCo, the name identifying a future limited liability company which defendant will form in Delaware and which will own OIG. OEP will own 90% of BidCo and DJC 10%. The agreements contemplate a future limited liability agreement governing BidCo. BidCo was never formed.

The parties' numerous email messages and draft agreements show that they disagreed on defendant's compensation, whether to add a third partner or a third investor who would not be a partner, and whether defendant could raise funds to buy OIG. At various times, each party's emails to the other referred to the necessity of signing or finalizing the agreement and whether OIG would allow them to purchase it as partners.

These are some examples of the parties' changes to the agreements. Defendant gave itself $2 million as compensation, which plaintiff reduced to $1.5 million. Defendant's November 19 email stated, "I am ok with the language . . . Do you want to sign first or me? I would appreciate it if you could give it one last consideration to increase the cap. DJC is bringing a unique 20 year skill set/track record . . . and clearly helping create the investment opportunity here" (NYSCEF 41). Plaintiff wrote back, "I am not prepared to go any higher on the cap . . . I am at least a little concerned about signing our agreement until we have

been authorized to partner up. If our partnership is not formally permitted, we may want to teak [sic] the agreement" (id.).

The agreement had provided that any excess remaining in the escrow after the purchase would be paid 50% to each party, up to a cap of $3 million to defendant. Plaintiff's November 30 email shows that its attorney eliminated this provision (NYSCEF 44).

The December 1 email by defendant shows that it deleted the provision that, before closing, BidCo shall not solicit additional equity capital for the transaction or dilute the ownership of BidCo unless by mutual agreement by the parties. Defendant added a provision that it "will be retained to raise additional funds for Bidco above those contemplated . . . necessary to consummate the Transaction. BidCo will pay Mr. de Jong a fee of 4% of the amounts raised within 3 months of the date hereof" (NYSCEF 47, ¶ 1 [i], [k]). To the provision that the parties would "cooperate in good faith to help ensure the success of the Transaction," defendant added that they would also contemplate alternative proposals (id., ¶ 3 [a]).

The December 3 email by plaintiff shows that its attorney added provisions that upon closing or earlier, as determined by plaintiff, plaintiff may allocate up to 5% of its equity to a local partner at its choosing; "contemporaneous therewith," BidCo and the parties will execute a limited liability agreement that reflects the addition of the new partner, whose share shall come from OEP's 90% (NYSCEF 49, ¶ 1 [g]); and if the seller did not accept the proposal or the closing did not occur, defendant would not be entitled to any compensation or equity under the agreement (id., ¶ 1 [k]). The provision that de Jong would be retained and would receive a 4% fee was deleted.

The last draft, sent by plaintiff on December 3 provides that, upon closing of the purchase of OIG, OEP shall be issued 90% interest and DJC shall be issued 10% "interest in consideration for its services conducted pursuant to this Agreement for the benefit of Bidco." $1.5 million shall be released to DJC as "compensation for its services conducted under this Agreement." BidCo will be a manager-managed limited liability company, and OEP will be designated as BidCo's initial "Managing Member." Bidco's day to day management shall be handled by a management team designated by the Managing Member. Brent Kallop will be the initial President and CEO of BidCo. DJC's voting rights will be proportionate to its 10% interest. Should DJC wish to sell its interest in Bidco, OEP will have a right of first refusal to purchase DJC's shares. "DJC shall have customary preemptive rights and tag-along sale rights, to be negotiated in good faith by DJC and OEP." In all other respects, the form of the LLC Agreement shall be determined by OEP in its sole good faith discretion (NYSCEF 49, ¶ 1 [g]).

Bidco or DJC may not make a proposal to OIG with respect to the transaction or discuss with it a proposal regarding a transaction on any terms other than the terms of the proposal or the terms of a nonconforming proposal that has been approved by OEP. Nonconforming proposals are those not conforming to the terms of the agreement. OEP reserves the right to grant a conditional approval for

BidCo and DJC to make a nonconforming proposal to OIG. OEP may withdraw or cancel the conditional approval at any time for any reason at its sole discretion. Should the sellers reject the proposal or refuse to close the transaction, plaintiff in its sole discretion may terminate this agreement (NYSCEF 49, ¶ ¶ 1 [a]-[i]). If the closing does not occur, BidCo and DJC will not be entitled to any compensation (id., ¶ 1 [i], [k]). DJC and De Jong shall not pursue or engage in any discussions or negotiations regarding any other transaction with the sellers or any party (id., ¶ 3 [b]).

Choice of law and choice of forum was set in Delaware, and the agreement includes disclaimer of reliance and merger clauses (NYSCEF 49, ¶ ¶ 4, 11, 12). The agreement provides: "This Agreement will become effective when all parties have signed it. The date this Agreement is signed by the last party to sign it (as indicated by the date associated with that party's signature) will be deemed the date of this agreement" (NYSCEF 49, ¶ 15). Signature blocks follow, with the names of Kallop, De Jong, and their respective companies.

While the agreement provides that if BidCo is not formed by the time that the final proposal is submitted to OIG, DJC may submit the proposal on behalf of BidCo, the proposals in the record were not made on behalf of BidCo or a partnership. Each party submitted proposals under its own name and on its own letterhead.

On November 19, defendant submitted a non-binding proposal. It states that "if permitted to partner with OEP, we believe that we can make a significant payment" on OIG's shareholder loans using OEP's escrow and "we would like to incorporate OEP into the Purchase Co for the Transaction" (NYSCEF 39). On November 30, plaintiff submitted a binding offer. "Either OEP, or an entity wholly owned and controlled by OEP, would be the Purchaser." A request was included that OIG permit the parties to partner (NYSCEF 43). Another binding offer on the same date makes the same request (NYSCEF 69).

III. Legal Standard

On a motion to dismiss pursuant to CPLR 3211 (a) (7), the court accepts as true the facts as alleged in the complaint, accords the plaintiff the benefit of every possible favorable inference, and determines only whether the facts as alleged manifest any cognizable legal theory (Sokoloff v Harriman Estates Dev. Corp., 96 NY2d 409, 414 [2001]; Richbell Info. Servs. v Jupiter Partners, 309 AD2d 288, 289 [1st Dept 2003]). Notwithstanding this broad standard, dismissal will eventuate if the complaint fails to allege facts that support an element of the claim or that do not allow for the right of recovery (Connaughton v Chipotle Mexican Grill, Inc., 29 NY3d 137, 142 [2017]).

Evidentiary material submitted by the defendant may serve to assess the viability of a complaint pursuant to CPLR 3211 (a) (7) (Basis Yield Alpha Fund (Master) v Goldman Sachs Group, Inc., 115 AD3d 128, 134 [1st Dept 2014]). Where extrinsic evidence shows that the complaint does not include a material allegation necessary to support the cause of action, dismissal will eventuate, even where the

claim is a "well-pleaded cognizable claim" (id.). Extrinsic evidence on a 3211 (a) (7) motion is used to determine whether the plaintiff has a cause of action, not whether it has stated one (id. at 135; Bishop v Maurer, 33 AD3d 497, 498 [1st Dept 2006], affd 9 NY3d 910 [2007]). "Whether a plaintiff can ultimately establish its allegations is not part of the calculus in determining a motion to dismiss" (EBC I, Inc. v Goldman, Sachs & Co., 5 NY3d 11, 19 [2005]).

A motion to dismiss based upon documentary evidence pursuant to CPLR 3211 (a) (1) should be granted only "where the documentary evidence utterly refutes plaintiff's factual allegations, conclusively establishing a defense as a matter of law" (Goshen v Mutual Life Ins. Co. of NY, 98 NY2d 314, 326 [2002] [internal citation and quotation marks omitted]).

Defendant claims that the parties' emails utterly refute the allegations in the complaint. While email communications between the parties can qualify as documentary evidence (Kaplan v Conway & Conway, 173 AD3d 452, 453 [1st Dept 2019]; Amsterdam Hospitality Group, LLC v Marshall-Alan Assocs., Inc., 120 AD3d 431, 432 [1st Dept 2014]), in this case, the emails do not utterly refute plaintiff's allegations.

IV. Breach of the Confidentiality Agreement

The first cause of action in the complaint alleges that defendant breached the parties' confidentiality agreement, entitled "Mutual Confidentiality Agreement," by sharing information with third parties. The agreement is governed by the laws of New York.

The agreement is dated September 15. The preamble provides that the parties are making confidential information available to each other in connection with the "Potential Transaction," defined as the acquisition of Peruvian oil and gas companies (NYSCEF 24, at 1). "Confidential Information" is information furnished by one party to the other party in connection with a "Potential Transaction" (id., ¶ 1). Each party agrees to use "Confidential Information" only to determine whether it wishes to enter a "Potential Transaction" with the other party, and not to disclose any "Confidential Information" to others.

"Unless and until a definitive agreement has been executed and delivered by both Parties, neither Party shall have any obligation to the other by virtue of this Agreement (including, without limitation, any obligation to consummate a Potential Transaction), except for those express obligations set forth herein" (NYSCEF 24, ¶ 6).

"Limitation on Damages. Each party waives to the fullest extent permitted by law, any right to consequential, special, punitive, exemplary, incidental, or indirect damages in any dispute in connection with this agreement" (NYSCEF 24, ¶ 13).

Defendant states that the cause of action for breach of the confidentiality agreement should be dismissed because the complaint provides none but conclusory statements about the information that

defendant allegedly shared with third parties. Paragraph 37 of the complaint alleges that plaintiff shared with defendant extensive analyses of OIG's business activity. Paragraph 102 alleges that plaintiff enjoyed a substantial competitive advantage over others in the industry by virtue of various trade secrets and confidential information that are not known or readily available to the general public. Paragraph 103 alleges that "[t]his information was gleaned over 15 years of owning and managing the multiple complex businesses of [OIG], navigating the Peruvian oil and gas sector and establishing a network of Peruvian contacts. [Plaintiff's] knowledge is impossible to otherwise acquire or duplicate."

Although nothing is revealed about the composition of the confidential information, the allegations are sufficient to sustain the cause of action. "Statements in a pleading shall be sufficiently particular to give the court and parties notice of the transactions, occurrences, or series of transactions or occurrences, intended to be proved and the material elements of each cause of action or defense" (CPLR 3013). At this stage of the litigation, the allegations give defendant sufficient notice about the information that it allegedly wrongly used.

Defendant further argues that the damages sought by plaintiff are not available under the limitation of damages provision of the confidentiality agreement, warranting dismissal of this claim. According to defendant, the complaint seeks damages based on a claim for "loss of a business opportunity," which is consequential damages barred by the agreement.

Contractual provisions that limit liability or damages are enforceable (Ambac Assur. Corp. v Countrywide Home Loans, Inc., 31 NY3d 569, 581 [2018]). Damages based on lost profits and loss of a business opportunity may be barred by a confidentiality agreement, however, general damages, also called direct damages, are not barred (Aetna Cas. & Sur. Co. v Kidder, Peabody & Co., 246 AD2d 202, 209 [1st Dept 1998]).[1]

Under certain circumstances, lost profits may qualify as general damages (Biotronik A.G. v Conor Medsystems Ireland, Ltd. 22 NY3d 799, 805 [2014]). This occurs when the non-breaching party bargained for lost profits and those are "the direct and immediate fruits of the contract" (id. at 806 [citation and internal quotation marks omitted]). Lost profits as a measure of general damages will be imposed on the defaulting party if these damages were within the contemplation of the parties at the time of contracting (id.; Kenford Co. v County of Erie, 73 NY2d 312, 319 [1989]).

Here, however, damages based on lost profits (or 'lost opportunity') are not available. Section 6 of the confidentiality agreement provides that the parties do not yet have a definitive agreement and that they have no "obligation to consummate a Potential Transaction," until there is a definitive agreement. This provision shows that the parties did not contemplate damages based on lost profits from the failure to acquire OIG at the time that they entered into the confidentiality agreement. The agreement acknowledges that the parties had no obligation to consummate the acquisition of OIG, so it cannot be

said that the parties contemplated or bargained for damages based upon lost profits, premised upon an acquisition the parties both agreed may not occur.

However, to the extent that the complaint sufficiently alleges injurious conduct, it also sufficiently implies damages stemming from the conduct. "There is no requirement that the measure of damages shall be correctly set forth in a complaint, the test being merely whether or not the complaint sets forth allegations from which damages can properly be inferred" (Daukas v Shearson, Hammill & Co., 26 AD2d 526, 526 [1st Dept 1966]). The complaint will not be dismissed because of insufficient pleading of damages.

V. Choice of Law

The second cause of action seeks a declaratory judgment that the parties entered a partnership, the third is for breach of the partnership agreement, and the fourth cause of action is for breach of the fiduciary duty that partners owe to each other.

Defendant bases its motion to dismiss on New York law. Plaintiff contends that Texas law applies. Plaintiff asserts that the parties formed a partnership in Texas, both parties are sited in Texas, and all communications and other events pertaining to this complaint occurred in Texas.

In light of the parties' different approaches, a choice of law analysis is required. The court must first assess whether there is an actual conflict between the laws of the jurisdictions concerning the issue at hand (TBA Global, LLC v Proscenium Events, LLC, 114 AD3d 571, 572 [1st Dept 2014]; TBA Global, LLC v Proscenium Events, LLC, 114 AD3d 571, 572 [1st Dept 2014]). An actual conflict exists where jurisdictions provide different substantive laws which could result in a "significant possible effect on the outcome of the trial" (Elmaliach v Bank of China, Ltd., 110 AD3d 192, 200 [1st Dept 2013] [internal quotation marks and citation omitted]).

In New York, an indispensable element of an agreement to form a partnership or joint venture is a promise to share in the profits and losses of the business (Matter of Steinbeck v Gerosa, 4 NY2d 302, 317 [1958]; Lebedev v Blavatnik, 193 AD3d 175, 185—86 [1st Dept 2021]; Slabakis v Schik, 164 AD3d 454, 455 [1st Dept 2018]). Shared losses are an "essential element" of a partnership agreement (Moses v Savedoff, 96 AD3d 466, 470 [1st Dept 2012]; Magnum Real Estate Servs., Inc. v 133-134-135 Assoc., LLC, 59 AD3d 362, 363 [1st Dept 2009] [joint venture]; Prince v O'Brien, 256 AD2d 208, 212 [1st Dept 1998]).

In Texas, "an agreement by the owners of a business to share losses is not necessary to create a partnership" (Texas Business Organizations Code [Tex Bus Orgs] § 152.052 [c]; Nguyen v Hoang, 507 SW3d 360, 374 [Tex App 2016]). In Texas, parties could form a partnership without agreeing to share losses, which is not the law in New York. This is a substantive conflict which could lead to different trial

outcomes in the jurisdictions. Given this conflict, the court must next determine which state's law applies.

New York employs the "center of gravity" or "grouping of contacts" approach to determine conflict of law questions in contract cases (Zurich Ins. Co. v Shearson Lehman Hutton, 84 NY2d 309, 317 [1994]). The Restatement lists five significant contacts in a contract case: the place of contracting, the place of negotiation of the contract, the place of performance, the location of the subject matter of the contract, and the domicile, residence, nationality, place of incorporation, and place of business of the parties (Restatement Second, Conflict of Laws § 188 [2]). Here, the oil company that is the subject of the alleged partnership is in Peru, but the other significant contacts occurred in Texas. As Texas has more contacts with this action than New York, Texas law will be applied.[2]

VI. Statute of Frauds Under Texas Law

Defendant argues that the New York statute of frauds bars any claim based on the partnership agreement. In Texas and New York, an agreement which cannot be performed within one year from the date of making the agreement, must be in writing (Gen Oblig Law § 5-701[a] [1]; Tex Bus & Com Code § 26.01 [b] [6]). Whether an agreement falls within the statute of frauds is a question of law (Beverick v Koch Power, Inc., 186 SW3d 145, 149 [Tex App 2005]).

A contract that could possibly be performed within a year, however improbable performance within one year may be, does not fall within the statute of frauds Beverick v Koch Power, Inc., 186 SW3d 145, 149 [Tex App 2005]; Cuidado Casero Home Health of El Paso, Inc. v Ayuda Home Health Care Servs., LLC, 404 SW3d 737, 752 [Tex App 2013][a non-compete agreement that specified that it applied during the course of employment and the twelve-month period thereafter was not within the statute of frauds, where the agreement did not state that it was not to be performed within a year after execution and "conceivably could have been accomplished within one year"]).

In the absence of a known date when performance will be completed, the statute of frauds does not apply if performance could conceivably be completed within one year of the agreement's making (Young v Ward, 917 SW2d 506, 509 [Tex App 1996]).

Defendant argues that the agreement could not be performed within one year from the making, due to the non-compete clause which barred any discussion or negotiation regarding any other transaction involving OIG. However, the partnership agreement does not limit the time for the parties' performance, and within one year, the parties could have presumably purchased OIG, and drawn up an agreement for BidCo. The statute of frauds does not apply to the partnership agreement.

VII. Partnership under Texas Law

Whether the allegations in the complaint sufficiently allege the existence of a partnership under Texas law will be determined under the principles of partnership formation and contract formation (see Rainier Southlake DST v Woodbury Strategic Partners Fund, LP, 2017 WL 6047725, *5, *7, 2017 Tex App LEXIS 11407, *14, *17 [Tex App]).

In Texas (as in New York), a joint venture is governed by the same rules as a partnership (Texas Dept. of Family & Protective Servs. v Atwood, 176 SW3d 522, 535 [Tex App 2004]: Heinrich v Wharton County Livestock, Inc., 557 SW2d 830, 833 [Tex App 1977]). "[A]n association of two or more persons to carry on a business for profit as owners creates a partnership, regardless of whether: (1) the persons intend to create a partnership; or (2) the association is called a 'partnership,' 'joint venture,' or other name" (Energy Transfer Partners, L.P. v Enterprise Prods. Partners, L.P., 593 SW3d 732, 737 [Tex Sup 2020], quoting Tex Bus Orgs § 152.051 [b]). A partnership relationship must be based on an agreement, express or implied (City of Corpus Christi v Bayfront Assocs., Ltd., 814 SW2d 98, 107 [Tex App 1991]). An oral agreement to form a partnership is recognized (Malone v Patel, 397 SW3d 658, 674 [Tex App 2012]).

Texas sets forth five factors that a court should review in determining whether a partnership exists: (1) receipt or right to receive a share of profits of the business; (2) expression of an intent to be partners in the business; (3) participation or right to participate in control of the business; (4) agreement to share or sharing either the losses or the liability of the business; and

(5) agreement to contribute or contributing money or property to the business (Tex Bus Orgs § 152.052 [a]; Houle v Casillas, 594 SW3d 524, 548 [Tex App 2019]).

Whether a partnership exists must be determined by examining the totality of the circumstances (Ingram v Deere, 288 SW3d 886, 903-04 [Tex Sup 2009]). Evidence of none of the factors will preclude the recognition of a partnership, and evidence of only one factor will also normally be insufficient to establish the existence of a partnership (id. at 904). Not all of these factors need be present for a partnership to exist and no one factor is dispositive (McDowell v McDowell, 143 SW3d 124, 129 [Tex App 2004]).

Profit sharing is one of the two "most important" factors in determining the existence of a partnership, along with control over the business (Stephens v Three Finger Black Shale Partnership, 580 SW3d 687, 713 [Tex App 2019]). To determine whether the parties expressed an intent to be in a partnership, the court may look to their writings and conduct (Westside Wrecker Serv. v Skafi, 361 SW3d 153, 168 [Tex App 2011]). Evidence of expressions of intent could include the parties' statements that they are partners or a signed partnership agreement or one party holding the other out as a partner (Westside, 361 SW3d at 168). This inquiry is "separate and apart from the other factors [evidencing partnership] and should only include evidence not specifically probative of the other factors" (id.).

Here, the parties allegedly told each other that they were partners, and their emails to each other refer to a partnership and the acquisition of OIG. Although the parties also repeatedly discussed signing or finalizing the agreement and never did so and disagreed on terms. With respect to profit sharing, the agreement's provision that defendant will be compensated for its services in the sales process does not show an agreement to share BidCo's profits. Plaintiff argues that as 10% owner of the partnership, defendant would have been automatically entitled to 10% of the profits. However, the agreement makes no provision for profit sharing.

A partnership relationship does not exist unless each party has a right to control and manage the enterprise along with the other party (Houle, 594 SW3d at 549). Control is the right to make executive decisions (id., citing Rojas v Duarte, 393 SW3d 837, 843 [Tex App 2012]). Indicia of control includes the right to write checks on the business account, control over and access to the records, and the receipt and management of assets and monies (Stephens, 580 SW3d at 712; Rojas, 393 SW3d at 843). The agreement gives sole control of BidCo to plaintiff, including the "sole discretion" to terminate the agreement and does not mention defendant's role. Plaintiff had final say over the bidding process and the decision to go forward if OIG accepted a bid.

Although an agreement to share losses is not a necessary element of a partnership, it is nonetheless indicative of one (Stephens, 580 SW3d at 712). Here, provision is made neither for sharing losses nor third-party liabilities, per Tex Bus Orgs § 152.052 (a) (4) (A) (B).

To create the required community of interest in an enterprise, each partner must contribute money, effects, labor, skill, or a combination of any of them, into the common trade, business, or profession (Nguyen, 507 SW3d at 375). Labor and time can be the equivalent of contributing money or property to the partnership (Houle, 594 SW3d at 551). In this case, defendant's labor consisted of negotiating with the sellers, signing a confidentiality agreement with them, and putting in proposals to buy OIG. The agreement does not state what if anything that defendant would have contributed to BidCo once it was formed and OIG was acquired. This element is not sufficiently alleged. In total, plaintiff has failed to sufficiently plead the factors that show the existence of a partnership.

Under contract formation principles, where the parties have agreed that no binding or enforceable obligations will be created unless certain conditions are met those conditions must be met for a partnership to exist (Energy, 593 SW3d at 741; Arnold v Caprielian, 437 SW2d 620, 625 [Tex App 1969]). Where parties agree that they are not partners until they sign a formal written agreement, no partnership exists until the signatures are made (Energy, 593 SW3d at 741; also Anubis Pictures, LLC v Selig, 2021 WL 805214, *13, 2021 Tex App LEXIS 1580, *40 [Tex App 2021]; Wright v Hernandez, 469 SW3d 744, 758 [Tex App 2015] [about contracts in general]).

As stated above, section 15 of the partnership agreement provides that it becomes effective when signed. In addition, section 6 of the confidentiality agreement states that the parties have no obligation to each other, apart from the obligations therein, until they have executed a definitive agreement. The agreement was never signed and did not become enforceable. The second, third, and fourth causes of action based on partnership are dismissed.

VIII. Fifth Cause of Action - misappropriation of trade secrets Sixth Cause of Action - unfair competition

The parties apply New York law to these claims, which are based on defendant's misappropriation of confidential information, described in the confidentiality agreement as information furnished by one party to the other party in connection with purchasing Peruvian oil companies. As defendant argues, these claims restate the claims for breach of the confidentiality agreement. The unfair competition and misappropriation claims are predicated on the same conduct prohibited by the parties' confidentiality contract. For that reason, they are dismissed (Saulsbury v Durfee, 201 AD3d 1318, 1323 [4th Dept 2022]; Linkable Networks, Inc. v Mastercard Inc., 184 AD3d 418, 418 [1st Dept 2020]).

IX. Choice of Law -Tort Law

The complaint alleges that defendant engaged in fraud, promissory estoppel, and negligent misrepresentation. When deciding conflict of law questions concerning tort law, New York uses "interest analysis" to determine which jurisdiction has the greater interest in having its law applied in the litigation (Elmaliach, 110 AD3d at 202). "The interest analysis addresses two inquiries: (1) what are the significant contacts and in which jurisdiction are they located; and (2) whether the purpose of the law [at issue] is to regulate conduct or allocate loss" (Padula v Lilarn Props. Corp., 84 NY2d 519, 521 [1994] [citation and internal quotation marks omitted]). The significant contacts are usually the parties' domiciles and the location of the tort (Elmaliach, 110 AD3d at 202). As already determined, Texas has more significant contacts to this litigation than New York. The alleged misconduct occurred in Texas and the parties are domiciled there.

Concerning the second part of interest analysis, conduct-regulating rules govern conduct in order to prevent injuries from occurring (Padula, 84 NY2d at 522). Loss-allocating rules are "those which prohibit, assign, or limit liability after the tort occurs" (id.; Schultz v. Boy Scouts of Am., 65 NY2d 189, 198 [1985]). If the conflicting laws are conduct-regulating, the law of the jurisdiction where the tort occurred will generally apply, because that is the jurisdiction with the greatest interest in regulating behavior within its borders (Padula, 84 NY2d at 522; Cooney v Osgood Mach., 81 NY2d 66, 72 [1993]).

Fraud and negligent misrepresentation are conduct regulating rules (Seipel v Jenkens & Gilchrist, P.C., 341 F Supp 2d 363, 377 [SD NY 2004]; HSA Residential Mtge. Servs. of Texas v Casuccio, 350 F Supp 2d 352, 364 [ED NY 2003]). The same applies to promissory estoppel, which concerns promises that subsequently result in injury to the person who relied on the promises. The rules by which damages can

be recovered on fraud claims are conduct regulating; the rules regulate which types of injuries must be shown to constitute a tort (AHW Inv. Partnership, MFS, Inc. v. Citigroup Inc., 661 Fed Appx 2, 4-5 [2d Cir 2016]).

X. Cause of Action Seven - Fraud

Cause of Action Eight - Promissory Estoppel

Cause of Action Nine - Negligent Misrepresentation

These claims allege that defendant repeatedly represented to plaintiff that they were partners seeking to buy OIG. Allegedly, defendant's representations were false and made to induce plaintiff to act in partnership with defendant instead of proceeding with a different partner and to disclose proprietary information about OIG that was necessary to craft a successful bid. "Based on information and belief," at the time that defendant made some of the representations, it had already begun working with outside investors to craft an alternative deal that would cut out OEP" (NYSCEF 20, ¶ 117).

Using New York law, defendant argues that the misrepresentation claims must be dismissed because plaintiff does not allege reasonable reliance and the damages sought by plaintiff, exemplary damages and benefit of the bargain, are not available as remedies for fraud. Moreover, plaintiff fails to plead unconscionable injury or inequality between the parties as required for promissory estoppel and a special relationship as required for negligent misrepresentation. Plaintiff contends that Texas law allows these claims to be maintained. As stated above, Texas law applies.

In New York, only out of pocket expenditures are recoverable on a fraud claim, and profits which would have been realized if there had been no fraud cannot be recovered (New York Wheel Owner LLC v Mammoet Holding B.V., 481 F Supp 3d 216 [SD NY 2020]; Connaughton v Chipotle Mexican Grill, Inc., 29 NY3d 137, 142-43 [2017]). Punitive or exemplary damages are recoverable in a fraud action where the defendant's conduct evinces a high degree of moral turpitude and demonstrates such wanton dishonesty as to imply a criminal indifference to civil obligations (Errant Gene Therapeutics, LLC v Sloan-Kettering Inst. for Cancer Research, 174 AD3d 473, 475-476 [1st Dept 2019]).

Texas recognizes two measures of direct damages for common-law fraud: out-of-pocket damages, measured by the difference between the value expended and the value received, and benefit-of-the-bargain damages, measured by the difference between the value as represented and the value received (Adam v Marcos, 620 SW3d 488, 508 [Tex App 2021]; Samson Lone Star Ltd. Partnership v Hooks, 497 SW3d 1, 19 [Tex App 2016]). Benefit of the bargain damages include profits that would have been made had performance occurred as promised (id.). Both kinds of damages are recoverable for fraudulent inducement, "but if a promise to perform is unenforceable, the benefit-of-the-bargain measure is not available because one can have no compensable expectancy from a bargain that is not binding"

(Anderson v Durant, 550 SW3d 605, 614 [Tex 2018]). As the partnership agreement is not binding, plaintiff may not recover lost profits. However, exemplary damages may be recoverable, as Texas allows plaintiffs to recover exemplary damages with respect to harm resulting from fraud and, unlike New York, does not require wanton conduct by defendants (Texas Civil Practice & Remedies Code § 41.003 [a]; Home Comfortable Supplies, Inc. v Cooper, 544 SW3d 899, 906 [Tex App 2018]).

A common-law fraud claim requires "a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury" (Zorrilla v Aypco Constr. II, LLC, 469 SW3d 143, 153 [Tex Sup 2015] [internal quotation marks and citation omitted]). The false representation in a fraud claim must concern a material fact rather than an opinion, judgment, probability, or expectation (Harding Co. v Sendero Resources, Inc., 365 SW3d 732, 747 [Tex App 2012]). However, a promise to perform an act in the future can also amount to fraud if made with the intention to deceive the other party and with no intention of performing the promised act (Spoljaric v Percival Tours, Inc., 708 SW2d 432, 434 [Tex Sup 1986]).

The complaint alleges that defendant made a false representation by repeatedly promising that it was or would be plaintiff's partner with no intention of being a partner. Relying on that misrepresentation, plaintiff acted in partnership with defendant instead of proceeding with a different partner. This states a claim for fraud.

Fraud, negligent misrepresentation, and promissory estoppel require that the misled party have actual and justifiable reliance on the misrepresentations (Grant Thornton LLP v Prospect High Income Fund, 314 SW3d 913, 923 [Tex Sup 2010]; Frost Crushed Stone Co. v Odell Geer Const. Co., 110 SW3d 41, 44 [Tex App 2002]). Justifiable reliance can be negated as a matter of law when there are "red flags" that signal reliance is unwarranted (Barrow-Shaver Resources Co. v Carrizo Oil & Gas, Inc., 590 SW3d 471, 501 [Tex Sup 2019]; Darnell v Rogers, 588 SW3d 295, 305 [Tex App 2019]).

In this case, there were red flags. The complaint states that, in September, defendant falsely told plaintiff that it could not share information from the virtual data room unless they were 50/50 partners (NYSCEF 20, ¶ 39). Also, defendant subsequently made a false statement about plaintiff's escrow account to OIG (id., ¶ ¶ 42, 50). Whether plaintiff was justified in continuing to rely on defendant after these alleged untruths and whether it actually relied are questions for summary judgment or trial.

In New York, a plaintiff has a claim for negligent misrepresentation when the parties have a special or privity-like relationship imposing a duty on the defendant to convey correct information to the plaintiff (J.A.O. Acquisition Corp. v. Stavitsky, 8 NY3d 144, 148 [2007]). The elements of negligent misrepresentation in Texas are:

"(1) defendant's representation to a plaintiff in the course of defendant's business or in a transaction in which the defendant had an interest; (2) defendant's providing false information for the guidance of others; (3) defendant's failure to exercise reasonable care or competence in obtaining or communicating information; (4) plaintiff's justifiable reliance on defendant's representation; and (5) defendant's negligent misrepresentation proximately causing the plaintiff's injury"

(Willis v Marshall, 401 SW3d 689, 698 [Tex App 2013]; Miller v LandAmerica Lawyers Title of El Paso, 362 SW3d 842, 845 [Tex App 2012]). "The theory of negligent misrepresentation allows plaintiffs who are not parties to a contract for professional services to recover from the contracting professionals" (Willis, 401 SW3d at 698; see International Bank of Com.-Oklahoma v Lane Gorman Trubitt, LLC, 2022 WL 3088577, *5, 2022 Tex App LEXIS 5504, *15 [Tex App 2022]). Here it is not alleged that defendant was in the business of contracting for professional services, or that advice given by defendant about buying OIG was amiss in any manner, or that defendant had a pecuniary interest in OIG, apart from a possible future interest if the parties' bids succeeded.

The false information supplied in a negligent misrepresentation case must be a misstatement of existing fact, not a promise of future conduct (Rhey v Redic, 408 SW3d 440, 452 [Tex App 2013]). A promise to do or to refrain from doing an act in the future ordinarily is not actionable as negligent misrepresentation because it does not concern an existing fact (Maddox v Vantage Energy, LLC, 361 SW3d 752, 760 [Tex App 2012]). Here it is alleged that defendant promised that the parties were or would be in a partnership. This is a promise to do an act in the future and of defendant's intentions, not a misrepresentation of fact. In New York, promissory estoppel is "reserved for that limited class of cases where the circumstances are such as to render it unconscionable to deny the promise upon which the plaintiff relied" (Matter of Hennel, 29 NY3d 487, 495 [2017] [internal quotation marks and citation omitted]). In Texas, the element of unconscionability is not required.

Although promissory estoppel is normally a defensive theory used to bar the application of the statute of frauds, it is available as an affirmative claim for relief to a promisee who relied to its detriment on an otherwise unenforceable promise (Blackstone Med., Inc. v Phoenix Surgicals, L.L.C., 470 SW3d 636, 654-655 [Tex App 2015]; Kenny v Porter, 604 SW2d 297, 303 [Tex Civ App 1980]). In this form, the party asserting promissory estoppel may recover not lost profits but the money expended in relying on the promise (Lamajak, Inc. v Frazin, 230 SW3d 786, 794 [Tex App 2007]).

To plead promissory estoppel, a plaintiff must allege: (1) a promise by the defendant; (2) foreseeability by the defendant that the plaintiff will rely on the promise; and (3) substantial reliance by the promisee to his or her detriment (id.). The complaint sufficiently alleges these elements.

XI. Conclusion

Accordingly, it is hereby

ORDERED that the motion to dismiss is granted to the extent that the second, third, fourth, fifth, sixth, and ninth causes of action are dismissed, and the motion is otherwise denied; and it is further

ORDERED that defendant shall answer the complaint within 30 days of the date of this decision.

DATE 05/24/2023

ROBERT R. REED, J.S.C.

FOOTNOTES

1.    Nominal damages are also available in breach of contract cases (Matter of Schleifer v Yellen, 158 AD3d 512, 513 [1st Dept 2018]).

2.    The choice of law analysis concerns only the substantive law of the relevant jurisdictions. Matters of procedure are governed by the law of the forum (Tanges v Heidelberg N. Am., 93 NY2d 48, 53-54 [1999]).

Robert R. Reed, J.

**Was this helpful?**  Yes 👍  No 👎



### Welcome to FindLaw's Cases & Codes

A free source of state and federal court opinions, state laws, and the United States Code. For more information about the legal concepts addressed by these cases and

statutes visit FindLaw's Learn About the Law.

**Go to Learn About the Law  >**

### LLC v. LLC (2023)

**Docket No:** Index No. 653659 /2021

**Decided:** May 24, 2023

**Court:** Supreme Court, New York County, New York.

## Need to find an attorney?

### Search our directory by legal issue

Enter information in one or both fields (Required)

**Legal issue**

**I need help near** (city, ZIP code or county)

Tarrytown, New York

**Find a lawyer  >**

# Exhibit 13

 Gmail

Khodayar Shahriyarmolki <k.shahriy@gmail.com>

## Request for Clarification and Formal Objection – EPB Purchase Agreement Termination

████████████████████                                                   Wed, Jul 16, 2025 at 1:20 PM
To: info@qenta.com

**16 July 2025**

Dear QENTA Team,
(*Please forward this message to your executive, legal, and compliance teams for review.*)

I am a former Euro Pacific Bank (EPB) customer who opted in to the migration of my account to QENTA, including my EPB precious metals holdings, and am writing in response to your 12 July 2025 status update announcing the termination of the purchase agreement.

Based on that update and recent information made publicly available by Peter Schiff, it appears QENTA now intends to return only the cash value of customer assets as of September 2022 – rather than the metals themselves or their current, appreciated value. If accurate, this would directly contradict the representations made to customers and raises serious concerns regarding QENTA's obligations and equitable treatment of customer assets.

QENTA's own communications to EPB customers made the following assurances:

- "...remaining customer assets will be held by Qenta subsidiaries but you will have full and ongoing access to your… precious metals holdings." *(Qenta Welcome Letter, Sept 8, 2022)*

- "Precious Metals Account holdings will be transferred to Qenta's management." *(Migration Update, Sept 30, 2022)*

- " ...Qenta **will honour your current portfolio** as it stands. Qenta **will convert migrated funds to gold** as our license requires us to do, however we will assume all the risk on this conversion and **your current exposure on migrated funds will remain the same** as before." *(Migration FAQ, Dec 16, 2022)*

- "Clients will have the ability to hold gold, and cash out their holdings at any time in USD." *(Migration & Liquidation Update, Mar 8, 2023)*

These statements clearly gave customers the expectation that metals exposure would be preserved – not arbitrarily severed from market performance or reduced to a historical valuation.

A core reason for many customers opting in – rather than liquidating our positions and "opting out" of the migration – was to retain exposure to precious metals and maintain those holdings in kind, including during the migration period itself. Whether QENTA received cash or metal from EPB at the point of receipt is ultimately immaterial, as you undertook to mirror and preserve those exposures and to act in a **custodial capacity** – not to convert customer-designated assets into proprietary gains. If QENTA retains appreciation while returning only the principal value, this raises potential issues of **unjust enrichment**, **breach of fiduciary responsibility**, and a violation of customers' **reasonable reliance** on your commitments.

I therefore do **not consent** to the proposed method of return and **expressly reserve all rights** in relation to the treatment of my assets.

Trust between QENTA and many former EPB customers has steadily eroded due to your conduct, including the absence of any status update since **October 2024**. This latest development further damages that trust, particularly in light of the discrepancy between your public message to customers (in which you expressed your intent to "return all liquidated assets to the Receiver *as they were originally received*") and your letter to the Receiver, which reportedly states assets will be returned "**at their receipt values as of their receipt date**." That shift in language arguably appears designed to obscure the financial implications from customers and avoid early objection.

Accordingly, I request the following:

1.  Confirmation of the quantity of metals (or equivalent cash) received on my behalf

2.  Clarification of how those assets are currently held (e.g., bullion, G-Coin, or cash)

3.  The current market value of those holdings

4.  A clear explanation of your intended method of return – and the legal basis for it

Please treat this message as a **formal objection** and provide a written response outlining QENTA's position. I expect QENTA to act in good faith and in line with the representations it made to customers during the migration process.

Sincerely,

Dr 

EPB USD Account Number: ▮▮▮▮▮ Account Reference: ▮▮▮▮
EPB registered email address: ▮▮▮▮▮▮▮



**Andrew Cobb**
New member

Yesterday at 15:22

#3,629

> **Pschiff said:** ⊕
>
> Qenta won't talk to me, only the Receiver. For now the Receiver wants the Opt. in customers to deal with Qenta on their own. I am trying to convince the receiver to change his mind, but that is also hard as he wont' speak to me. So I am working on other legal action on my own to force Qetna to return control of the bank's assets to the bank. But at least the silver is safe.

Thank you for your efforts Peter. Please keep us updated on your progress. If you need anything from Opt-in customers to support the action you are taking, please reach out. I'm sure most Opt-in customers would be willing to help!

I still think we need to lean hard on OCFI and the Receiver and convince them that leaving Opt-in assets with Qenta is a breach of their fiduciary responsibility to customers. Also, if your interpretation of the purchase agreement termination is correct, customer assets need to be returned to the bank. How can the Receiver justify his decision to abandon Opt-in customers...what kind of crack pot legal advice was he given? I'm going to draft an email to OCFI and the receiver this weekend asking them to reconsider their stance and take control of Opt-in assets.

🌐 Pypenator and Radko



**spartan7510**
Member Plus

Jul 15, 2025                                                                                          ⌁ #3,446

All EPB customers have been screwed over, either by way of Quenta now wanting to keep the OPT-IN customers metals and mutal funds gains, or by way of OPT-OUT where we had to liquidate our metals holdings on the promise the funds would be returned in 3 months. We could have purchased our metals back and had minimal to zero losses if the plan was actioned as we were promised. Now 3 years later, inflation kicking off, loss purchasing power on USD, we have all lost out.

I personally believe a class action lawsuite to recover losses + compensation against OCIF and TRUSTEE may be the only option now. How much longer must we wait on empty promises from such an incompetent TRUSTEE and corrupt OCIF? With TRUMP in power, who is anti-globalist, anti IRS ect, this may be our best shot during this period to get something back, in IMHO

🔵 Pypenator

---

**Pschiff**
Pro Member

Jul 15, 2025                                                                                          ⌁ #3,447

> danielboros said: ⊕
> That gain would have never been made if the gold was exchanged to USD

The gold gain is not gone. The gold is sitting in a brinks vault in Switzerland, exactly where Qenta transferred it. he Silver is still with Silver Bullion in Singapore. Brent just want to steal that gain for himself. He terminated the purchase. He now claims that allows him to sell the gold and silver now, send the bank back what the gold and silver were worth when it was transferred to Qenta in Sept. of 2022, and keep al the gain for himself.

> Vqn said: ⊕
> What a complete mess ! What would happen if the reciever denies these terms?

If Qenta refuses to return the assets it receives, and the receiver correctly rejects their offer to return gets 38K of the 80K they received, then the Purchase and Sale agreement requires arbitration in N.Y. City.

---

**Vqn**
Pro Member

Jul 15, 2025                                                                                          ⌁ #3,448

> Pschiff said: ⊕
> The gold gain is not gone. The gold is sitting in a brinks vault in Switzerland, exactly where Qenta transferred it. he Silver is still with Silver Bullion in Singapore. Brent just want to steal that gain for himself. He terminated the purchase. He now claims that allows him to sell the gold and silver now, send the bank back what the gold and silver were worth when it was transferred to Qenta in Sept. of 2022, and keep al the gain for himself.
>
> If Qenta refuses to return the assets it receives, and the receiver correctly rejects their offer to return gets 38K of the 80K they received, then the Purchase and Sale agreement requires arbitration in N.Y. City.

What a mess. As this is almost only the gains regarding gold and the mutual funds, could the reciever send back the customer funds that are already in USD cash or will everyone hsve to wait for this dispute to be resolved?

# Exhibit 14



**FREE Shipping & Insurance on U.S. orders over $10k. Flat $25 for orders below $10k** †

**1-888-GOLD-160** (465-3160)     Request a Callback    💬 Chat Now    ●    🛒 **View Cart · 0**

**≡SchiffGold**

☰ Menu

Gold · **3314.60** ▼ **-22.5**    Silver · **38.16** ▼ **-0.08**    Platinum · **1397.20** ▼ **-0.6**    Gold/Silver Ratio · **86.86** ▼ **-0.86**

# Contact Us

## Please fill out the form below to contact us, or use one of the options listed here:

💬 **Live Chat**

✉️ **Email:** info@schiffgold.com

📞 **Phone:** 1-888-465-3160

📄 **Callback Request Form**

**FREE Shipping on $10k+ orders – $25 below $10k†**

Platinum · **1397.20** ▾ **-0.6**    Gold/Silver Ratio · **86.86** ▾ **-0.86**    Gold · **3314.60** ▾ **-22.5**    Silver · **38.16** ▾

# Contact Us

☎ **1-888-GOLD-160** (465-3160)

≡    *Gold*    🛒 View Cart · 0    Menu

💬 **Live Chat**

✉ **Email:** info@schiffgold.com

📞 **Phone:** 1-888-465-3160

📄 **Callback Request Form**

**Contact**

First Name *

Last Name *

Email *

**Order Minimums in Effect: 2oz gold and/or 100oz silver** [More Info.](#)    ✕

Message *

**To prevent Spam Bots: What is 3 + 4 ? ***

Please select one

Submit

**SchiffGold**

222 Bloomingdale Rd Suite #107
White Plains, NY 10605

1-888-465-3160

1-212-481-0310

**Hours of Operation**

8 am to 9 pm - 7 days a week!

# SchiffGold

Available 8am to 9pm - 7 days a week!

Our Company

Our Services

**Order Minimums in Effect: 2oz gold and/or 100oz silver [More Info.](#)**

Exclusive Weekly Email Updates

## Peter Schiff's's Gold News

Subscribe Now

**Note:** Until October 1st, 2014, SchiffGold® was formerly known as Euro Pacific Precious Metals

© 2014 – 2025 · SchiffGold.com | All Rights Reserved

**Order Minimums in Effect: 2oz gold and/or 100oz silver More Info.**

# Exhibit 15



**Euro Pacific Bank**

## <u>Liquidation and Dissolution Plan for</u>
## <u>Euro Pacific Bank</u>

### *I. Introduction*

On June 30th, 2022, the Office of the Commissioner of Financial Institutions ("OCFI") issued a Complaint and Order to Cease and Desist and Order Appointing a Trustee against Euro Pacific Bank ("EPB") for lack of compliance with the renewal process; for lack of compliance with the minimum capital required under Article 2(g) of Act 273-2012 and lack of compliance with a Consent Order dated October 28, 2021. OCFI appointed Wigberto Lugo-Mender, Esq. as trustee ("Trustee").

On August 9, 2022, EPB and the OCFI entered a Consent Order for Liquidation and Dissolution of International Financial Entity ("Consent Order") (marked as Exhibit A) to dispose of the administrative proceedings initiated by OCFI against EPB. Section IV(2)(d) of the Order requires EPB to submit a Voluntary Liquidation Plan ("Plan") for OCFI's consideration within 15 days of the execution of the Order. In compliance with that provision of the Order, EPB hereby submits its Plan for an orderly liquidation of the bank. The following is EPB's plan to fully liquidate the bank, surrender its banking license and tax decree, and carry out the dissolution of the corporate entity that owns the bank in the most efficient and inexpensive way possible. All of this will be done in coordination with, and subject to the approval of, the Trustee and OCFI.

### *II. Preliminary Steps*

Immediately upon execution of this Plan, the Trustee will reach out to Novo Bank and Mizuho Bank, to notify them of the liquidation process, and secure their cooperation with the same. EBP has already reached out to FirstBank and secured its agreement to continue offering banking services to EPB for the duration of the liquidation process. With the added cooperation of Novo Bank and Mizuho Bank, these steps will follow.

The Consent Order dated August 9th, 2022 (hereinafter, "Effective Date"), is hereby incorporated, and marked as **Exhibit A** to this Plan in its entirety. EPB shall be obligated to fully comply with its terms. Pursuant to Section IV (3), the closing of operations, transfers and withdrawal of funds is subject the following:

(i)     This Voluntary Liquidation Plan shall become effective on the date of the approval of the Plan by the affirmative written consent of EPB, the Trustee, and OCFI.

(ii)    The Liquidation Period shall not exceed ninety (90) days from the Effective Date.





**Web**
info@europacbank.com
www.europacbank.com

**Phone**
+1-888-527-4041
+1-787-305-3663

**Address**
53 Palmeras St. 10th Floor
San Juan, 00901, Puerto Rico

(iii) EPB may only maintain its business operations for the sole purpose of completing the operating tasks geared to the effective and adequate implementation of this Liquidation Order, marshalling, winding up its business and affairs, and preserving the value of its assets.

(iv) At the date of the Effective Date, EPB shall provide the Trustee with a list of all accounts, including inactive accounts.

(v) Within five (5) business days of the Effective Date, EPB shall mail a notice to its Creditors, at their address shown on EPB's records, that EPB is undergoing Voluntary Liquidation and, thus, the deposits held at EPB will be transferred or paid accordingly.

(vi) This Voluntary Liquidation Plan shall provide that all deposit accounts held in EPB shall be transferred to an assuming institution that will make all monies available to clients immediately after the transfer, *provided, however*, that prior to a transfer of deposits to an assuming institution EPB shall provide adequate notice and a thirty-day window to Depositors that are Non-Related Parties to withdraw their deposits in cash.

(vii) EPB, as a corporate entity, shall be terminated within ten (10) business days after this Voluntary Liquidation Plan is terminated, by submitting all required documents to the Department of State.

(viii) The assuming institution to which EPB client accounts are transferred may resume banking operations in any foreign jurisdiction other than Puerto Rico, subject to strict compliance with all statutory and/or regulatory requirements governing their business operations in the corresponding jurisdiction.

(ix) At the execution of the last payment obligation, EPB business locations and international banking operations in Puerto Rico will be closed permanently and irrevocably.

## Liabilities and Payment to Creditors

During the Liquidation Period, the Trustee shall cause EPB to pay, discharge, or  otherwise provide for the payment or discharge of, all liabilities and obligations of EPB, pursuant to the steps listed in the Consent Order at Section IV(4)(A)-(B). EPB will provide written notice to all its Depositors and Creditors in accordance with Section IV(4)(A) and subsection (v) above. The notice shall state the procedure for withdrawing and/or transferring funds and the procedures after the allotted time for withdrawing and/or transferring funds has elapsed. The notice shall also include the Trustee's official email address to receive claims and inquiries.

### III.    *Additional Steps Towards Liquidation*

1) Creation and Funding of Cash Reserve Account

 

**Web**
info@europacbank.com
www.europacbank.com

**Phone**
+1-888-527-4041
+1-787-305-3663

**Address**
53 Palmeras St. 10th Floor
San Juan, 00901, Puerto Rico

Immediately upon the execution of this Voluntary Liquidation Plan, EPB will establish and fund a Cash Reserve Account with sufficient funds in cash or readily available funds to pay all deposits and the Trustee's reasonable administrative expenses. EPB understands that the Trustee shall certify whether the Cash Reserve Account satisfies the requirements set forth herein.

EPB will fund the Cash Reserve Account using the following monies:

- a) $500,000.00 that it will receive immediately upon the execution of this plan from Qenta, Inc. as described below;

- b) $200,000.00 that it will receive from OCFI after payment of fine;

- c) $400,000.00 that it will receive immediately from selling its proprietary position in the bank's mutual funds immediately upon the execution of this Voluntary Liquidation Plan; and

- d) $2,153,831.30 (as of 08/23/22) that it will receive immediately in cash from the bank's selling of its proprietary gold and precious metals immediately upon the execution of this Voluntary Liquidation Plan.

In total, EPB's Cash Reserve Account will have $3,253,831.30 in available reserve funds to cover all deposits and the Trustee's reasonable administrative expenses. EPB will establish this Cash Reserve Account in the same operating account it currently has at FirstBank immediately upon the execution of this Voluntary Liquidation Plan and will not be required to open a separate account.

2) Sale of Assets (Section IV (5))

EPB notes that the steps that will follow from the sale of the assets as specified herein will follow only as to the Depositor accounts that do not notify EPB within thirty (30) days of receiving EPB's notice under Section IV (4)(A) of the Consent Order that they wish to transfer their deposits to a financial institution of their choosing or cash out. Once EPB has covered all the deposits that wish to either withdraw and/or transfer their funds to a financial institution of their choosing, it will then transfer the remaining funds (for which no such notice is received from Depositor) to the assuming institution, as follows.

a. ___G-Commerce DMCC

G-Commerce DMCC, a wholly owned subsidiary of Qenta, Inc., has agreed to assume/buy all the bank's deposit obligations of both cash and precious metals. G-Commerce DMCC is incorporated under the laws of Dubai, UAE. It is licensed, regulated, and required to maintain global best practices for Know Your Customer ("KYC") and Anti Money Laundering ("AML") compliance. Once both cash and precious metals deposits are transferred to G-Commerce DMCC, EPB customers will have immediate access to their funds, and will be able to make and receive third-party payments in multiple currencies, including U.S. dollars, which they are not currently able to do at EBP. As such, the bank respectfully posits that this represents a big improvement for customers.[1]

b. Qenta, Inc.



| Web | Phone | Address |
|---|---|---|
| info@europacbank.com | +1-888-527-4041 | 53 Palmeras St. 10th Floor |
| www.europacbank.com | +1-787-305-3663 | San Juan, 00901, Puerto Rico |

Qenta, Inc. ("Qenta") incorporated under the laws of Delaware, has agreed to buy all issued and outstanding shares of the following wholly owned EPB subsidiaries that are all incorporated outside of Puerto Rico, including Euro Pacific Funds SCC Ltd., Euro Pacific Securities Inc., Euro Pacific Card Services Ltd., and Global Corporate Staffing, Ltd. Qenta has already received the required approvals from regulators in the British Virgin Islands for the transfer of control.[2] For the subsidiaries located in St. Vincent and the Grenadines, and the one located in the U.K., no government approval for the change of control is necessary.[3] Qenta has also agreed to assume the following contractional obligations of EPB: Neteller (e-money pay safe transfer service), HedgeGuard (portfolio management system), and Temenos (core banking system). In addition, Qenta will cover the $250,000.00 cost to renew the Temenos Contract at the end of September, if the transfer of accounts has not been completed by that date.

Once these agreements are executed, the money will be payable to EPB in two installments, $500,000.00 as soon as the plan is approved by OCIF and the Receiver, and $750,000.00 thirty (30) days following that approval. EPB has included this purchase offer as an Exhibit 3 to this liquidation plan for OCIF's review and consideration. The sale of EPB's assets to Qenta and G-Commerce DMCC assures that there will be enough funds available to pay off all the bank's

---

[1] As required by Section IV, Paragraph 4(A) and (B) of the liquidation order, before transferring any customer funds,

EPB will send out emails to all its customers giving them all pertinent information about G-Commerce DMCC and informing them that if they do not want their accounts transferred to this buyer, they have thirty (30) days to provide wiring instructions to an alternate bank or financial account with the same beneficial owner as their EPB account, and their funds will be wired to those accounts. Deposits that are not in U.S. dollar, or deposits in currencies the bank cannot transact in, will have to be converted to a currency which the bank can wire out. Any accounts that remain after the thirty (30) day period expires will be transferred to G-Commerce DMCC, along with appropriate bank records relating to those customers, as specified in the liquidation order.

[2] See Exhibit 1.

[3] See Exhibit 2.



Web
info@europacbank.com
www.europacbank.com

Phone
+1-888-527-4041
+1-787-305-3663

Address
53 Palmeras St. 10th Floor
San Juan, 00901, Puerto Rico

remaining obligations once bank operations are suspended. As of today, those obligations, not including the $300,000.00 fine owed to OCFI pursuant to Section IV (8) of the Order and the Deposits, amount to approximately $500,000.00.

3) Suspension of Banking Operations and Surrender of License and Tax Decree

EPB ceased operations on June 30th, 2022, and the Trustee took possession of the Corporation. The Corporation ceased conducting any business activity, except for the purposes of winding up its business and affairs, marshalling and preserving the value of its assets, and distributing the Corporation's assets in accordance with the provision of this Plan and through the appointed Trustee. Upon proper return or transfer of client funds in conformity with this Plan, and upon the successful transfer of EPB's subsidiaries, EPB shall deliver the original license to OCFI. Likewise, EPB shall coordinate with Department of Commercial Development to deliver its Tax Decree.

4) Assignment of Commercial Lease

Aside from Deposits and other Obligations, the sole remaining creditor will be EPB's landlord in San Juan, Puerto Rico. EPB has already advised the landlord to attempt to secure a new tenant to replace the bank and it is also engaged in efforts to secure a potential tenant. There are four months remaining on the lease. The total rent obligation is $115,000.00. If a replacement tenant cannot be found within the ninety (90) days allowed for liquidation, EPB will assign the lease to Mr. Peter Schiff's asset management company for its use, or sublease part or all the space to third parties. The office furniture, phones, computers, among other equipment will be sold, to whoever leases the office, or to retain it, if Mr. Schiff's company assumes the lease.

5) Preservation of Bank Records

After the customer records are transferred to G-Commerce and Qenta, G-Commerce and Qenta will become the custodians of the records as agreed upon in writing. Pursuant to Puerto Rico Corporate Law, EPB will keep and preserve accounting books and customer records (for those that are not transferred to G-Commerce and Qenta) at a secure location for at least three (3) years. Pursuant to Article 7.14 of Puerto Rico's General Corporations Act, EPB will maintain said records in or through any means of storage of information or method, so long as the files maintained can be converted into clearly legible paper within a reasonable time. EPB understands that it shall convert any record so maintained at the request of any person with the right to examine them, in accordance with the corresponding provisions of Puerto Rico law.




Web
info@europacbank.com
www.europacbank.com

Phone
+1-888-527-4041
+1-787-305-3663

Address
53 Palmeras St. 10th Floor
San Juan, 00901, Puerto Rico

6) <u>Remaining Assets</u>

EPB understands and recognizes that, pursuant to Section IV(4)(B)(6) no distribution of assets of EPB shall be made to the Shareholder, Mr. Peter Schiff, until all Deposits are either paid in cash or transferred to the assuming depository institution. Once all Deposits are covered, and upon execution of steps 1 through 4 of this Voluntary Liquidation Plan, the remaining assets of the EPB will be distributed to Mr. Schiff.

7) <u>Dissolution of Corporation</u>

The Corporation shall be terminated as reasonably practicable after all Depositors and Liabilities have been paid (i.e., the "Termination Date").

[SPACE LEFT BLANK]





Web
info@europacbank.com
www.europacbank.com

Phone
+1-888-527-4041
+1-787-305-3663

Address
53 Palmeras St. 10th Floor
San Juan, 00901, Puerto Rico



### *IV.* *Miscellaneous Provisions*

Taxes. The Corporation shall file a request for an administrative determination or ruling with the Department of the Treasury of Puerto Rico confirming that the liquidation of the Corporation is not subject to Puerto Rico taxation pursuant to the Act and the Puerto Rico General Corporation Law of 2009 (the "PRGCL"), the Internal Revenue Code for the New Puerto Rico, as amended (the "Code"), and the Corporation's Articles of Incorporation and By-Laws.

Indemnification. The Corporation and the Shareholder, joint and severally, shall continue to indemnify its officers, directors, employees, agents and the Trustee in accordance with its certificate of incorporation, bylaws, and contractual arrangements as therein or elsewhere provided, the Corporation's existing directors' and officers' liability insurance policy and applicable law, and such indemnification shall apply to acts or omissions of such persons in connection with the implementation of this Plan and the winding up of the affairs of the Corporation. The Shareholder is authorized to obtain and maintain insurance as may be necessary to cover the Corporation's indemnification obligations.

Further Assurances. EPB's Board shall take such further action, prior to, at, and after the final Liquidation Distribution, as may be necessary or desirable and proper based on the advice of the Administrator to consummate the transactions contemplated by this Plan.

Governing Law. This Plan shall be governed and construed in accordance with the laws of the Commonwealth of Puerto Rico.

Severability. Any provision of this Plan that is declared invalid or unenforceable by a court of competent jurisdiction shall be ineffective to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable the remaining provisions hereof. The headings or titles of the sections of this Plan are used for purposes of reference and they should not affect the construction, interpretation, validity and/or enforceability of this Plan.

Modifications and Headings. This Plan can only be modified with the express written consent of OCFI and the Corporation. The headings in this Plan are inserted for convenience only and are not intended to affect the meaning or interpretation of this Plan or its individual terms.

### [SIGNATURE PAGE IN NEXT PAGE]

Web
info@europacbank.com
www.europacbank.com

Phone
+1-888-527-4041
+1-787-305-3663

Address
53 Palmeras St. 10th Floor
San Juan, 00901, Puerto Rico

**IN WITNESS WHEREOF**, the Corporation and the Shareholder hereto have caused this Plan to be approved and executed by their duly authorized officers as September 1, 2022.

**Euro Pacific Bank**
The "Corporation"

By: _____

Name:   Peter Schiff
Title:   Director


**Peter Schiff**
The "Shareholder"

By: _____

Name:   Peter Schiff
Title:

Web
info@europacbank.com
www.europacbank.com

Phone
+1-888-527-4041
+1-787-305-3663

Address
53 Palmeras St. 10th Floor
San Juan, 00901, Puerto Rico

Accepted by:

TRUSTEE APPOINTED BY **THE OFFICE OF THE COMMISSIONER OF FINANCIAL INSTITUTIONS**

By: _____

Name: Wigberto Lugo Mender

Title:   Trustee

Dated:   9 | 6 | 2022

**OFFICE OF THE COMMISSIONER OF FINANCIAL INSTITUTIONS**

By: _____

Name: Natalia I. Zequeira Díaz

Title:   Commissioner

Dated:   9 / 6 / 2022

Web

info@europacbank.com

www.europacbank.com

Phone

+1-888-527-4041

+1-787-305-3663

Address

53 Palmeras St. 10th Floor

San Juan, 00901, Puerto Rico

Exhibit A
Consent Order

Exhibit B
Related Parties



Web
info@europacbank.com
www.europacbank.com

Phone
+1-888-527-4041
+1-787-305-3663

Address
53 Palmeras St. 10th Floor
San Juan, 00901, Puerto Rico

# Exhibit 16

## Activity in Case 3:24-cv-01511-CVR-MEL Schiff v. Internal Revenue Services et al Order on Motion for TRO

From:  prd_docketing@prd.uscourts.gov

To:    prd_docketing@prd.uscourts.gov

Date:  Friday, July 18, 2025 at 10:46 AM GMT-4

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### United States District Court

### District of Puerto Rico

## Notice of Electronic Filing

The following transaction was entered on 7/18/2025 at 10:45 AM AST and filed on 7/18/2025

**Case Name:**      Schiff v. Internal Revenue Services et al

**Case Number:**    3:24-cv-01511-CVR-MEL

**Filer:**

**Document Number:** 152(No document attached)

**Docket Text:**
**ORDER: denying Docket No. [151] Emergency Motion for Temporary Restraining Order and Preliminary Injunction. Plaintiff seeks to enjoin Quenta, Inc., from dissipating assets that it received under a now-terminated Purchase and Assumption Agreement. Plaintiff alleges these assets allegedly belong to the receivership estate of Euro Pacific International Bank and Quenta, Inc., has refused to return them. However, a review of the record shows that Quenta, Inc. is not a defendant in this case. As such, the Court lacks jurisdiction to entertain Plaintiffs motion for a temporary restraining order and preliminary injunction seeking to enjoin Quenta, Inc. Signed by Judge Camille L. Velez-Rive on July 18, 2025. (ASE)**

**3:24-cv-01511-CVR-MEL Notice has been electronically mailed to:**

Rafael Escalera-Rodriguez    escalera@reichardescalera.com, matos@reichardescalera.com

Wigberto Lugo-Mender    wlugo@lugomender.com

Beatriz T. Saiz    beatriz.t.saiz@usdoj.gov, eastern.taxcivil@usdoj.gov

Salvador J. Antonetti-Stutts    salvador.antonetti@oneillborges.com, docket_clerk@oneillborges.com, marta.koplik@oneillborges.com, sjantonetti@gmail.com, virginia.martinez@oneillborges.com

Roberto A. Camara-Fuertes    rcamara@ferraiuoli.com, camara.robert@gmail.com, edocketslit@ferraiuoli.com, rcamara@ecf.courtdrive.com, wgonzalez@ferraiuoli.com

Leslie Yvette Flores-Rodriguez     lfr@mcvpr.com

Heriberto Lopez-Guzman     hlopez@hlopezlaw.com, lrivera@hlopezlaw.com

Jan Carlos Bonilla-Silva     jbs@bonillasilvalaw.com, jancbonilla@gmail.com

Margarita L. Mercado-Echegaray     margarita.mercado@us.dlapiper.com, denise.gutierrez@us.dlapiper.com, ingrid.azize@us.dlapiper.com, margaritalmercado@gmail.com

Daniel Brown-Saenz     daniel.brown-saenz@us.dlapiper.com, dbrownsaenz@gmail.com, denise.gutierrez@us.dlapiper.com, ingrid.azize@us.dlapiper.com

Ismael Torres-Pizarro     ismaeltorres2002@yahoo.com

Suleicka Tulier-Vazquez     stulier@ferraiuoli.com, eDockets@ferraiuoli.com, stulier@ecf.courtdrive.com, suleicka@gmail.com, wgonzalez@ferraiuoli.com

Jorge A. Candelaria-Serrano     jorge.candelaria@oneillborges.com, abigail.torres@oneillborges.com, docket_clerk@oneillborges.com, jorge.candelaria@ecf.courtdrive.com

Victoria M. Rivera-Llorens     vrll@mcvpr.com

Maria Cristina Torres-Short     maria.torres@oneillborges.com, docket_clerk@oneillborges.com, luised.navarro@oneillborges.com

Alexander J. Yun     Alexander.Yun@usdoj.gov, eastern.taxcivil@usdoj.gov

William Todd Miller     tmiller@bakerandmiller.com, scolcock@bakerandmiller.com

**3:24-cv-01511-CVR-MEL Notice has been delivered by other means to:**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER – COMMERCIAL DIVISION

-------------------------------------------------------------------X

PETER SCHIFF,                                            Index No.: 67774/2025

          Petitioner,

    - against -

QENTA INC., RESPONSIBLE GOLD TRADING DMCC,
and G-Commerce DMCC

          Respondents.

-------------------------------------------------------------------X

SUPPLEMENTAL AFFIRMATION OF PETER SCHIFF IN SUPPORT
OF PETITION FOR TEMPORARY RESTRAINING ORDER

I, Peter Schiff, hereby affirm under penalties of perjury pursuant to CPLR § 2106 as
follows:

1. I am the Petitioner in the above-captioned matter.

2. This supplemental affirmation is submitted to provide my personal identifying
   information to complete the record in support of the Petition for a Temporary
   Restraining Order currently pending before this Court.

3. My residential address is:

   22 The Estates. Dorado, Puerto Rico 00646.

4. My business address for Schiff Gold, a precious metals and financial services
   company headquartered in White Plains, New York, is:

   222 Bloomingdale Road, White Plains, NY 10605.[1]

---

[1] Although this dispute involves Euro Pacific International Bank ("EPB"), of which I am sole
shareholder, my connection to New York through Schiff Gold establishes a significant business
presence in Westchester County, further supporting venue and jurisdiction in this Court.

5. I have previously affirmed that I am the sole shareholder of Euro Pacific International Bank ("EPB") and a party to the Purchase and Assumption Agreement relevant to this proceeding. This supplemental affirmation does not alter or amend those substantive facts but is submitted solely to provide my personal contact information for purposes of service and jurisdiction.

6. I respectfully submit this affirmation to ensure the Court's record is complete and accurate.

Dated: White Plains, New York
        August 1, 2025

                                        Respectfully submitted,

                                        Peter Schiff
                                        Petitioner

---

**AFFIRMATION OF TRUTH OF STATEMENT**
*[Pursuant to CPLR § 2106, amended 1/1/2024]*

I, PETER SCHIFF, plaintiff in this action, hereby affirm under penalties of perjury under the laws of the State of New York, this 1st day of August 2025, that the foregoing Verified Petition is true to my knowledge, information, and belief. I understand that this document may be filed in a court proceeding.

Peter Schiff

---

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER – COMMERCIAL DIVISION

--------------------------------------------------------------------X

PETER SCHIFF,                                                    Index No.: 67774/2025
                    Petitioner,

         - against -

QENTA INC., RESPONSIBLE GOLD TRADING DMCC,
and G-Commerce DMCC
                    Respondents.

--------------------------------------------------------------------X

AFFIRMATION OF PETER M. CHEMA IN SUPPORT OF PETITION
FOR TEMPORARY RESTRAINING ORDER

I, Peter M. Chema, Esq., an attorney duly admitted to practice before this Court, affirm under penalties of perjury pursuant to CPLR § 2106 as follows:

1.  I am counsel for Petitioner Peter Schiff in this matter.

2.  Based on my review of the Purchase and Assumption Agreement ("PAA") dated September 30, 2022, and other business records provided by my client, I affirm the following corporate details concerning the Respondents:

- Respondent Qenta Inc. is a Delaware corporation with its principal place of business at 777 Post Oak Blvd Suite 430, Houston, TX 77056.

- Respondent Responsible Gold Trading DMCC is a Dubai company with its principal office at OneJLT-06-48, One JLT, Plot No: DMCC-EZ1-1AB, Jumeirah Lakes Towers, Dubai, United Arab Emirates.

- Respondent G-Commerce DMCC is a wholly owned subsidiary of Qenta Inc., incorporated under the laws of Dubai, UAE, with offices at Jumeirah Lakes Towers, Dubai, United Arab Emirates.

3. I have no personal knowledge of the Respondents beyond the foregoing corporate details, which are derived from official documents and client records.

4. This affirmation is made to supplement the record in support of Petitioner's request for a Temporary Restraining Order.


Dated: August 1, 2025
White Plains, New York


Peter M. Chema, Esq.
Attorney for Petitioner
55 Park View Road, South
Pound Ridge, NY 10576
Tel: (914) 393-8492
pchema.law@gmail.com