**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **WIGBERTO LUGO-MENDER, as the duty appointed Trustee in the liquidation of EURO PACIFIC INTERNATIONAL BANK, INC.,** | |
| *Plaintiff*, | |
| v. | |
| **QENTA, INC.; PETER D. SCHIFF; BRENT DE JONG; ET AL.,** | **CIVIL NO.**: 25-1501 (PAD) |
| *Defendants.* | |
| **EURO PACIFIC FUNDS SCC LTD.; EURO PACIFIC SECURITIES, INC.; EURO PACIFIC CARD SERVICES LTD.; AND GLOBAL CORPORATE STAFFING LTD.** | |
| *Parties in Interest.* | |

## MOTION FOR SANCTIONS PURSUANT TO FED.R.CIV. P. 11

### I.      INTRODUCTION

This lawsuit is not just legally baseless, it is a flagrant abuse of judicial process, cloaked in the false legitimacy of regulatory oversight. The Trustee, a court-appointed fiduciary acting under the direct supervision of Puerto Rico's banking regulator, the Office of the Commissioner of Financial Institutions ("OCIF," based on its Spanish acronym), has weaponized his position to launch a defamatory and sanctionable attack against Defendant Peter D. Schiff. The egregious nature of this conduct cannot be overstated: the Trustee answers to the very agency tasked with safeguarding the integrity of the financial system, yet he has filed a Verified Complaint riddled with demonstrably false allegations, glaring omissions, and a reckless disregard for the truth. That OCIF, an institution entrusted with protecting depositors, has tacitly endorsed this litigation lends it an undeserved air of credibility that must be stripped away.

1

This is not a case of mistaken facts or good-faith error. The Trustee has been intimately involved in every step of EPB's liquidation, has received countless emails from Mr. Schiff offering assistance, and has witnessed firsthand Mr. Schiff's efforts to recover tens of millions in customer assets. Yet, instead of acting to prevent Defendants Qenta, Inc. ("Qenta") and Brent de Jong ("De Jong") from misappropriating over $30 million in customer assets, the Trustee has chosen to vilify the one individual who took legal action to protect EPB's depositors. The inclusion of Mr. Schiff in this lawsuit is not just unjustified, it is retaliatory, deceptive, and sanctionable under Rule 11.

This motion exposes how the Trustee falsely accused Mr. Schiff of conspiring with Qenta to defraud EPB's customers, despite lacking a single document, communication, or statement authored by Schiff to support that charge. The Trustee's deliberate omission of critical facts, including Mr. Schiff's legal action to recover $80 million in customer assets and his successful efforts to reclaim over $10 million in silver from Qenta, reveals an intentional attempt to mislead the Court. Similarly, legal theories advanced, under the Commodity Exchange Act and RICO, are not just weak; they are wholly unsupported by law and fact, failing even the most basic pleading standards.

Most troubling of all, this lawsuit was filed not to protect EPB's customers, but to retaliate against Mr. Schiff for his constitutionally protected advocacy and criticism of the Trustee's inaction. The Trustee's decision to include Mr. Schiff, despite knowing he played no role in any fraudulent scheme, is a transparent attempt to silence dissent and inflict reputational harm. That this conduct is being facilitated by OCIF, a governmental regulator entrusted with safeguarding the public interest, is a stunning breach of public trust. Rule 11 sanctions are not only warranted, but they are also essential to deter this abuse of process and restore integrity to these proceedings.

## II.  **FACTUAL AND PROCEDURAL BACKGROUND**

On January 28, 2016, Euro Pacific Intl. Bank, LTD. filed a petition with the OCIF to organize an International Financial Entity (IFE) under the name Euro Pacific Intl. Bank, LLC, as a subsidiary of the parent entity. (*See* Docket No. 1-2, pp. 1-12.) On February 25, 2016, OCIF issued a permit to Euro Pacific Intl. Bank, LLC to organize as an IFE, pursuant to the provisions of Law No. 273-2012. (*Id.*)

On December 14, 2016, Euro Pacific Intl. Bank, LLC notified OCIF that it would not commence operations as a subsidiary of Euro Pacific Intl. Bank, LTD. in the jurisdiction of St. Vincent and the Grenadines. The entity requested that the Permit be transferred entirely to Euro Pacific Intl. Bank, Inc. ("EPB") (*Id.*) On January 4, 2017, OCIF approved the transfer and granted the Permit to Euro Pacific Intl. Bank, Inc., under the same conditions and requirements as the original Permit. (*Id.*) Subsequently, on February 9, 2017, OCIF issued License No. IFE-33 to EPB, authorizing the commencement of operations as an IFE under Law No. 273-2012. (*Id.*)

On June 30, 2022, OCIF issued an Administrative Complaint and Order to Cease and Desist ("Querella y Orden de Cese y Desista," by its Spanish title) against EPB, whose sole shareholder was Peter D. Schiff. (*See Id.*, pp. 1-21.) On August 9, 2022, to avoid litigation on the Cease and Desist, OCIF and EPB entered into a Consent Order for Liquidation and Dissolution ("Consent Order"), under which EPB agreed to surrender its IFE license and voluntarily proceed with the liquidation of its operations. (*See Id.*, pp. 22-33.)

One of the prerequisites for proceeding with this voluntary liquidation was the appointment of Lugo-Mender as Trustee. OCIF appointed him to oversee the liquidation and granted him broad authority to act on behalf of the institution. The Trustee was mandated to, *inter alia*, immediately take possession of all assets, liabilities, books, records, documents, and files belonging to EPB. He

assumed the functions of the Board of Directors and was tasked with organizing the affairs of the institution to ensure the prompt completion of its dissolution and liquidation. (*See Id.*, pp. 18-20.) The Trustee was likewise authorized to act on behalf of EPB to dispose of, sell, and liquidate its assets, and to engage in any transactions necessary to complete the institution's dissolution and liquidation. This included obtaining all required approvals and authorizations from OCIF. (*See Id.*, p. 29.)

The Consent Order also required EPB to submit a Voluntary Liquidation Plan to OCIF within fifteen (15) days of executing the Liquidation Order. The plan had to be approved by both OCIF and the Trustee and align with the policy objectives of Act No. 273-2012, particularly ensuring the protection of client deposits. EPB was responsible for covering all costs associated with the liquidation. Notably, the plan would become effective **only upon written approval by the Trustee and OCIF**. (*See Id.*, p. 26.)[1]

Another integral part of EPB's liquidation was the execution of the Purchase and Assumption Agreement ("PAA"), dated September 30, 2022. Through the PAA, EPB agreed to sell and transfer specific assets and liabilities to Qenta and two of its subsidiaries, G-Commerce DMCC, and Responsible Gold Trading DMCC. (*See Id*., pp. 68-83.) The assets included cash and cash equivalents, precious metals, subsidiary shares, assumed contracts, IT equipment, and EPB's website domain. The liabilities assumed were those owed to "Eligible Customers," as defined in the agreement.

The liquidation process encountered significant delays, primarily due to complications involving EPB's correspondent bank, Novo Banco, in Portugal. As of November 2023, the Trustee

---

[1] The Trustee suggests the plan was "prepared by Schiff himself", without acknowledging that both he and OCIF extensively revised and ultimately authorized the plan. Yet another example of the Trustee's lack of candor.

acknowledged in a customer update that the release of funds held at correspondent banks remained a major obstacle.[2] He stated, "Any distributions to customers will commence once the Plan of Liquidation is filed by the undersigned with the Puerto Rico regulatory agency and approved by the Commissioner."

Further complicating matters, on July 11, 2025, Qenta formally notified the Trustee of its intention to terminate the PAA. In its letter, Qenta emphasized that the transaction never closed and confirmed that it had not assumed any liabilities or obligations of EPB. Qenta also stated that it would cease all activities related to EPB and requested that the Trustee take appropriate steps to protect EPB's assets and customers.

Qenta's attempt to return customer-owned gold at its 2022 valuation, approximately $20 million, is a central point of contention in this case. The Court may take judicial notice of the fact that, as of 2025, the same gold is worth nearly $50 million, meaning Qenta stands to retain a windfall of roughly $30 million if allowed to proceed under outdated valuations. This maneuver, which Qenta has framed as a good faith return of assets, is in fact an effort to capture the appreciation in value that rightfully belongs to EPB's customers. Similarly, Qenta previously attempted to retain customer-owned silver valued at $5 million in 2022, which has since appreciated to over $11 million, as well as retaining and liquidating over $10 million of mutual funds, while returning only about $6 million to customers, which was the value of those funds back in 2022.

In response to Qenta's outrageous proposal, Mr. Schiff filed an emergency motion in the U.S. District Court for the District of Puerto Rico seeking to prevent the dissipation of approximately $80 million in customer assets. Schiff alleged that Qenta had unlawfully retained

---

[2] *See*: https://epbprliquidation.com/november-15-2023-liquidation-process-update/

these assets after terminating the PAA and had attempted to claim half of EPB's precious metals through a "discount" scheme. He requested a freeze on the assets, a full accounting, and expedited discovery. Although the court denied the motion on procedural grounds—finding that Schiff lacked standing to seek relief against a non-party—the decision left open the possibility for the Trustee to pursue similar remedies. Undeterred, Schiff filed a Verified Petition for a Temporary Restraining Order ("TRO") and Preliminary Injunction in New York state court, where Judge Linda S. Jamieson granted the TRO, finding a likelihood of success on the merits. The case was later removed to federal court, where Judge Kevin Castel affirmed the TRO but ultimately vacated it, citing Schiff's lack of standing and noting that it was the Trustee who had standing to sue on behalf of EPB.[3]

Instead of efficiently stepping into Mr. Schiff's shoes and pursuing the return of customer funds in the proper forum, on September 16, 2025, the Trustee filed a Verified Complaint alleging that Mr. Schiff, along with Qenta and other defendants, engaged in a scheme to misappropriate approximately $50 million in customer assets from EPB during its liquidation. (*See* Docket No. 1.) The claims against Mr. Schiff include violations of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq.*, and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1964, asserting that he knowingly facilitated the transfer of assets under false pretenses. (*See Id.*)

More specifically, the complaint alleges that Mr. Schiff, as the sole shareholder of EPB, "lent credibility to Qenta's narrative and knowingly advanced a fraudulent scheme while disregarding his fiduciary duties to the bank's customers." Docket No. 1, p.3. The Trustee alleges that on September 1, 2022, EPB submitted a Voluntary Liquidation Plan prepared by Schiff, which

---

[3] Mr. Schiff's litigation against Qenta is extensively discussed in Mr. Schiff's response to the Trustee's request for injunctive relief. (*See* Docket No. 14, Section II(B).)

outlined the framework for winding down the bank's operations. (*Id.*, ¶15). A week later, on September 8, 2022, Schiff announced that Qenta would act as the acquiring entity, referencing a welcome letter signed by Qenta executives, and describing Qenta as the most efficient and transparent option to manage the liquidation process for the benefit of depositors. (*Id.*, ¶17). On September 30, 2022, Schiff, on behalf of EPB, executed the PAA between EPB and Qenta (¶22).

According to the complaint, between September 28 and November 9, 2022, Schiff and Qenta issued various written communications to EPB customers indicating that the migration of accounts and assets was underway. (*Id.*,¶28). These communications were disseminated through the EPB website, which the pleading states remained under the control of Schiff and/or Qenta (¶28). By December 5, 2022, Qenta publicly acknowledged that the transfers were incomplete, which the complaint characterizes as a reversal of prior updates jointly communicated by Qenta and Schiff. (*Id.*, ¶31). The pleading further contends that Schiff, in his capacity as EPB sole shareholder, facilitated Qenta's assumption of certain responsibilities. (*Id.*, ¶39). Finally, the complaint alleges that Schiff and/or Qenta retained control over certain customer information obtained through EPB subsidiaries, limiting access to that data by the Trustee, customers, and regulators, and thereby complicating the liquidation process overseen by OCIF. (*Id.*, ¶41).

This, in substance, is the full extent of the allegations leveled against Mr. Schiff, and they are not only facially deficient but, in several instances, demonstrably false. For example, the so-called "joint statements" allegedly issued between September and November 2022 are publicly accessible through the bank's website, of which the Court may take judicial notice[4]. None of these

---

[4] *See*: https://europacbank.com/support/bank-liquidation-update-20220902/

https://europacbank.com/support/bank-liquidation-update-20220902/

https://europacbank.com/support/bank-liquidation-update-20220916/

statements were authored by Mr. Schiff, nor did Mr. Schiff have any input into any of these statements. Rather, the plain language of these notices reflects they were issued by Euro Pacific International Bank and/or Qenta. More importantly, the Trustee is aware that Mr. Schiff did not have access to the Euro Pacific Bank website until July 30, 2025, after Qenta terminated the PAA. Mr. Schiff was able to recover control of the website from Qenta only after threatening a lawsuit to compel Qenta to return the bank's website to Schiff control, which was a requirement of the PAA. The fact that the notices authored by Mr. Schiff are signed in his name is proof positive of this fact.

The allegations that Mr. Schiff withheld information from the Trustee are demonstrably false. Under the Consent Order and Liquidation Plan, the Trustee had full control over all the bank's systems and records. Mr. Schiff retained copies of certain records that OCIF required him to keep in his personal possession for three years, in accordance with the Liquidation Plan. At all times, Mr. Schiff reasonably assumed the Trustee had complete access to the original records. It was only around the time Qenta terminated the agreement that Mr. Schiff learned the Trustee claimed to be missing records. Surprised by this, Mr. Schiff immediately emailed the Trustee, offering to share any customer information he had. Importantly, Mr. Schiff never had access to the bank's systems, even before the Trustee assumed control, as he was a shareholder and director, not

---

https://europacbank.com/support/bank-liquidation-update-20220928/

https://europacbank.com/support/bank-liquidation-update-20220930/

https://europacbank.com/support/bank-liquidation-update-20221008/

https://europacbank.com/support/bank-liquidation-update-20221017/

https://europacbank.com/support/bank-liquidation-update-20221021/

https://europacbank.com/support/migration-update-20221101/

https://europacbank.com/support/migration-liquidation-update_20221205/

an officer or employee. The records in his possession were static copies generated by bank staff under the Receiver's direction. Despite Mr. Schiff's outreach, the Trustee never responded to his email and instead filed this lawsuit, alleging, among other things, that Mr. Schiff had deprived him of essential bank information. Finally, and most importantly, the Trustee is fully aware that Mr. Schiff never conspired with Qenta or participated in any fraudulent scheme related to EPB. The inclusion of his name in this lawsuit is therefore sanctionable under Rule 11.

### III.    <u>RULE 11 STANDARD</u>

Rule 11(b) of the Federal Rules of Civil Procedure provides in pertinent part that "[b]y presenting to the court a pleading, written motion, or other paper —whether by signing, filing, submitting, or later advocating it— an attorney […] *certifies* that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances" that the filing "is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;" that "the claims, […] and other legal contentions are warranted by existing law;" and that  "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery[.]." Fed. R. Civ. P. 11(b)(1)-(b)(3). The rule requires litigants and their counsel "to conduct a reasonable inquiry into the facts and the law before signing" and filing a pleading with the Court and prohibits them from submitting any matter (1) that lacks evidentiary support; or (2) for an improper purpose. *Soler v. P.R. Tel. Co.*, 230 F. Supp. 2d 232, 237 (D.P.R. 2002); *Molina v. Casa La Roca, LLC*, 2022 U.S. Dist. LEXIS 2356, *6-7 (D.P.R. Jan. 3, 2022); *Cruz v. Savage*, 896 F.2d 626, 630 (1st Cir. 1990).

Sanctions may be imposed on any attorney, law firm, or party that is responsible for violations of this Rule.  Fed. R. Civ. P. 11(c)(1); *Alston v. Spigel*, 993 F.3d 27, 34 (1st Cir. 2021)

(sanctions may be imposed "for advocating a frivolous position, pursuing an unfounded claim, or filing a lawsuit for some improper purpose"); *Cruz*, 896 F.2d at 630 ("The purpose of Rule 11 is to deter dilatory and abusive tactics in litigation and to streamline the litigation process by lessening frivolous claims or defenses.").

Whether the attorney breaches his or her duty under Rule 11 to conduct a reasonable inquiry into the facts and the law "depends on the objective reasonableness of the litigant's conduct under the totality of the circumstances." *CQ Int'l Co., Inc. v. Rochem Int'l, Inc., USA*, 659 F.3d 53, 62 (1st Cir. 2011). In determining whether a party has failed to comply with Rule 11, the Court may examine a number of factors, including "the complexity of the subject matter, the party's familiarity with it, the time available for inquiry, and the ease (or difficulty) of access to the requisite information." *Id.* at 62-63. The reasonable inquiry standard is an objective one, and bad faith is not necessary for finding a violation. *Lockheed Shipbuilding Co. v. Ins. Co. of N.A.*, 1993 WL 358442 at ** 4-5 (D.R.I. April 2, 1993); *See also Lancellotti v. Fay*, 909 F.2d 15, 19 (1st Cir. 1990) (applying Rule 11's reasonable inquiry clause, the Court observed that "a pure heart no longer excuses an empty head"). Only a finding of culpable carelessness is required. *Cruz*, 896 F.2d at 634; *Lancellotti v. Fay*, 909 F.2d 15, 18-19 (1st Cir. 1990) (Rule 11 sanctions may be imposed due to groundless but "sincere" pleadings as well as for pleadings that, though not meritless, have been filed in bad faith); *CO International Co. v. Rochem International, Inc., USA*, 659 F.3d 53, 60 (1st Cir. 2011); *Montoyo-Rivera v. Pall Life Scis. PR, LLC*, 245 F. Supp. 3d 337, 347 (D.P.R. 2017).

A Rule 11 sanction "usually serves two main purposes: deterrence and compensation." *Navarro-Ayala v. Nunez*, 968 F.2d 1421, 1426 (1st Cir. 1992). "Encompassed within these objectives are several related subsidiary goals, e.g., punishing litigation abuse and facilitating case

management." *Id.* (citation omitted); *See also*, *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990) ("the central purpose of Rule 11 is to deter baseless filings"); *Cruz v. Savage*, 896 F.2d 626, 630 (1st Cir. 1990) ("The purpose of Rule 11 is to deter dilatory and abusive tactics in litigation and to streamline the litigation process by lessening frivolous claims or defenses").

The U.S. Supreme Court has noted that, under Rule 11(c)(4), District Courts may award attorneys' fees "directly resulting from" misrepresentations in pleadings. *Goodyear Tire & Rubber, Co. v. Haeger*, 137 S.Ct. 1178, 1186 n.5 (2017). "Ultimately, imposing sanctions under Rule 11 is committed to the sound discretion of the court." *Vrusho v. Creative Transp. Servs., Inc.*, 2013 WL 6909446, at *2 (D. Mass. Dec. 31, 2013).

A motion to sanction a litigant or his counsel for violating Rule 11 must be (1) made separately; (2) served to the opposing party prior to filing; and (3) filed only if the opposing party does not withdraw the challenged matter within 21 days after service. Fed. R. Civ. P. 11(c)(2).

## IV.  ARGUMENT

### A.  The Verified Complaint's allegations against Mr. Schiff are verifiably false.

Rule 11(b)(3) "forbids parties and their counsel from alleging factual contentions that lack evidentiary support." *Top Entm't Inc. v. Ortega*, 285 F.3d 115, 118 (1st Cir. 2002) (affirming imposition of sanctions for filing false allegations in a complaint); *Molina*, 2022 U.S. Dist. LEXIS 2356 at *9-11, *16-18 (awarding sanctions for filing motion based on false allegations). A party's legal counsel is obligated to evaluate the client's statements for accuracy. And if those contentions are facially implausible, as would be the case if they conflicted with prior sworn allegations and claims, the attorney must conduct a deeper investigation. *See*, *e.g.*, *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, No. 98 CIV 10175(JSM), 2002 WL 59434, at *1 (S.D.N.Y. Jan. 16,2002) (imposing sanctions on attorneys who "simply closed their eyes to the overwhelming evidence that statements

in [their] client's affidavit were not true"). At bottom, an attorney's "[b]lind reliance on the client is seldom a sufficient inquiry" under Rule 11. *Childs v. State Farm Mut. Auto Ins.*, 29 F.3d 1018 (5th Cir. 1994)); *see also Carona v. Falcon Services Co.*, 72 F. Supp. 2d 731, 732-33 (S.D. Tex. 1999) (rejecting claim that defendants committed "an honest mistake" when they submitted inconsistent affidavits by the same individual regarding defendant's own principal place of business).

Given the resulting proliferation of civil RICO claims and the potential for frivolous suits in search of treble damages, courts are instructed to place greater responsibility on the bar to inquire into the factual and legal bases of potential claims or defenses prior to bringing such suit or risk sanctions for failing to do so. *Chapman & Cole v. Itel Container Int'l B.V.,* 865 F.2d 676, 685 (5th Cir.) (Citation omitted). Rule 11's deterrence value is particularly important in the RICO context, as the commencement of a civil RICO action has "an almost inevitable stigmatizing effect" on those named as defendants. *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 660–61 (S.D.N.Y. 1996)(Citations omitted.)

The Trustee's Verified Complaint against Mr. Schiff is sanctionable under Federal Rule of Civil Procedure 11. The Complaint's central allegation, that Mr. Schiff conspired with Qenta to defraud EPB's customers, is not only facially implausible, but demonstrably false. What is worse, the Trustee and his counsel know it to be false and have proceeded with this lawsuit regardless of that fact.

The Trustee's Verified Complaint accuses Mr. Schiff of having "lent credibility to Qenta's narrative and knowingly advanced a fraudulent scheme" (Docket No. 1, p. 3), yet fails to cite a single document, communication, or statement authored by Mr. Schiff to support this serious allegation. This reflects the Trustee's deliberate intention to induce the Court to error.

The Trustee further alleges that EPB submitted a Voluntary Liquidation Plan on September 1, 2022, prepared by Mr. Schiff (*Id.*, ¶15). What the Complaint omits, however, is that this plan was not only submitted with the knowledge of the regulators—it was ultimately approved by both OCIF and the Trustee himself. (*See* Docket No. 1-2, p. 26.) That approval undermines any claim that the plan was part of a fraudulent scheme.

The Complaint also claims that between September 28 and November 9, 2022, Schiff and Qenta issued communications to EPB customers regarding the migration of accounts and assets. (Id., ¶28.) Yet the public record, namely EPB's own website, shows that all such updates were issued by EPB or Qenta, not Mr. Schiff personally. The Trustee's assertion that the website remained under Schiff's control during this period is demonstrably false, and the Trustee knows it is false. Qenta had full control of EPB's domain from September 30, 2022[5], until late July 2025, when Mr. Schiff regained access.

Finally, the Trustee alleges that Mr. Schiff and/or Qenta retained control over customer data, obstructing access by regulators and complicating the liquidation process. (Id., ¶41.) This claim is contradicted by the fact that the trustee was given complete control over all of the bank's systems and records on June 30, 2022, and by numerous emails in which Mr. Schiff explicitly offered to provide the Trustee with all information in his possession to assist in the liquidation. (*See* Exhibits 1, 2, and 3.) The only reason Mr. Schiff had copies of these records is that OCIF required that he keep them for three years, and the bank's staff, while under the Trustee' control, prepared the copies for Mr. Schiff pursuant to Schiff's request to comply with OCIF's requirement. Nothing prevented the Trustee from obtaining this information from the same source. The

---

[5] Control over the website passed on to Qenta upon execution of the PAA.

Trustee's failure to acknowledge these offers further illustrates the baseless nature of the allegations and supports the imposition of Rule 11 sanctions.

More egregiously, the Trustee's Verified Complaint omits the fact that Mr. Schiff filed suit against Qenta in New York state court seeking to enjoin the transfer or dissipation of approximately $80 million in EPB customer assets, including cash and precious metals.[6] This action by Mr. Schiff, taken after the Trustee ignored his pleas to join him in pursuit of Qenta,[7] plainly undermines the Trustee's entire theory of a conspiracy between Mr. Schiff and Qenta. The omission of these facts from the Verified Complaint is thus not accidental; it is a deliberate attempt to mislead the Court. Obviously, the fact that Mr. Schiff was the only party who took legal action to protect customer assets severely undercuts any theory that he was conspiring with Qenta. Thus, the Trustee deliberately omitted this fact from his complaint. The Trustee's failure to disclose this litigation, despite attaching hundreds of pages of exhibits to the Verified Complaint, underscores the deceptive nature of the pleading.

Likewise, the Trustee deliberately misled the Court by claiming he recovered over $10 million in customer-owned silver, despite knowing full well that it was Mr. Schiff who single-handedly secured the return of that silver from Qenta.[8] The Trustee made this false assertion because acknowledging the truth would unravel the central premise of his entire case. After all, it defies logic to suggest that Mr. Schiff was conspiring with Qenta to misappropriate customer assets while simultaneously going out of his way to recover $10 million worth of silver from Qenta's

---

[6] *See generally* Docket No. 14, Section II(B); *see also* Docket No. 14, Exhibits 1-3.

[7] *See* Exhibits 4 and 5.

[8] See Docket Nos. 14-4, 14-5, and 14-6.

control and restore it to the bank. His actions are fundamentally incompatible with the Trustee's theory of conspiracy.

The Trustee's conduct is especially troubling given his dual role as a court-appointed fiduciary and a licensed attorney acting under the direct supervision of OCIF. Since the inception of the liquidation, the Trustee has been intimately involved in every aspect of the process, including the filing of the Verified Complaint. It is inconceivable that such a complaint, laden with factual misrepresentations and omissions, was filed without the express or tacit approval of OCIF and its Commissioner. That approval, whether explicit or implied, lends the Complaint an undeserved air of legitimacy and regulatory endorsement. OCIF's oversight is not passive. They are a knowing participant in this sanctionable conduct.

The Trustee has received, and been copied on, numerous emails from Mr. Schiff offering to provide all information in his possession to assist with the liquidation. He has witnessed Mr. Schiff's persistent follow-ups urging him to expedite the process, pressure Qenta, and ultimately sue Qenta to recover customer funds, all actions which he has offered to finance personally. The Trustee has also been copied on direct email exchanges between Mr. Schiff and Qenta, where both parties openly accuse each other of contributing to the collapse of the liquidation, undermining any suggestion of collusion. (*See* Exhibits 6, 7, 8, and 9.) What is perhaps most egregious is the fact that, in an August 9, 2025 email, Mr. Schiff laid out a clear roadmap for a legitimate claim against Qenta, detailing how customer assets were misrepresented and withheld in violation of public promises. Rather than pursuing this claim, the Trustee co-opted Mr. Schiff's analysis and twisted it into a conspiracy theory, casting Mr. Schiff as a co-conspirator in the very fraud he sought to expose. (*See* Exhibit 10.)

This is not a case where the Trustee suspects fraud but lacks proof. On the contrary, the Trustee knows there is no fraud involving Mr. Schiff. He has been read into every material development since day one. After three years of liquidation proceedings, thousands of emails, hundreds of documents, and countless meetings, not a single piece of evidence supports the existence of a fraudulent conspiracy. The inclusion of Mr. Schiff in the Verified Complaint is not a mistake; it is the product of a deliberate decision to proceed with a false narrative without regard to the consequences these actions may have on Mr. Schiff. Rule 11 sanctions against the Trustee and his counsel are not only appropriate, but they are also necessary to deter this abuse of process and restore integrity to the proceedings.

### B.  The Verified Complaint's legal theory is utterly baseless.[9]

Arguments within a filing should be "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." Fed. R. Civ. P. 11(b)(2). Attorneys who violate Rule 11(b) may face sanctions after being given notice and a reasonable opportunity to respond. Fed. R. Civ. P. 11(c)(1); *See also Figueroa-Rodriguez v. Lopez-Rivera*, 878 F.2d 1488, 1491 (1st Cir. 1988) (citation omitted) (Rule 11 incentivizes attorneys to act "in a manner bespeaking reasonable professionalism and consistent with the orderly functioning of the judicial system.").Where there is no reasonable basis for counsel to believe his client's claims are supported by the existing law, the court should impose sanctions. *Jones v. Sullivan*, 779 F. Supp. 1033, 1037 (W.D. Mo. 1991)(Citations omitted).Moreover, a belief, no matter how sincere, that the law supports the signer's position is not sufficient to satisfy the requirements of Rule 11. *Collin County, Texas v. Homeowners Ass'n for Values Essential to Neighborhoods (HAVEN),* 654 F.Supp. 943, 954 (N.D.Tex.1987). Where a reasonable amount of

---

[9] Mr. Schiff incorporates his *Motion to Dismiss the Verified Complaint* by reference for purposes of this argument.

research would have revealed that there was no legal foundation for the position taken, Rule 11 sanctions are appropriate. *In re Faires,* 123 B.R. 397, 404 (Bankr. D. Colo. 1991); *See* also *D'Orange v. Feely*, 877 F. Supp. 152, 161 (S.D.N.Y. 1995)(...there is very little room for doubt that had Plaintiff's counsel conducted any remotely reasonable inquiry regarding the RICO "pattern" requirement as interpreted in the Second Circuit, this action would never have been filed against the Crudo Defendants in a federal court.")

The Verified Complaint filed by the Trustee against Mr. Schiff is devoid of any legal or factual foundation and fails to satisfy the basic requirements of Rule 11(b)(2). As outlined in the *Motion to Dismiss*, the claims under the Commodity Exchange Act ("CEA") are legally unsupported, as Mr. Schiff is not alleged to have engaged in any of the four narrowly defined transactional categories that give rise to a private right of action under the statute. The Trustee's attempt to apply the CEA to custodial transfers of physical commodities during a liquidation process is plainly outside the scope of the law.

The RICO claims are equally frivolous. The Trustee fails to plead the existence of a cognizable enterprise, a pattern of racketeering activity, or fraud with the particularity required under Rule 9(b). The allegations against Mr. Schiff are speculative, conclusory, and demonstrably false. The Trustee does not identify a single misrepresentation made by Mr. Schiff, nor does he allege any conduct that could plausibly constitute wire fraud or financial institution fraud. Instead, the complaint attempts to recast routine business communications and post-liquidation correspondence as criminal acts. Accordingly, counsel for the Trustee should be sanctioned pursuant to Rule 11(b)(2). *See Hartz v. Friedman*, 919 F.2d 469, 474–75 (7th Cir. 1990) (Holding sanctions were warranted where "it [did] appear that counsel neglected to make reasonable inquiry into the applicable law before filing.")

### C. Upon information and belief, the Verified Complaint was filed in retaliation for Mr. Schiff voicing his concerns about the stagnant liquidation of EPB.

Rule 11(b)(1) bars counsel from presenting any pleading with an "improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation[.]" Courts typically infer the purpose of a filing from the consequences of the pleading. *See Bay State Towing Co. v. Barge Am. 21*, 899 F.2d 129, 132 (1st Cir. 1990) (record supported district court's conclusion that frivolous opposition to summary judgment motion was filed to delay proceedings). For instance, courts have inferred an intent to harass where the claim is frivolous and the situation indicates the filing party has some motive to harass, such as retaliation. *See e.g. Chaudry v. Gallerizzo*, 174 F.3d 394, 410-11 (4th Cir. 1999) (sanctions upheld where trial court determined that plaintiffs brought claims against debt collectors based on evidence that no "rational person" would have believed supported their claim).

The purpose of this lawsuit is not to recover assets for EPB or its customers, something the Trustee could have accomplished through a straightforward, low-cost path. Instead, this action appears designed to vilify Mr. Schiff in the eyes of EPB's customers and the public, while casting the Trustee as a hero despite his own gross negligence, dereliction of duty, and breach of fiduciary responsibility.

The Trustee himself acknowledges in his reply to Mr. Schiff's response to the motion requesting injunctive relief how central Mr. Schiff's reputation is to his livelihood. Specifically, the Trustee remarked that Mr. Schiff's response "is directed primarily at what seems to be a public effort to manage and protect his personal reputation and public image, a concern especially acute given his status as a known financial commentator, media personality, and public figure whose personal brand are built upon public trust and perception." Docket No. 25, p. 1. By asserting knowingly false and inflammatory RICO allegations, the Trustee sought to inflict reputational

harm that would alarm the thousands of customers who have entrusted their assets to Euro Pacific Asset Management—Mr. Schiff's other company, which shares branding with Euro Pacific Bank. The Trustee's actions are not only legally indefensible, but they are also transparently self-serving and harmful to the very individuals he is duty-bound to protect.

Moreover, upon information and belief, Mr. Schiff's inclusion in this lawsuit also appears to be retaliatory. After his New York lawsuit was dismissed for lack of standing, Mr. Schiff persistently contacted the Trustee, OCIF, and their respective counsel, urging them to take action to protect tens of millions of dollars in customer assets. (*See* Exhibit 11, 12, and 13.) While his communications were passionate and frequent, they were also constitutionally protected expressions concerning matters of public and financial importance. Nevertheless, the Trustee's counsel blocked Mr. Schiff's email[10], and OCIF's counsel issued a cease-and-desist letter in response to his outreach[11]. These facts strongly suggest that Mr. Schiff was named in this action not because of any legitimate legal claim, but as retribution for his persistent advocacy against the Trustee.

These circumstances, coupled with the demonstrably false claims brought against Mr. Schiff, strongly suggest that this lawsuit was not filed for any legitimate purpose, but rather as a retaliatory measure intended to silence him and to harm Mr. Schiff's reputation. The fact that this conduct is being promoted and facilitated by OCIF, a governmental regulatory agency entrusted with protecting financial consumers, is particularly troubling and striking. Sanctions are appropriate to deter this misuse of judicial process and to uphold the integrity of the proceedings.

### D.  Mr. Schiff demands an order authorizing discovery and a hearing.

---

[10] *See* Exhibits 14 and 15.

[11] *See* Exhibit 16.

Although not the norm, hearings and discovery have been deemed appropriate where they aid the Court's evaluation of a motion for sanctions. *See Baker v. Alderman*, 158 F.3d 516, 525–526 (11th Cir. 1998) ("[A]lthough not mandated by Rule 11, [this court] considers it prudent for a district judge to hold a hearing before imposing sanctions."); *Sea Village Marina, LLC v. A 1980 Carlcraft Houseboat*, 2010 WL 338060, *6 (D.N.J. 2010)("There is insufficient information in the record upon which to determine whether a fraud has been perpetrated on the Court...The Court will therefore hold a hearing to determine whether Plaintiff or Plaintiff's counsel committed fraud on the Court, or violated any rules of procedure such as Fed. R. Civ. P. 11, and if so what response is appropriate."); and *Didie v. Howes*, 988 F.2d 1097, 1105 (11th Cir. 1993).

Mr. Schiff firmly believes that the Trustee and his counsel's conduct warrants sanctions under Rule 11(b)(2) and (b)(3). However, discovery and an evidentiary hearing are particularly necessary to aid the Court's responsible inquiry into whether the Verified Complaint was filed for an improper purpose, in violation of Rule 11(b)(1). As argued above, upon information and belief, Mr. Schiff's inclusion in this action was not based on any legitimate legal theory, but rather as retaliation for his constitutionally protected efforts to advocate for the protection of customer assets and for his well-deserved criticism of the Trustee and OCIF's inaction in light of Qenta's attempts to misappropriate customer-owned assets. Accordingly, the Court should permit discovery and hold a hearing to determine whether the Verified Complaint was filed in bad faith, and if so, impose appropriate sanctions to deter further abuse of the judicial process.

### E. The Bank's customers should not have to fund the Trustee's payment of sanctions.

Mr. Schiff respectfully requests that the Court ensure the estate of Euro Pacific Bank is not held responsible for any sanctions resulting from the Trustee's misconduct. Any such sanctions should be imposed personally on the Trustee, not passed on to the bank. EPB's customers have

already endured significant harm, and they should not be made to suffer further due to the Trustee's actions. Moreover, allowing the Trustee to shift the financial consequences of his misconduct onto innocent depositors would undermine the very purpose of sanctions—to punish improper behavior and deter its recurrence. Accountability must rest with the individual who committed the misconduct, not with the victims of it.

## V.    <u>CERTIFICATION OF COMPLIANCE WITH SAFE HARBOR PROVISION</u>

When sanctions are sought via motion, Rule 11 requires the party seeking sanctions to provide notice of the motion and of the offending conduct or pleading prior to filing. This "safe harbor" provision allows the opposing party and its counsel to "stop-and-think", and to "privately withdraw a questionable contention without fear that the withdrawal will be viewed by the court as an admission of a Rule 11 violation." *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 33, 39 (1st Cir. 2005) (citing Advisory Committee's Note to Fed.R.Civ.P. 11(b) and (c)).

In compliance with this so-called "safe harbor" provision, Mr. Schiff hereby certifies that, on October 15, 2025, he served a copy of this motion via email upon counsel for the Trustee, Eyck O. Lugo-Rivera.

**WHEREFORE**, Defendant Peter D. Schiff respectfully requests the Court impose sanctions upon the Trustee and his counsel, as requested above.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 6th day of November 2025.

**CERTIFICATE OF SERVICE**: It is hereby certified that, on this same date, the instant document was electronically filed with the Clerk of the Court using the CM/ECF system which will automatically send notice of such filing to all attorneys of record.

**DMR Law**
**Counsel for Defendant Peter D. Schiff**
Capital Center Building
239 Arterial Hostos Avenue Suite 1101
San Juan, PR 00918
Tel. 787-331-9970

*s/ Maria A. Dominguez*
Maria A. Dominguez
USDC-PR No. 210908
m.dominguez@dmrpr.com

*s/Javier F. Micheo-Marcial*
Javier F. Micheo Marcial
USDC-PR No. 305310
j.micheo@dmrpr.com